Justin S. Nematzadeh*
**NEMATZADEH PLLC**
101 Avenue of the Americas, Suite 909
New York, New York 10013
Telephone:    (646) 799-6729
jsn@nematlawyers.com
*Attorney for Plaintiffs and the Class*
*\*Pro hac vice application forthcoming*

John G. Balestriere*
Matthew W. Schmidt (State Bar No. 302776)**
**BALESTRIERE FARIELLO**
225 Broadway, 29th Floor
New York, New York 10007
Telephone:    (212) 374-5401
Facsimile:    (212) 208-2613
john.balestriere@balestrierefariello.com
matthew.schmidt@balestrierefariello.com
*Attorneys for Plaintiffs and the Class*
*\*Pro hac vice application forthcoming*
*\*\* Admission application forthcoming*

Mario Simonyan (State Bar No. 320226)
**ESQGo, PC**
303 North Glenoaks Boulevard, Suite 200
Burbank, California 91502
Telephone:  (424) 363-6233
mario@esqgo.com
*Attorney for Plaintiffs and the Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DREAM BIG MEDIA, INC., GETIFY SOLUTIONS, INC., and SPRINTER SUPPLIER LLC, Individually and on Behalf of all Others Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>ALPHABET INC. and GOOGLE LLC,<br><br>Defendants. | Case No.: 3:22-cv-2314<br><br>CLASS ACTION<br><br>COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, CLAYTON ACT, AND UNFAIR COMPETITION LAW<br><br>DEMAND FOR JURY TRIAL<br><br>4/13/2022 |

CLASS ACTION COMPLAINT

# **TABLE OF CONTENTS**

I. NATURE OF THE ACTION ................................................................................ 1

II. PARTIES ........................................................................................................ 7

IX. CLASS ACTION ALLEGATIONS ................................................................ 11

III. JURISDICTION AND VENUE ..................................................................... 13

IV. FACTUAL BACKGROUND .......................................................................... 14

V. INTERSTATE TRADE AND COMMERCE .................................................... 38

VI. ANTITRUST HARM ..................................................................................... 38

VII. PLAINTIFFS AND CLASS MEMBERS WERE INJURED AS A RESULT OF THE ALLEGED ANTICOMPETITIVE ACTIONS .......................................................... 42

X. CALIFORNIA LAW APPLIES TO THE ENTIRE CLASS ............................... 44

XI. TOLLING OF THE STATUTE OF LIMITATIONS ......................................... 45

XII. CAUSES OF ACTION .................................................................................. 47

XIII. PRAYER FOR RELIEF ................................................................................ 53

Plaintiffs Dream Big Media Inc., Getify Solutions, Inc., and Sprinter Supplier LLC ("Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' Class Action Complaint for Violations the U.S. Sherman Antitrust Act ("Sherman Act") and the Unfair Competition Law, against Defendants Alphabet Inc. and Google LLC ("Defendants"), allege the following:

## I. NATURE OF THE ACTION

1.      Alphabet Inc. and its subsidiaries and affiliated entities, including, without limitation, Google LLC (together, "Defendants" or "Google"), have for years engaged in anticompetitive conduct and other actions in violation of Sections 1 and 2 of the Sherman Act 15 U.S.C. §§ 1, 2, *et seq.* ("Section 1" and "Section 2," respectively), and the Unfair Competition Law. Leveraging its enormous market power, and at times monopoly power, across a range of internet products, Google has forced users of its digital-mapping products—services that have become ubiquitous through rapid and competitively close acquisitions—into a bundle of services. Then, once locked in, Google ratchets up the cost on its maps products.

2.      Plaintiffs and Class Members are those who have been harmed by Google improperly tying its mapping products together to restrain competition. Plaintiffs and Class Members also seek injunctive and declaratory relief to stop the alleged anticompetitive conduct.

3.      Central to Google's anticompetitive scheme alleged here are Google Maps' application programming interfaces, known as "APIs." An API is a method for one computer program to make use of, or "call," the resources of another program or service.

4.      For instance, a programmer developing a food-delivery application or website that needs to guide drivers to customers through its application ("app") or website may call on a Google Maps Embed API ("Maps APIs") for creating a digital dynamic map, call on a Google Routes Directions API ("Routes APIs") for adding directions on that dynamic map and provide

navigation information to the driver, and then call on a Google Places Place Details API ("Places APIs") for adding information about the restaurant. These are different products in different markets that can be used to create a digital map on an application or website. Indeed, Google itself recognizes that these are different products, as its pricing menu lists out APIs in different product offering groups, including, without limitation, Maps APIs, Routes APIs, and Places APIs.

5.      Google's impermissible use of its market power harms not only computer programmers. Websites also use digital-mapping API calls in order to display location information on their websites, something especially important to small businesses looking to attract customers. Embedding digital-mapping APIs into a website allows customers to both locate the business without opening a separate app or web page, and to be sure that they are seeing the correct business. These are all crucial details when a customer is considering whether to patronize a small business, where even small friction can mean loss of a sale.

6.      Not anyone can call a Google digital-mapping API. Access to a Google mapping API requires an API "key", which is a unique identifier that Google provides. API keys are tracked to a user's account, and Google charges for the account holder for API calls made using their key.

7.      Google's pricing varies, but, for example, it currently charges $2 for 1,000 calls to its Maps Static API (used to display a single map image on a web page); $2 for 1,000 calls to its Maps JavaScript API (used to display an interactive map that a user can move around and manipulate); $5 for 1,000 calls on its Routes Directions API (used to receive directions for different transportation modes); and $17 for 1,000 calls for Places Place Details API (used to request details about an establishment or point of interest).

8.      While these costs are small on their own, they add up quickly and are often beyond

the control of the purchaser of the API keys. The costs depend on how often a user access or reloads a website. As such, an anxious user who compulsively checks map information may quickly rack up many calls over a short period of time.

9.      Google has monopoly power—or at the least overwhelming market power—in the relevant product markets for digital-mapping APIs. According to a recent report by the U.S. House Committee on the Judiciary, Subcommittee on Antitrust, Commercial and Administrative Law ("House Antitrust Subcommittee") that was released around October 6, 2020, entitled "Investigation of Competition in Digital Markets-Majority Staff Report and Recommendations" ("House Antitrust Proposals"), Google's market share exceeds 80% in these markets.

10.      Moreover, Google exercises direct market power over the relevant product markets through the anticompetitive practices alleged herein. In essence, Google uses its market dominance to improperly tie together its products and lock users into what is sometimes called the Google ecosystem. There are competitors, but they have nowhere near the direct market power that Google exerts, nor nowhere near the monopoly power that Google has. Those competitors offer Maps APIs, Routes APIs, or Places APIs, mostly at significantly reduced prices to Google—and some even for free—and with comparable data and quality, if not better. But over the past several years, these competitors have been strangled out of competing effectively in the relevant product markets because of Google's anticompetitive conduct alleged herein.

11.      Direct victims of these alleged anticompetitive schemes are the class members identified herein: those who have purchased Maps APIs, Routes APIs, or Places APIs, or had their free credits provided by Google (the "free-tier credits") used up more rapidly because of Maps APIs, Routes APIs, or Places APIs.

12.      Google's terms of service prohibit users from using *any* Google Maps API or

component with *any* API or component of any *other* digital-mapping provider or service, which constitute separate and distinct products. Google goes so far as to prohibit display of non-Google digital maps near their own maps on an application or web page.

13. Further, the type of data tied together are not simply maps themselves, but what Google considers to be related data, including, without limitation, business and other location listings, which Google calls "Places." Google Places functions like a modern phone book, review website, and more, pulling together not just the address of a business, but also its operating hours, menus, user reviews, and other information. In addition to the terms in Google's terms of service, Google has been aggressively enforcing these provisions and effectively forcing users to choose whether they will use all of Google's digital-mapping APIs or none of them, all to the inclusion of competitors digital-mapping APIs.

14. A particular example (without limitation) of the anti-competitive nature of the tying alleged herein is that even if a Class Member requests a specific JavaScript-related Google Maps API, Google unilaterally will add on unnecessary, non-responsive other digital-mapping APIs, such as Places APIs, to that request and charge the Class Member for those additional APIs.

15. Another particular example (without limitation) is that prior to anticompetitive changes to Google's terms of services related to its digital-mapping APIs, certain JavaScript or Software Development Kits ("SDK tools")—not technically APIs—were provided as complimentary with other API calls because those JavaScript or SDK tools were necessary to make the actual APIs accurately overlay information as an image on a digital map. Those tools were not technically APIs. But after changes, Google recategorized those JavaScript or SDK tools as APIs, made them compulsory to other purchased APIs, and charged Class Members for them.

16.    Another example (without limitation) is that even if a Class Member wanted to overlay data that it has acquired through its own app or website—for example, Places API data concerning information learned from its own users, such as comments on a particular restaurant dish—on top of a digital-map that has used any Google APIs, Maps APIs, Routes APIs, or Places APIs, the Class Member cannot because even the Class Member's own data would be considered to violate the terms of service if it is overlaid on top of a digital map that used any Google digital-mapping APIs.

17.    The graphic below displays the Google Places API in practice—while this restaurant review has little relation to traditional mapping, Google ties this Places API service together with basic mapping functions.



18.     This unlawful tying and monopolistic behavior has resulted in concrete damages to app and website developers and all other direct users (or those who used them through a pass-through entity or website that passed all of the costs to them) of Google's digital-mapping APIs, in part through anticompetitive price hikes, forcing users to purchase separate Google products.

19.     For years, Google offered a free tier of the digital-mapping APIs, incentivizing developers or users to build their apps or websites with Google Maps. And during these years, Google has been acquiring potential competitors, such as Waze, to get to its monopoly power—or, at the least, market power.

20.     Overwhelmingly however, around May 2018 and continuing thereafter, Google Maps introduced a single "pay-as-you-go" pricing plan for the core mapping APIs. This shift reduced the number of free maps API calls that a firm could make from 25,000 per day to around 930 per day. Developers told the House Antitrust Subcommittee that the change amounted to a price increase of 1,400%. One market participant told the House Antitrust Subcommittee that Google instituted this price hike after "gaining dominance." Since becoming a Google Maps customer, the market participant's costs "have increased over 20x" and "there are no viable alternatives." To present, the staggering price increases to the APIs and also lowering of the free-tier credits continues to damage the class members.

21.     Even other large companies are beholden to the Google Defendants. For example, the House Antitrust Subcommittee reported that the ride-sharing company Lyft has cited its use of Google Maps as a potential risk to its business model. Lyft stated in a securities filing that "[s]ome of our competitors or technology partners may take actions which disrupt the interoperability of our platform with their own products or services."

22.     Under *per se* liability, whether the purported pro-competitive effects outweigh the anti-competitive effects is irrelevant. The allegations herein present *per se* liability.

23.     In the alternative, Defendants' potential defenses of pro-competitive explanation of avoiding "quality issues and/or brand confusion" are not justified. Even with an ever-increasing stranglehold over Maps APIs, Routes APIs, and Places APIs, Google with its strict control has recklessly or intentionally done a poor job of maintaining quality and accurate business-mapping features.

24.     Defendants' pricing for Google Maps APIs, Routes APIs, and Places APIs are notoriously known to be materially more expensive than competitors' pricing. Many competitors, indeed, offer such APIs for free.

25.     Further Google does not offer a full suite of APIs in all of its Maps APIs, Routes APIs, and Places APIs. There are bodies of API information within these relevant product groups that Google does not offer, that competitors may have, but that Class Members cannot access because of Google's anticompetitive conduct alleged herein.

26.     This class action is not about punishing an innovative company that is reaping the rewards of its well-deserved success through large size and power. Instead, this class action is about seeking redress from and stopping a massive company which had the means to acquire several other companies to gain size and create entry barriers, and then used its tying and monopolistic maintenance and exclusionary actions in certain relevant products and services to stifle competition. The result foreclosed users from using sought-after products and services offered by competitors in other relevant products and services.

## II. PARTIES

### Dream Big Media, Inc.

27.     Plaintiff Dream Big Media, Inc. ("Dream Big Media") is a California corporation with a principal place of business in California.

28.     Dream Big Media is a digital-advertising business that has used and paid for

Google's digital-mapping APIs.

29.     For example, it used Google Maps Route APIs to determine the distance between two zip codes. These fees also quickly added up. For example, in November 2019 and December 2019 alone, Dream Big Media incurred $1,371.44 on Google Maps' "Distance Matrix API" alone. Distance Matrix API is a Routes product that provides the travel distance between two points.

30.     Due to the anticompetitive conduct alleged herein, Dream Big Media could not use competing providers' digital-mapping APIs nor mix and combine Google's digital-mapping APIs with competitors' digital-mapping APIs.

31.     Dream Big Media was forced to use the other products or services that Google had made subject to the tying and other anti-competitive conduct alleged herein.

**Getify Solutions, Inc.**

32.     Plaintiff Getify Solutions, Inc. ("Getify Solutions") is a Texas corporation with a principal place of business in Texas.

33.     In 2018, Getify Solutions developed a mobile web app called "RestaurNote" that allowed users to make notations about experiences that related to their physical location, among other uses. For instance, if you had a memorable meal at a restaurant and wanted to order it again—or ordered poorly and wanted to avoid the error next time—you could make a note for the next time you went to that restaurant.

34.     A mobile web app is intended for use on mobile devices (such as phones or tablets) and is built using web technologies (as opposed to native mobile apps that are built for Android or iOS).

35.     RestaurNote utilizes Google's web-based digital-mapping APIs in order to allow users to find their location on a map—a crucial feature of an app tied to physical location—and

for other uses.

36.     RestaurNote is intended to be a free app, and Google Maps' original pricing structure provided for this—Maps provided sufficient free credits that even moderately sized businesses could expect to rarely exceed the credit allowance.

37.     However, in the summer of 2018, Google announced a major change in its pricing structure, which significantly impacted the amount that an app like RestaurNote would pay. Given that RestaurNote was intended to be a free app, this made the program unworkable, and Getify Solutions indefinitely paused its development once the app was stable and usable, with limited access given to friends and family to keep fees from Google under control. This was despite the fact that Getify Solutions ran through substantial amounts of the credits offered by Google in order to induce it to use the APIs, and Getify Solutions expended significant time, effort, and costs to have developed the app to launch.

38.     Due to the anticompetitive conduct alleged herein, Getify Solutions could not use Google's digital-mapping APIs alongside any other APIs from any other provider besides Google if any of that data would interact with Google's digital-mapping capabilities. And Getify Solutions was forced to either exclusively use products and services provided by Google, pursuant to the tying and other anti-competitive conduct alleged herein, or use no Google-provided products and services in the RestaurNote app.

**Sprinter Supplier LLC**

39.     Plaintiff Sprinter Supplier LLC is a Pennsylvania limited liability company with a principal place of business in Pennsylvania.

40.     Sprinter Supplier is an e-commerce automotive parts shop located in Northeast Philadelphia. During the global Covid pandemic, Sprinter Supplier also began ordering personal protective equipment, such as masks, to distribute to frontline workers. It found that digital-

mapping APIs were highly valuable in displaying map information on its website in order to help local customers find its business.

41.    When Sprinter Supplier initially became aware of Google's staggering digital-mapping APIs pricing, it searched for providers as an alternative to or in combination with Google's digital-mapping APIs. Indeed, Sprinter Supplier found competing providers to Google of comparable digital-mapping APIs, especially those that offered such APIs for free or at significantly cheaper prices.

42.    But due to the anticompetitive conduct alleged herein, Sprinter Supplier could not use those competing providers' digital-mapping APIs nor mix and combine Google's digital-mapping APIs with competitors' digital-mapping APIs. And Sprinter Supplier was forced to use the other products or services that Google had made subject to the tying and other anti-competitive conduct alleged herein. However, the costs of Google's digital-mapping APIs quickly became concerning. Although Google promised Sprinter Supplier free credits, those credits were quickly eaten up by Google's digital-mapping API fees.

**Defendants**

43.    Defendant Alphabet Inc. ("Alphabet") is a Delaware corporation with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043. Defendant Alphabet wholly owns and controls Defendant Google and non-party Waze, and Defendant Alphabet is the alter ego of Defendant Google and Waze. Google and Waze direct all profit to and report revenue through Alphabet.

44.    Defendant Google LLC is a Delaware limited liability company with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043. Defendant Google is a wholly owned and controlled subsidiary of XXVI Holding Inc., which is a subsidiary of Defendant Alphabet. Since 2005, Google has wholly owned and controlled Google Maps.

Since 2013, Google has wholly owned and controlled Waze. Google is the alter ego and agent of Defendants Alphabet and Waze, and the companies regularly combine and comingle their operations.

45.     All Defendants are engaged in substantial interstate commerce. Each Defendant deals with and earns revenue from app and website developers and other users throughout the U.S.

## IX. CLASS ACTION ALLEGATIONS

46.     Plaintiffs brings this action on behalf of themselves and as a class action under Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3) on behalf of the following class ("Class"):

> From April 13, 2018, through the date that the alleged unlawful anticompetitive activity ceases, all direct purchasers, app or website developers, or other types of users of Maps APIs, Routes APIs, or Places APIs, or direct purchasers, app or website developers, or other types of users of Maps APIs, Routes APIs, or Places APIs who spent money or had their free-tier credits consumed more rapidly because of the anticompetitive allegations therein, or other types of users who continue to experience anticompetitive harm as a result of the allegations herein.

47.     Specifically excluded from the Class are the following: Defendants; officers, directors, or employees of any Defendant; any entity in which any Defendant has a controlling interest; any affiliate, legal representative, heir, or assign of any Defendant; any person acting on their behalf; any judicial officer presiding over this action and his/her immediate family members; the judicial staff; and any juror assigned to this action.

48.     Also specifically excluded from this Class are indirect purchasers, app or website developers, or other types of users who have purchased Maps APIs, Routes APIs, or Places APIs from a more-direct purchaser to Defendants that did *not* pass on all of the purchase price or free-tier credits to the app or website developers or other types of users.

49.     The Classes are readily ascertainable, and the records for them should exist,

including, without limitation, in Defendants' own records and transaction data.

50.     Due to the nature of the trade and commerce involved, there are three of geographically dispersed members in the Class, the exact number and their identities being known to Defendants.

51.     Plaintiff's claims are typical of the Class members' claims. Plaintiffs and the Class members sustained damages arising out of Defendants' common course of conduct in violation of the laws alleged herein. Each Class member's damages and injuries were directly caused by Defendants' wrongful conduct.

52.     There are questions of fact and law common to the Class members, including the following, without limitation:

    a.   Whether Google has monopoly power in the relevant markets, including the markets for Maps APIs, Routes APIs, and Places APIs;

    b.   Whether Defendants have engaged in unlawful tying or bundling;

    c.   Whether Defendants have engaged in unlawful monopoly leveraging;

    d.   Whether Google engaged in unlawful self-preferencing;

    e.   Whether Defendants have blocked rivals from competing in the digital-mapping stack;

    f.   Whether the anticompetitive conduct constitutes monopolization, monopoly maintenance, an attempt to monopolize, or a conspiracy to monopolize;

    g.   Whether Defendants' anticompetitive conduct has harmed Plaintiffs and the Class members by increasing their costs;

    h.   Whether Defendants' anticompetitive conduct has harmed Plaintiffs and the Class members by causing them to pay supra-competitive prices for using Defendants' digital-mapping products and services; and

i.   The appropriate Class-wide damages measure.

53.   Plaintiffs will fairly and adequately protect the Class members' interests. Plaintiff's interests are aligned with and not antagonistic to those of the other Class members. Plaintiffs have retained counsel competent and experienced in prosecuting class actions and antitrust litigation to represent itself and the Class.

54.   Questions of fact or law are common to the Class members and predominate over any questions affecting only individual Class members.

55.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The prosecution of separate actions by individual class members would impose heavy burdens on the courts and Defendants and would create a risk of inconsistent or varying adjudications of the questions of fact and law common to the Class. On the other hand, a class action would achieve substantial economies of effort and expense and would assure uniformity of decisions as to persons similarly situated without sacrificing procedural fairness or brining about other undesirable results. Absent a class action, it would not be feasible for the vast majority of Class members to seek redress for the violations of law alleged herein.

### III. JURISDICTION AND VENUE

56.   This class action arises under Sherman Act Sections 2 and 15, 15 U.S.C. §§ 2, 15, and Clayton Act Sections 4 and 16, 15 U.S.C. §§ 15 & 26.

57.   This Court has subject matter jurisdiction over Sherman Act claims pursuant to 28 U.S.C. §§ 1331 & 1337 and Clayton Act Sections 4 and 16, 15 U.S.C. §§ 15 & 26.

58.   This Court has personal jurisdiction over Defendants. Alphabet, Google, Google Maps, and Waze each maintain their headquarters in California.

59.   Venue is proper in this District pursuant to Clayton Act Sections 4, 12, and 16, 15

U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391(b), (c), and (d). All Defendants reside, transact business, are found, and have agents in this District.

60.     Pursuant to the Google Maps Platform Terms of Service, venue and personal jurisdiction is consented to in this District.

61.     Defendants' acts were within the flow of, were intended to have, and did in fact have a substantial effect on the interstate commerce of the United States.

## IV. FACTUAL BACKGROUND

62.     The digital-mapping "stack" provides users with virtual maps of the physical world.

63.     With the proliferation of smart devices, digital mapping has become a critical resource for users and businesses alike.

64.     There are two sets of customers for digital-mapping services: app or website developers (or other types of businesses) who use underlying mapping libraries and design tools to produce customized maps; and consumers (or users), who use map products for navigation.

65.     Consumer-facing providers of mapping services license map databases and layer technologies atop of the map data. Consumers use these search and traffic tools either through a standalone, turn-by-turn navigation service that licenses the underlying data—such as MapQuest or Bing Maps—or through a vertically integrated provider, such as Google Maps, Waze, or other providers.

66.     App or website developers or other users have contracted with Defendants to use their Google Maps and related products and services, including, without limitation, application APIs, and other products and services, such as Google's general search tools and Google Cloud Platform ("GCP").

67.     The essential input for both types of services is a digital-map database.

68.     Mapping data can be gathered in a few ways, including through the collection of imagery from satellites and streets, the tracking of global positioning system ("GPS") traces, and the collation of public domain mapping data.

69.     Building a digital map database is costly and time-intensive, requiring significant investment in mapping technologies and data collection.

70.     The more robust the API, the more it costs. Desktop-based pulls and more advanced functions, such as directions, route-mapping search, street view, speed limits, or current location tracking can go a la carte for as much as $32 per 1,000 views. App or website developers or other users also have the option to purchase a premium, all-in-one package. All of this affects the features that app or website developers or other users will choose to implement and the overall impression that their end users will have when considering their app against others in the same field.

71.     Business-facing providers serve map design tools and mapping libraries required to produce customized maps. The leading providers of business-to-business mapping software Google, and there are other providers, including, without limitation, HERE, Mapbox, TomTom, Apple Maps, Bing, ESRI, Comtech, and Telenav. Some of these providers operate in more-specialized markets. For example, HERE and TomTom primarily serve automotive customers, while ESRI provides desktop Geographic Information System ("GIS") software used by governments and spatial analysts.

72.     The dominant providers of consumer-mapping applications are Google Maps and Google-owned Waze.

73.     Digital-mapping APIs are often broken down into three distinct relevant product markets: Maps APIs, Routes APIs, and Places APIs. Indeed, Google itself breaks this out on its publicly available documents and websites, especially in terms of free-tier and pricing menus,

as three distinct relevant products, as also recognized by other providers, competitors, users, and analysts.

74.     Maps APIs is one relevant product market. It is global. Even Google itself breaks this out as a separate relevant product market group and for separate pricing. An example of pricing is $2 for 1,000 calls to its Maps Static API (used to display a single map image on a web page) and $2 for 1,000 calls to its Maps JavaScript API (used to display an interactive map that a user can move around and manipulate). This API pricing both eats up more quickly users' free-tier credits, which are assets in themselves, and of course are charged to users above the free tiers.

75.     Routes APIs is another relevant product market. It is also global. Even Google itself breaks this out as a separate relevant product market group and for separate pricing. An example of pricing is $5 for 1,000 calls on its Routes Directions API (used to receive directions for different transportation modes). This API pricing both eats up more quickly users' free-tier credits, which are assets in themselves, and of course are charged to users above the free tiers.

76.     Places APIs is another relevant product market. It is global. Even Google itself breaks this out as a separate relevant product market group and for separate pricing. An example of pricing $17 for 1,000 calls for Places Place Details API (used to request details about an establishment or point of interest). This API pricing both eats up more quickly users' free-tier credits, which are assets in themselves, and of course are charged to users above the free tiers.

77.     There are additional relevant markets salient for this case outside of the Maps APIs, Routes APIs, and Places APIs markets and outside of the digital-mapping stack. These include the market for internet search and the market for cloud computing, both of which are global.

1

2   **1.   Google acquired several companies, such as Waze, to amass its monopoly power.**

3       78.     Google Maps in its current state can be traced to a series of acquisitions.

4       79.     In September 2003, Google Labs launched "Search by Location," a feature that

5   sought to filter search results based on a user's geographic location.

6       80.     However, the feature stalled because Google lacked mapping data.

7       81.     In October 2004, a few months after Google's IPO, Google acquired

8   Where2Technologies, an Australian startup that created web-based dynamic maps.

9       82.     Google soon followed this acquisition with two additional purchases: Keyhole, a

10  firm that used satellite images and aerial photos to create digital-mapping software, and

11  ZipDash, a provider of real-time traffic information captured through GPS.

12      83.     In February 2005, Google launched Google Maps.

13      84.     The following year, Google introduced Google Maps API, which enabled

14  developers to use and build on top of its digital maps.

15      85.     In 2008, it launched "Ground Truth," a project devoted to assembling and refining

16  underlying mapping data and images. This effort included Google Street View Cars, which

17  drove around the country—and, eventually, the world—taking pictures of the surrounding

18  buildings and landscapes and delivering Google structured data that it could use to create digital

19  maps. As part of Project Ground Truth, Google also obtained mapping information from satellite

20  and aerial imagery, as well as from public databases. A 2008 budget request for Ground Truth

21  stated that the goal of the project was "long term independence from Tele Atlas and Navteq,"

22  two sources of mapping data that Google had been using at the time and that were owned by

23  TomTom and Nokia, respectively. The presentation stated that achieving independence would

24  take several years and requested a 5-7-year renewal of the Tele Atlas contract to help Google

bridge "between now and completion of Google Truth initiatives."

86.     Although Google Maps was not generating revenues, Google was investing in it heavily. Google's documents show that from 2008 to 2009, the company spent $32 million on the Street View program and $88.7 million on Ground Truth overall.

87.     When Google launched Google Maps in 2005, MapQuest had been the "king of Internet-based maps and driving directions," with Yahoo gearing up to heavily compete. By 2008, Google's internal documents show that Google was "#1 in Maps usage," as well as at the top in capturing online local search.

88.     Some market participants at the time questioned whether Google was using its search dominance to give Google Maps a boost. In 2009, one publisher noted that "61% of visits to Google Maps came directly from Google," giving it an advantage over MapQuest. The publisher wrote, "[a]s long as Google dominates search, MapQuest will face a tough battle for visits."

89.     Google's documents revealed that by 2012, Google Maps was the top provider of digital maps in desktop, mobile, and API, and it was closely tracking Waze's fast growth. One Google presentation in 2012 noted that Waze was the most-downloaded app in the navigation category and that it was seeing a 30% increase in daily downloads and averaging around 100,000 downloads a day. Google also honed in on the fact that Waze was the only other mapping provider that was vertically integrated across the full stack at that time, spanning the provider, application, map, traffic, and search layers.

90.     In 2013, Google purchased Waze, an Israeli crowd-sourced mapping provider, for $1.3 billion. The acquisition solidified Google's dominance in turn-by-turn navigation, eliminating its only meaningful competitive threat.

91.     Of these acquisitions, only Waze—for which Google paid $1.1 billion—was

subject to an antitrust investigation.

92. Although Google did not originally report the Waze transaction, both the U.S. Federal Trade Commission ("FTC") and the United Kingdom's Office of Fair Trading ("OFT") reviewed the deal.

93. Both enforcers initially approved the transaction but have since revisited the decision. In 2019, the OFT commissioned a study reviewing its past merger cases, including Google/Waze, and the FTC is reportedly examining the Waze deal as part of its broader review of previous tech mergers.

94. Market participants viewed Google and Waze as close competitors in a "highly concentrated" market for navigable digital map databases and turn-by-turn navigation applications.

95. Prior to the transaction, Waze had observed that it and Google were "the only vertically integrated stacks."

96. One market participant told antitrust enforcers that it viewed Waze as "Google's closest competitor for real-time, updated [turn-by-turn] navigation services" and that Waze "was the digital-map competitor with the best opportunity to overcome Google's significant data and funding advantage."

97. Market participants cited several reasons the transaction would undermine competition.

98. First, they noted that barriers to entry in the market for turn-by-turn navigation providers were high and that it would be difficult for new firms to enter.

99. One market participant stated that "[n]avigable digital map databases contain far more information than maps and addresses. For example, Google's database includes a range of other information, including traffic, conditions and rerouting information, interior and exterior

1  photographs, reviews, commentary from Google+ friends."

2      100.    And Waze in particular had a unique crowd-sourced model that would be difficult

3  for other firms to replicate.

4      101.    Although Waze had secured a "first-mover advantage" and acquired a "critical

5  mass of users," the group of self-selected volunteers who edited Waze's maps were "unlikely to

6  fill such a role (without payment) for more than one set of mapping data." The market participant

7  added, "[o]nce those editors provide the benefit of their input into Waze they create a powerful

8  map that passive Waze users will turn to as well given the lack of other real-time-updated maps

9  of comparable quality. As a result, passive Waze users likely will have no incentive to multi-

10  home."

11      102.    Second, market participants pointed to the fact that Waze was the only firm

12  meaningfully positioned to dislodge Google Maps because it—like Google—lacked financial

13  pressures.

14      103.    One entrepreneur noted that "Google and Waze do not care how much it costs to

15  keep the maps up-to-date. Google because it has a lot of money, and Waze because it relies on

16  the community."

17      104.    One market participated warned about the following: "The acquisition would

18  effectively lead to the elimination of Waze as a market disrupting force that would otherwise be

19  capable of challenging the model adopted by Google's dominant Google Maps. In essence,

20  Google's acquisition of Waze is defensive—seeking to remove a disruptive force from the

21  market."

22      105.    Several market participants and advocates who opposed the deal noted that

23  Waze's former chief executive officer ("CEO"), Noam Bardin ("Bardin"), had recently stated

24  that Waze was "the only reasonable competition" to Google Maps, which suggests that Google

pursued the acquisition, in order to quash its most significant competitor.

106.   And third, market participants argued that the acquisition would give Google both the incentive and ability to foreclose rivals, including those apps that offer mobile-navigation and social-networking services. Seeking to mitigate this concern, Google's letter to the FTC emphasized the "numerous providers who license mapping, traffic, and incident" data for use in mobile apps.

107.   But today, although Google Maps and Waze teams remain purportedly separate, analysts have reported that Google has used Waze as a tool to "test and iterate on monetizing Navigation without disrupting its much larger Google Maps asset."

108.   One market participant stated, "Google has used Waze as an ads guinea pig," noting that Waze has released efficacy reports of location-tailored ads, information that seems to have informed Google Maps' recent expansion of advertising.

109.   Since completing the Waze acquisition, Google has reportedly come to capture 81% of the market for navigation mapping services.

110.   Despite Google's claims that entry barriers were low and alternate offerings abundant, no major competitor has emerged since Google acquired Waze.

111.   Based on the materials that the FTC provided to the House Antitrust Subcommittee, it is unclear whether the FTC fully assessed entry barriers. Instead, it appears that the FTC primarily took a static view—focusing on the existing quality of Waze's maps—rather than assessing the dynamic effects of the acquisition.

112.   In essence, in acquiring Waze, Google bought out one of the few companies in the world making navigable maps while also providing turn-by-turn navigation service.

113.   Google effectively acquired an innovative startup with employees focused on a mission and bureaucratized it into a failing subsidiary.

114.    As reported in news around February 14, 2020, the acquisition "was literally Google acquiring its number one competitor in maps," said Sally Hubbard, director of enforcement strategy at the Open Markets Institute, which is pushing for a crackdown on big internet platforms. "It was a bad deal that should have been blocked."

115.    Even Mr. Bardin, who left Google in early 2021, has been outspoken about Google's anticompetitive gutting of Waze as a prior independent and innovative competitor:

> We quickly learned, the hard way, that we could not get distribution from Google. Any idea we had was quickly co-opted by Google Maps. The Android app store treated us as a 3rd party, there was no pre-installation option and no additional distribution. We did have a lot more marketing dollars to spend but had to spend them like any other company, except we were constrained in what we could do and which 3rd parties we could work with due to corporate policies. All of our growth at Waze post acquisition was from work we did, not support from the mothership. Looking back, we could have probably grown faster and much more efficiently had we stayed independent.

116.    Mr. Bardin has stated that "that Google had promised us autonomy to continue to act as Waze and we believed them." But Mr. Bardin has been vocal about Google's lack of focus on "user value creation" after having acquired Waze:

> Focus—as much as I tried to keep the team focused, being part of a Corporation means that the signal to noise ratio changes dramatically. The amount of time and effort spent on Legal, Policy, Privacy—on features that have not shipped to users yet, meant a significant waste of resources and focus. After the acquisition, we have an extremely long project that consumed many of our best engineers to align our data retention policies and tools to Google. I am not saying this is not important BUT this had zero value to our users. An ever increasing percent of our time went to non user value creation tasks and that changes the DNA of the company quickly, from customer focused to corporate guidelines focused.

> ***

> We start companies to build products that serve people, not to sit in meetings with lawyers. You need to be able to answer the "what have I done for our users today" question with "not much but I got promoted" and be happy with that answer to be successful in Corp-Tech. I guess that's just not me.

117.    While Google captured the navigation market through offering Google Maps for

free, even as it generated no revenue, Google now monetizes both Google Maps and Waze through charging supra-competitive prices to app and website developers and other users and selling ads.

118.    In 2013, Google introduced a limited form of maps advertising, and in recent years it has expanded the program, allowing local businesses to purchase advertising on maps to maximize foot traffic.

119.    Around September 2016, Google acquired Urban Engines, a mapping-analytics startup.

120.    Research by Google shows that 76% of users who search for locations nearby end up visiting a related business within a day and that 28% of those searches ultimately lead to a purchase. This high conversion rate leads analysts to believe that Google Maps alone could help drive between $1.9 billion and $3.7 billion of incremental revenue by 2021.

121.    Commenting on the value of Google Maps to the Google ecosystem, one analyst noted:

> [Google Maps'] user base has been impressive for years, crossing 1B a few years ago, but monetization is just getting started … Maps is the closest thing to a platform that Google has at the application layer, with three stakeholders in the ecosystem: 1) users; 2) publishers; and 3) advertisers. The importance of Maps to mobile, including both the advertising and transportation-on-demand spaces, is one of the biggest potential markets Google is servicing in the future.

**2.    Google exercises dominance—if not monopoly power—in the relevant product markets of Maps APIs, Routes APIs, or Places APIs, along with the other affected relevant product markets.**

122.    Google has monopoly power—or at the least, market power—in the relevant product markets Maps APIs, Routes APIs, or Places APIs. According to the House Antitrust Proposals and analysts, Google's market share exceeds 80% in the digital-mapping stack. Moreover, Google exercises direct market power over the relevant product markets through the

anticompetitive practices alleged herein. In essence, Google uses its market dominance to improperly tie together its products and lock users into the Google ecosystem. There are competitors with nowhere near the direct market power that Google exerts, nor nowhere near the monopoly power—or at the least, market power—that it has. Those competitors offer Maps APIs, Routes APIs, or Places APIs, mostly at significantly reduced prices to Google—and some even for free—and with comparable data and quality, if not better. But over the past several years, these competitors have been strangled out of competing effectively in the relevant product markets because of Google's anticompetitive conduct alleged herein. Direct victims of these alleged anticompetitive schemes are the class members identified herein: those who have purchased Maps APIs, Routes APIs, or Places APIs or had their free-tier credits used up more rapidly because of Maps APIs, Routes APIs, or Places APIs. The Class Members also seek injunctive and declaratory relief to stop the alleged anticompetitive conduct.

123.    Google also has monopoly, or at a minimum market, power in the internet search market where it has by some estimates a 90% market share. And Google has market power in the cloud computing market, through its exercise of power in other related markets.

124.    Google currently monopolizes or is attempting to cement monopoly power in all of the distinct products and services through unlawful tying, negative tying, exclusive dealing, bundling, monopoly leveraging, and self-preferencing, including, without limitation, in Maps APIs, Routes APIs, Places APIs, business-to-business features and services, destination information and features, mapping data and tools, advertising through map features, navigation tools (such as turn-by-turn services), and street view.

125.    Google already dominates the market for digital maps with over a billion users. It is the dominant provider of mapping data and turn-by-turn navigation services.

126.   Google's documents reveal that by 2012, Google Maps was the top provider of digital maps in desktop, mobile, and API.

127.   Financial analysts have described navigation maps as a "utility" that people cannot do without.

128.   Although data on the value of the consumer-facing digital mapping industry is not publicly available, analysts have estimated that Google Maps earned Google around $2.95 billion in revenue in 2019. One bank has estimated that if Google Maps were a standalone product, its market capitalization would hit $61.5 billion.

129.   According to a third-party estimate, Google Maps and Waze capture 81% of the market for turn-by-turn navigation services.

130.   One market participant estimated that Google Maps API captures over 90% of the business-to-business market.

**3.   The barriers to entering the digital-mapping-stack market are staggering.**

131.   Google has an enormous advantage over digital-mapping stack competitors and app and website developers owing to the sheer volume of information that it acquires about users through its panoply of products and services. It acquires data from browsing histories and advertising data from the suite of its Google search, Chrome, G-Suite, and YouTube offerings, and it has location data from Google Maps, Waze, and Google's Android operating system embedded in hundreds of millions of mobile phones. Indeed, Google's former CEO Eric Schmidt has boasted that "[w]e know where you are. We know where you've been. We can more or less know what you've been thinking about."

132.   The barriers to entering the market for developing products and services for the digital-mapping stack are staggering because of access to data, fixed costs, market tipping, network effects, and Google's alleged anticompetitive activity that shackle app and website

developers, other users, and exclude competitors in anticompetitive ways.

133.    Several factors suggest that Google Maps is well positioned to maintain its dominance. The high fixed costs of creating mapping data pose a significant barrier to entry. Apple, which recently built its mapping database from the ground up, told the House Subcommittee that the effort required billions of dollars.

134.    Moreover, Google also benefits from an enormous lead in the tracking and processing of location data, as well as from the prevalence of tracking-enabled Android devices.

135.    An analyst has recently said that Google Maps has "reasonably sustainable moats."

136.    For example, one blunt weapon that Google wields to erect entry barriers is a treasure-trove of competitively valuable information, including, without limitation, traffic, conditions and rerouting information, interior and exterior photographs, reviews, and commentary from Google+ friends.

137.    For instance, a person's location history using Google Maps reveals valuable and sensitive information about others as well—such as traffic patterns and other data.

138.    According to Professors Dirk Bergemann, Alessandro Bonatti, and Tan Gan, the creation of this "data externality" mean that for firms such as Google, "the cost of acquiring . . . individual data can be substantially below the value of the information to the platform."

139.    In particular, Waze has a unique crowd-sourced model that would be difficult for other firms to replicate.

140.    Market participants cite several factors that privilege dominant digital map incumbents and impede entry.

141.    First is the capacity of Google to invest heavily in creating mapping databases and technology without needing to turn a profit. For example, prior to its acquisition by Google,

Waze executives observed that Google Maps had "disrupted the market" primarily through "financial disruption," namely that it had "unlimited funds" and was giving away Google Maps to users for free. Startups seeking to enter this market yet lacking the financial cushion that permits them to incur losses while developing the product will be at a relative disadvantage.

142.   Another factor is that incumbents that are integrated can collect relevant map and location data from across complementary lines of business, feeding this data back into mapping.

143.   For example, one market participant noted that Google "collects an unparalleled amount of data used in digital mapping from users of its dominant search engine and Android smartphone OS."

144.   Another market participant stated that Google's dominant position in search and advertising incentivizes businesses to closely monitor and maintain the accuracy of their information in Google's systems, "leading to a dynamic by which Google enjoys a free, crowdsource effort to improve and maintain their data's quality," thereby improving the quality of Google Maps. Firms without concurrent positions in web search and the smartphone market are comparatively disadvantaged.

145.   A third factor is the superior distribution that integrated firms in maps-adjacent lines of business can provide their own mapping product at the expense of third-party mapping products. Google gives Google Maps default placement on its Android devices, while Apple does the same with Apple Maps on iOS devices. Together, Android and iOS account for 99% of the smartphone operating systems in the United States.

146.   Market participants explained that the default placement of Google Maps on Android devices also disadvantages third-party mapping providers technologically. If a developer chooses a third-party mapping provider when building an app, downloading that app on Android would involve downloading both the app features and the mapping functionality.

By contrast, choosing to develop the app with Google Maps would reduce the app's file size on Android, as Google Maps is already on the device.

147. Lastly, incumbents benefited from a lack of prohibitions on collecting location data—an advantage that startups today lack given the passage of new data restrictions that limit the development of digital mapping technology.

148. Notably, many of these rules came into existence following public outrage prompted by Google Street View. By the time these rules were implemented, Google had already mapped out most of the planet.

149. Except for Apple's independent mapping database, there has been no recent entry in the market for underlying mapping data.

150. Similarly, the list of leading providers of consumer mapping services and business-to-business services has mostly been unchanged since 2013.

**Google uses unlawful tying and other anticompetitive conduct to acquire and maintain its monopoly power Maps APIs, Routes APIs, and Places APIs.**

151. Google has engaged in a series of actions to acquire and/or maintain monopoly power, at least market power, throughout the relevant product markets, including Maps APIs, Routes APIs, and Places APIs, as well as the search and cloud computing, including the following, without limitation: (i) anticompetitive acquisitions, especially of Waze, at different levels of the digital-mapping stack; (ii) using data amassed through its consumer services (for example, search, Gmail, YouTube, Chrome, and Android OS) to lock in substantial app developer demand; (iii) tying, negative tying, bundling, and monopoly leveraging in connection with Google's Maps APIs, Routes APIs, Places APIs, and products and services for search and GCP; (iv) requiring app and website developers and other users who seek to use certain of Google's digital-mapping products and services—Maps APIs, Routes APIs, or Places APIs—

to use its other digital-mapping products and services and not use those of competitors; (v) self-preferencing Google's products and services over the products and services of app developers who use Defendants' products and services; and (vi) using Google's market power from other markets to impair actual or potential rivals from accessing data that could allow them to compete with Google.

152.    In terms of tying, Google uses at least three weapons to further entrench its monopoly power—or at the least, market power—in the relevant product markets of Maps APIs, Routes APIs, and Places APIs: First, Google has ratcheted up its prohibition against app or website developers or other users from using any part of its mapping features and using any competitors' Maps APIs, Routes APIs, or Places APIs and also forbids app or website developers or other users from using any Google digital mapping features alongside any non-Google mapping features; second, Google has leveraged access to its dominant search products to intimidate app or website developers or other users out of working with other digital-map providers; and third, Google misleadingly favors its own non-maps-related products that compete with the products offered by app developers that license Google Maps APIs, Routes APIs, and other Places APIs.

### i.    *Google Maps app developers are prohibited from using any competing tools.*

153.    Google has been revising and enforcing the Google Maps platform's Terms of Service ("Terms of Service") to prohibit app developers from using *any* component of the Google Maps Core Service with mapping services provided by non-Google firms.

154.    According to the House Antitrust Proposals, flexing a stranglehold over crucial digital search and mapping markets, Google has leveraged monopoly power to effectuate exclusionary tying. App or website developers or other users using Google Maps have told the House Antitrust Subcommittee that over the past several years, Google has been imposing

anticompetitive and exclusionary licensing restrictions as it has gained a more-dominant market position.

155.    Business-facing mapping products usually consist of a core set of features to provide greater mapping functionality. For example, the Google Maps platform offers developers Maps APIs, Routes APIs, and Places APIs. App or website developers or other users would want to choose to mix and match for example, using maps data from one firm but places data from another. However, Google has ratcheted up its prohibition against app developers using any part of its mapping tools alongside any non-Google mapping features.

156.    For example, prior to April 2020, the Terms of Service stated the following:

(e) No Use With Non-Google Maps. Customer will not use the Google Maps Core Services in a Customer Application that contains a non-Google map. For example, Customer will not (i) display Places listings on a non-Google map, or (ii) display Street View imagery and non-Google maps in the same Customer Application.

157.    Recent changes to the Terms of Service are even more restrictive by prohibiting developers from even displaying any component of Google Maps "near" any other map:

Google Maps Content means any content provided through the Services (whether created by Google or its third-party licensors), including map and terrain data, imagery, trace data, and places data (including business listings).

***

(e) No Use With Non-Google Maps. To avoid quality issues and/or brand confusion, Customer will not use the Google Maps Core Services with or near a non-Google Map in a Customer Application. For example, Customer will not (i) display or use Places content on a non-Google map, (ii) display Street View imagery and non-Google maps on the same screen, or (iii) link a Google Map to non-Google Maps content or a non-Google map.

158.    Both versions of this provision prohibit developers from using *any* component of the Google Maps Core Service with mapping services provided by non-Google firms.

159.    The April 2020 change to the terms of service is even more restrictive: it prohibits developers from even displaying any component of Google Maps "near" any other map.

160.    In practice, Google's contractual provisions have forced several major companies to switch entirely to Google's ecosystem, even in cases where they preferred mapping services from a non-Google provider—for example, Mapbox.

161.    Through interviews with market participants, the House Antitrust Subcommittee learned that Google has been enforcing these provisions aggressively.

162.    According to one firm, Google closely tracks and pressures developers who use Google's place data in conjunction with mapping data from a non-Google firm, effectively forcing them to choose whether they will use all of Google's mapping services or none of them.

163.    One firm described Google's coercive tactics, stating that "[i]t's a bigger player putting a gun to our head saying 'switch or else.'"

164.    A particular example (without limitation) of the anti-competitive nature of the tying alleged herein is that even if a Class Member requests a specific JavaScript-related Google Maps API, Google unilaterally will add on unnecessary, non-responsive other digital-mapping APIs, such as Places APIs, to that request and charge the Class Member for those additional APIs. Another particular example (without limitation) is that prior to anticompetitive changes to Google's terms of services related to its digital-mapping APIs, certain JavaScript or SDK tools—not technically APIs—were provided complimentary with other API calls because those JavaScript or SDK tools were necessary to make the actual APIs accurately overlay information as an image on a digital map. Those tools were not technically APIs. But after changes, Google had recategorized those JavaScript or SDK tools as APIs, made them compulsory to other purchased APIs, and charged Class Members for them. Another particular egregious example (without limitation) is that even a Class Member wanted to overlay data that it has acquired through its own app or website—for example, Places API data concerning information learned from its own users, such as comments on a particular restaurant dish—on top of a digital-map

that has used any Google APIs, Maps APIs, Routes APIs, or Places APIs, it cannot because even the Class Member's own data would be considered to violate the terms of service if it is overlayed on top of a digital map that used any Google digital-mapping APIs.

ii.    *Google leverages its dominant search products to intimidate app developers.*

165.    Monopolistic leveraging is the use of monopoly power in one market to strengthen or gain a monopoly share in another market. Leveraging may be achieved through many anticompetitive practices, including, without limitation, contractual or technological tying, bundling, and exclusive dealing. In digital markets, the DOJ has noted that monopolistic leveraging and relationships between markets is as important as dynamics within the market, such as barriers to entry and market power.

166.    Google has leveraged its monopoly power in its search products and services to suppress competition in the digital-mapping stack.

167.    Because Google's monopoly in online search has furnished it with a treasure-trove of data and a robust index, its place-search feature is also seen by app developers effectively as a must-have.

168.    One market participant that has lost business partnerships due to Google's coercive restrictions told the House Antitrust Subcommittee that Google is "using access to its dominant search products as leverage to intimidate businesses out of working with other map providers." He noted that Google's conduct now threatens his firm's survival, saying that "[t]his is existential for us."

169.    One app developer noted that Google's control over what now serves as a key mapping technology has allowed Google to call all the shots. "We license Google Maps and it's essentially a contract of adhesion. It's full of restrictions and we aren't able to negotiate any changes," the developer said. The developer added that they had explored switching to

alternative mapping providers. "Other providers still value us and want to know how they can accommodate us," they said. "With Google, we just have to comply with all their restrictions."

170.    In a submission to the House Antitrust Subcommittee, one market participant who uses Google Maps to power its reservation system, website, and mobile app stated the following: "[L]ocal businesses are most likely to use Google's tools to index their websites because Google controls the search engine space, which has the ability to deliver—or restrict—whether these websites appear in corresponding links in consumer search results." The market participant added that this dependence reinforces Google's market power, as it "provides Google with another opportunity to monetize companies' supply chains and leverage its pricing power over companies that need to promote their businesses and/or purchase ad space to grow." This business predicted that "the data advantages that Google incorporates into its tools will only grow with time, making it impossible for a new player to ever achieve the scale, user base, or database necessary to compete."

171.    According to Google Maps' terms of service, Class Members could not use advertising overlays from a source other than Google's APIs if it is being done any digital map that includes any information from a Google Maps API, Routes API, or Places API. Only Google is permitted to enable the type of advertising information and the manner in which it is overlayed on a digital map based on Google Maps APIs, Google Routes APIs, or Google Places APIs.

### iii.    *Google even uses its control over digital mapping to favor its own products.*

172.    App developers told the House Antitrust Subcommittee that Google even uses its control over digital mapping to favor its own products in other lines of business.

173.    Since Google provides mapping services and also offers non-mapping services that use its own mapping as an input, Google can selectively degrade access for third parties that

rely on Google's mapping product to disfavor them as competitors to its non-mapping products.

174.    For example, market participants noted that Google has added various restrictions to the license agreement for Google Maps digital-mapping APIs—restrictions that apply to third-party developers or other users but not to Google's own competing products.

175.    One example is unequal rights to map caching. Map caching occurs when a server stores copies of map images that it can speedily distribute when next recalled. Without caching, a map is drawn each time it is requested, a much slower process.

176.    Although previous versions of the Google Maps digital-mapping APIs agreement permitted caching by developers or other users, the recent versions prohibit caching of maps with limited exception.

177.    Third-party apps or websites built on Google Maps' digital-mapping APIs can no longer store a map cache.

178.    However, market participants note that Google's own products built on Google Maps—ranging from its local search service to its hotel finder—face no similar restrictions, enabling them to load faster than those run by third parties.

179.    Commenting on the asymmetry, one market participant told the House Antitrust Subcommittee that Google's decision to deny third parties caching "denigrates the service that our maps can provide compared to Google's." They added "that's why we can't create an app that provides directions as well as Google or we can't update a user's location as quickly as Google."

180.    Allegedly, Microsoft used similar anticompetitive strategies in the 1990s. For example, allegedly, Microsoft correctly recognized that the web browser could displace the operating system as the most important computer interface. The web browser is an application that sits on top of a "stack" or layers of software, with the operating system at its foundation.

Allegedly, Microsoft used its Windows operating system monopoly to force consumers to install, load, and use Internet Explorer instead of a rival web browser. Allegedly, by so doing, Microsoft was both expanding its monopoly "upward" in the stack—from the operating system into web browsers—and maintaining its operating system monopoly by making the web browser dependent on Windows. Similarly, Google is alleged to be seeking to maintain and expand control throughout the entire digital-mapping stack, including, without limitation, in Maps APIs, Routes APIs, and Places APIs, by forcing app or website developers or other users to use distinct products and services both within and outside of the digital-mapping stack. Google, like Microsoft before it, is thereby squelching innovation and locking app and web developers and other users into a Google-controlled system from top to bottom.

**4.   Defendants' purported pro-competitive justifications ring hollow.**

181.   Under *per se* liability, whether the purported pro-competitive effects outweigh the anti-competitive effects is irrelevant. The allegations herein present *per se* liability.

182.   In the alternative, Defendants' potential defenses of pro-competitive justifications cannot stand.

183.   Defendants cannot justify their restraints of trade and monopolizing conduct.

184.   Defendants cannot convincingly claim efficiency justifications for its conduct because their conduct creates numerous inefficiencies.

185.   Defendants' potential ripostes of pro-competitive justifications in avoiding "quality issues and/or brand confusion" would be incredible.

186.   Even with an ever-increasing stranglehold over Maps APIs, Routes APIs, and Places APIs, Google with its strict control has done an abysmal—if not intentional or reckless—job of maintaining quality and accurate business-mapping features.

187.   Defendants' pricing for Google Maps APIs, Routes APIs, and Places APIs are

widely known to be materially more expensive than competitors' pricing—indeed, competitors offer such APIs for free. A particular example of over-pricing by Google compared to its competitors (without limitation) is the Google Places APIs, an otherwise commodity form of API information.

188.     And there would not be confusion to the end user about the source of the digital-mapping information because direct users can seamlessly display on a digital map the source of which component digital-mapping information comes from which competitor.

189.     Moreover, users would appreciate having back-up digital mapping data by another provider when Google's servers freeze or shut down, which has happened recently. Building back-ups data into systems is critical in case the initial data provider experiences difficulties. Indeed, based on public revelations, around Mar 2022, Google Maps nearly experienced a complete world-wide failure and outage that lasted several hours. This left Class Members powerless to display their digital maps and help it support their businesses, apps, and websites. Having back-up data also enables the user to truly experiment which competitor provides the highest-quality data.

190.     And Google does not offer a full suite of APIs in all of its Maps APIs, Routes APIs, and Places APIs. There are bodies of API information within these relevant product groups that Google does not offer, that competitors may have, but the Class Members cannot access because of Google's anticompetitive conduct alleged herein.

191.     The Antitrust House Subcommittee emphasized this phenomenon:

> Although Google's responses to the Subcommittees' questions about its conduct regarding Google Maps emphasized "quality" and "user experience," … public reporting has documented that Google Maps' listings are "overrun with millions of false business addresses and fake names." …   A fake listing can occur when a business creates a fake listing or when a fraudulent business hijacks the name of a legitimate business on Google Maps, diverting user calls or visits from the legitimate business to a fraudulent one. A survey of experts conducted by the *Wall*

*Street Journal* estimated that Google Maps hosts around 11 million falsely listed businesses on any given day. …  The same experts stated that "a majority" of the listings on Google Maps for businesses such as "contractors, electricians, towing and car repair services, movers and lawyers," as well as others, are not actually located at the location given by Google Maps.

These fake listings endanger consumer safety, giving rise to situations where users of Google Maps have unknowingly requested home repairs and other services from fraudulent providers, ultimately, paying inflated prices for shoddy work. …  The fraudulent listings also disadvantage legitimate businesses, both those whose listings have been hijacked as well as those whose own listings appear below those of sham businesses.

Legitimate businesses hurt by fake listings say that contacting Google to report the situation generally fails to resolve the problem. In practice, the only ways legitimate businesses can shield themselves from fake listings is to buy ads from Google. Ad prices for categories that are most susceptible to ad fraud have increased more than 50% over the last two years.

\*\*\*

Both digital advertisement experts and individuals engaging in fraudulent activity believe that Google has turned a blind eye to the problem. According to the *Wall Street Journal*, one ad specialist who was invited by Google to help root out the problem left after concluding that Google "has obviously chosen not to solve the problem." …  A business owner who helps facilitate the fake listings says his activity leaves a "huge footprint" and yet Google is "just letting it happen." He added, "I know Google knows."

192.    Developers, users, and mapping providers have questioned Google's purported quality and confusion rationales, noting that developers were the ones best positioned to determine whether combining mapping services from multiple providers created a "negative user experience." One provider added, "The developers we partner with are extremely sophisticated. They're not confused."

193.    Nor is there any valid argument that monopoly is somehow desirable in the relevant markets. Even in markets with network effects, antitrust law does not recognize a defense to anticompetitive conduct based on size. Competition on the merits will produce better outcomes than monopoly for app developers and users.

1   194.    Nor can Google claim any of the abstract justifications often used when firms

2   vertically integrate. Google's integration in fact reflects a strategy through which Google raises

3   barriers to entry and prevents new competitors or ways of doing business from breaking into the

4   online advertising marketplace.

### V. INTERSTATE TRADE AND COMMERCE

195.    Google engages in interstate commerce and activities substantially affecting

interstate commerce, including, without limitation, providing products and services such as

Google Maps, Waze, Gmail, YouTube, Android OS, and search, to app and website developers,

other users, and consumers throughout the U.S. and globally.

196.    App and website developers and other users use Google's services in the relevant

markets to provide products and services to users across the U.S. and globally.

### VI. ANTITRUST HARM

197.    Defendants' conduct goes far beyond aggressive competition. Their

anticompetitive actions intend to and in fact have excluded rivals and harmed the competitive

process. This conduct is not competition on the merits or otherwise privileged. Even worse, the

conduct has been planned and thoroughly executed over many years—it is willful.

198.    Defendants' conduct harms app and website developers and ultimately other users

by depriving them of valid competitive choice, degrading consumer privacy, degrading quality

and variety of products and services offered to consumers, stifling innovation, and ultimately

raising the prices for digital-mapping goods and services.

199.    As a result of the anticompetitive conduct alleged herein, Defendants have

foreclosed other firms from competing in the relevant markets to the detriment of app or website

developers and other users, such as Plaintiff, and the Class members.

200.    And Defendants have reinforced their market position by impairing potential

competing Maps APIs, Routes APIs, or Places APIs providers by using Google's market power in other markets to prevent potential rivals from collecting rival datasets that could make the potential rivals viable alternatives to Google Maps and Waze for app or website developers, which in turn could loosen Google's strangle-hold on the relevant markets.

201.    In particular, by acquiring Waze—the main vertically integrated competitor that could have jeopardized Google Maps' quest for dominance—and several other acquisitions, Google morphed competitors into structural support for further dominance.

202.    Google has foreclosed competition to Google Maps and Waze's products and services from having implemented the anticompetitive conduct herein, such as tying, leveraging monopoly power to create dominance in other products and services, fraudulent and manipulative conduct, and anti-competitive self-preferencing.

203.    The foreclosure caused by Google's conduct in the relevant markets can be seen by the exit and limited entry of competitors. Entry into the relevant markets has been weak over the time period of Google Maps and Waze's increasing dominance. This lack of entry has resulted from artificial entry barriers arising from Google's anticompetitive conduct.

204.    This unlawful tying and monopolistic behavior has resulted in concrete damages to app developers, in part through egregious and anticompetitive price hikes.

205.    For years, Google offered a free tier of the Maps API, incentivizing developers to build their apps with Google Maps.

206.    However, in around May 2018 and continuing thereafter, Google Maps introduced a single "pay-as-you-go" pricing plan for the core mapping APIs.

207.    This shift dramatically reduced the number of free maps API calls that a firm could make—from 25,000 per day to around 930 per day.

208.    Developers told the House Antitrust Subcommittee that the change amounted to

a price increase of 1,400%.

209.    One market participant told the House Antitrust Subcommittee that Google instituted this price hike after "gaining dominance." Since becoming a Google Maps customer, the market participant's costs "have increased over 20x" and "there are no viable alternatives."

210.    Another developer stated that the 2018 pricing change "took our bill from $90/month in October to $20,000/month in December." The developer stated that it was able to subsequently reduce its bill through making a change that enabled the location-retrieval function to occur directly on a user's device—a change that gave Google "greater ability to identify and track" the device user.

211.    Several developers expressed their frustrations publicly, noting that Google's decision to hike prices so sharply, and without giving developers significant notice, underscored its power to set the terms of commerce.

212.    One developer stated the following: "I understand that Google wants to make this into a line of business. But it feels like they're taking advantage of us. They know that they're the best, and that no one else is even close. Instead of just giving us Maps for free or very cheap, in exchange for collecting all our usage data, they now feel they need to charge really high prices."

213.    In effect, Google makes market participants pay twice to access Google Maps—first by giving Google their valuable usage data and then again by paying Google's volume-based fees for API calls.

214.    Even apparently powerful, large companies are beholden to Defendants.

215.    For example, the House Antitrust Subcommittee reported that the ride-sharing company Lyft has cited its use of Google Maps as a potential risk to its business model. Lyft

stated in a securities filing that "[s]ome of our competitors or technology partners may take actions which disrupt the interoperability of our platform with their own products or services."

216.    In 2019, Uber disclosed that it relied on Google Maps for "the mapping function that is critical to the functionality" of its platform. It added, "We do not believe that an alternative mapping solution exists that can provide the global functionality that we require to offer our platform in all of the markets in which we operate." Uber disclosed that from January 1, 2016, through December 31, 2018, the company had paid Google $58 million for use of Google Maps.

217.    And Google in 2020 executed a juggernaut of an exclusive-dealing arrangement with Ford that is slated to span six years, entails several billions of dollars, and not only locks Ford into Google Maps and Google Automotive Services, but also obligated Ford to use GCP rather than staying with Microsoft Azure.

218.    And recent news has revealed that automakers through the Google Automotive Services package face a bundled together package of Google digital-mapping APIs, the Google Play application store, Google Assistant, and other services. For example, car companies are prevented from mixing Google Maps digital-mapping APIs with voice assistants developed by smaller rivals.

219.    Concrete monetary damages to helpless app developers and the flexing of monopoly power over other market participants are not the only devastating consequences of Defendants' alleged tying and monopolization.

220.    It gets worse.

221.    Letting Defendants' alleged tying and monopolistic actions proceed unfettered— as it appears to have been raging on for the past several years—results in very real danger to

everyday users in the form of severe degradation of accuracy. According to a *Wall Street Journal* article cited in the House Antitrust Proposals, users are subjected to real danger:

> [A] 67-year-old-woman contacted a local home repair service she found through Google, only to be serviced by a man who was pretending to be from the company she had hired. The man charged almost twice the cost of previous repairs and demanded a personal check or cash. The woman told the *Wall Street Journal*, "I'm at my house by myself with this guy. He could have knocked me over dead."

## VII. PLAINTIFFS AND CLASS MEMBERS WERE INJURED AS A RESULT OF THE ALLEGED ANTICOMPETITIVE ACTIONS

222.    Defendants' anticompetitive and exclusionary conduct has resulted in harm to competition.

223.    Defendants have unlawfully maintained monopolies by using Google's market power to disadvantage app developers and rivals through tying, exclusionary conduct, information asymmetries, and other conduct that has collectively and separately harmed competition in the following ways, without limitation:

a.    Denying rivals in the relevant markets access to the necessary scale to compete effectively by denying rivals' access to data and app developer demand;

b.    Substantially foreclosing competition in the markets for certain products and services within the digital-mapping stack;

c.    Substantially foreclosing competition in the markets for certain products and services within the digital-mapping stack and using market power in those certain products and services to foreclose competition in other products and services within the digital-mapping stack;

d.    Substantially foreclosing competition in the relevant markets by creating information asymmetry;

e.    Substantially foreclosing competition in the relevant markets by engaging in self-

preferencing;

   f. Harming app developers' ability to effectively monetize their apps; and

   g. Improperly shielding Defendants from competitive pressures, thereby allowing them to continue to extract high margins and applying significant pressure on innovation.

  224. As a direct and proximate result of Google's anticompetitive conduct, Plaintiffs and the Class members suffered substantial losses to their business and property.

  225. Costs for app developers who relied on Google Maps were artificially increased during the Class Period due to Google's unlawful conduct. Absent Google's anticompetitive conduct, Plaintiffs and the Class members would have experienced less costs.

  226. And inflated costs that app developers experienced due to Google's unlawful conduct have forced many proposed Class members to have gone out of business altogether.

  227. As a direct and proximate result of the alleged anticompetitive conduct herein, Google reaps more revenue, suppresses Plaintiffs and the Class members' earnings, and forces them to reduce content, causing further reductions in earnings.

  228. Evidence of the anticompetitive effects from Defendants' conduct includes, without limitation, the exit of rival firms and limited and declining entry rates in the relevant markets, despite significant profits enjoyed by Google in those same markets.

  229. A significant entry barrier—high switching costs—exists in the market for digital-mapping stack products and services used by app developers. Defendants' conduct, including, without limitation, tying certain products and services to other products and services, creates artificial entry barriers into the digital-mapping stack market. Defendants' foreclosure of rival digital-mapping stack products and services has left app developers with little to no choice in their selection of digital-mapping stack products and services.

  230. Defendants' anticompetitive conduct has shielded them from competitive

pressures that would otherwise require ongoing, substantial innovation in response to app developers and users' needs. This lack of innovation has caused grave harm to competition.

231.     An example of the adverse effects from Defendants' anti-competitive conduct when innovation did occur—specifically by Waze before Google acquired it—demonstrates the potential innovation that has been thwarted throughout the Class Period.

232.     For example, Plaintiff Dream Big Media incurred charges of more than $1,300 on Google Maps products in 2019 alone.

233.     Plaintiff Getify Solutions experienced, and continues to experience, significant charges to its credit balance, in addition to the harm from being unable to launch its product.

234.     For example, Plaintiff Sprinter Supplier experienced a charge of $5.74, for example, in early February 2020, depleting a credit balance that Google had provided—indeed, it is even unclear given Google's reporting whether the credit balance handled this charge.

235.     The harm to competition deprives app developers, users, and other consumers of improved quality, greater transparency, increased output, and/or lower prices.

236.     Google's anticompetitive conduct is continuing and so are damages suffered by Plaintiffs and the Class members.

237.     The full amount of such damages will be calculated after discovery and upon proof at trial.

## X. CALIFORNIA LAW APPLIES TO THE ENTIRE CLASS

238.     California's substantive laws apply to every Class member, regardless of where in the U.S. the Class member resides. The Terms of Service explicitly state that California law will govern all disputes arising out of or relating to the terms, service-specific additional terms, or any related services, regardless of conflict of laws rules. By choosing California law for the

resolution of disputes covered by its Terms of Service, Google concedes that it is appropriate for this Court to apply California law to the instant dispute.

239.     Further, California's substantive laws may be constitutionally applied to the claims of Plaintiffs and the Class under the Due Process Clause, *see* U.S. CONST. amend. XIV, § 1, and the Full Faith and Credit Clause, *see* U.S. CONST. art. IV, § 1, of the U.S. Constitution. California has significant contact or significant aggregation of contacts with the claims asserted by Plaintiffs and all Class members, thereby creating state interests that ensure that the choice of California state law is not arbitrary or unfair. Defendants' decisions to reside in California and avail themselves of California's laws and to engage in the challenged conduct from and emanating out of California render the application of California law to the claims herein constitutionally permissible. The application of California laws to the Class is also appropriate under California's choice of law rules because California has significant contacts with the claims of Plaintiffs and the Class, and California has the greatest interest in applying its laws here.

## XI. TOLLING OF THE STATUTE OF LIMITATIONS

240.     The statutes of limitations did not begin to run because Plaintiffs did not and could not discover their claims.

241.     Plaintiffs and the Class members had no knowledge of Defendants' anticompetitive conduct or facts sufficient to place them on inquiry notice of the claims asserted herein during the Class Period and continuing hereafter.

242.     As described herein, Plaintiffs and the Class members suffered economic loss as a result of Defendants' tying and wrongful exercise of monopoly power in the relevant markets . Other than dealing directly with Defendants when using its digital-mapping products and services, Plaintiffs had no direct contact or interaction with Google and had no means from which it could have discovered Defendants' wrongful conduct.

243.     Plaintiffs first learned about information in the public domain sufficient to put it on notice of Defendants' alleged anticompetitive conduct when the House Antitrust Proposals were released around October 6, 2020.

244.     Before then, it was reasonable for Plaintiffs and the Class members not to have suspected that Defendants were engaging in any unlawful anticompetitive behavior.

245.     Plaintiffs allege a continuing course of unlawful conduct by Defendants, including conduct within the applicable limitations periods. That conduct has inflicted continuing and accumulating harm within the applicable statute of limitations.

246.     For these reasons, the statutes of limitations applicable to Plaintiffs and the Class members claims have been tolled with respect to the claims asserted herein.

247.     Additionally and alternatively, application of the fraudulent-concealment doctrine tolled the statutes of limitations on Plaintiff's claims.

248.     Plaintiffs and the Class members had no knowledge of Defendants' wrongful tying and acquisition and maintenance of monopoly power in the relevant markets or of facts sufficient to place them on inquiry notice of their claims, during the Class Period and continuing thereafter. No information in the public domain or otherwise available to Plaintiffs and the Class members during the Class Period suggested that Defendants had wrongfully tied and acquired a monopoly or was using its monopoly power to charge app developers supra-competitive prices for digital-mapping products and services.

249.     Defendants concealed their illicit conduct, both by failing to disclose their wrongful tying and acquisition and maintenance of a monopoly through exclusionary acts in the relevant markets .

250.     Because Defendants' antitrust violations were self-concealing and affirmatively concealed by Defendants, Plaintiffs and the Class members had no knowledge of Defendants'

antitrust violations or of any facts or information that would have caused a reasonably diligent person to suspect Defendants of having wrongfully tied and acquired and maintained monopoly power during the Class Period.

251.     Therefore, by operation of Google's fraudulent concealment, the statutes of limitations applicable to Plaintiffs and the Class members' claims were tolled throughout the Class Period.

## XII. CAUSES OF ACTION

### COUNT ONE: Violation of Sherman Act Section 1
### (15 U.S.C. § 1)

252.     Plaintiffs hereby incorporate by reference the allegations above as if fully set forth herein.

253.     As described above, Google and entered into and carried out an unlawful tying agreement in violation of Sherman Act Section 1, 15 U.S.C. § 1.

254.     Google improperly tied the distribution of the Maps APIs, Routes APIs, and Places APIs—each of which are separate and distinct products—to the detriment of Plaintiffs and the Class.

255.     Google has sufficient market power in the tying markets to materially restrain competition in the markets for the tied products and has shown an ability to leverage its market power in the tying markets to substantially exclude competition in the tied markets.

256.     Google's tying practices are a *per se* violation of antitrust laws in addition to being unreasonable and unlawful restraints of trade.

257.     Google's practices include unreasonable and unlawful restraints of trade via negative tying.

258.     Google's practices described here also constitute unlawful exclusive dealing.

259.     Google's tying practices further fail the quick look or abbreviated rule of reason standard because there is no plausible justification of Google's practices.

260.     As a direct and proximate result of the unlawful tying and agreements, Plaintiffs and proposed Class members have suffered injury and damages.

261.     On behalf of itself and the Class members, Plaintiffs seek money damages from Defendants for these violations. These damages represent the lower costs the Class would have experienced, absent Defendants' anticompetitive conduct alleged herein. Damages will be quantified on a class-wide basis at trial.

262.     These actual damages should be trebled under Clayton Act Section 4, 15 U.S.C. § 15.

263.     On behalf of itself and the Class members, Plaintiffs seeks injunctive relief barring Defendants from engaging in the anticompetitive alleged herein. The violations set forth above and the effects thereof are continuing and will continue unless injunctive relief is granted.

264.     Plaintiffs and the Class members' injuries are of the type that the U.S. federal antitrust laws were designed to prevent and flow directly from Defendants' unlawful, anticompetitive conduct.

**COUNT TWO: Tying in Violation of Sherman Act Section 2**
**(15 U.S.C. § 2)**

265.     Plaintiffs hereby incorporate by reference the allegations above as if fully set forth herein.

266.     Defendants have engaged in unlawful tying or bundling, including technological tying, of Google products and services, including through its search, GCP, and digital-mapping products and services.

267.     Defendants' contractual arrangements and other conduct force app developers to

use Defendants' digital-mapping products and services if they use Google's other products and services.

268.    Maps APIs, Routes APIs, and Places APIs are separate products and services in separate markets.

269.    As detailed above Defendants have monopoly power in the markets for Maps APIs, Routes APIs, and Places APIs.

270.    Google has sufficient market power in the tying markets to materially restrain competition in the markets for the tied products and has shown an ability to leverage its market power in the tying markets to substantially exclude competition in the tied markets.

271.    Defendants' tying arrangements affect a significant volume of interstate commerce and have the effect of substantially foreclosing competition in the market for the Maps APIs, Routes APIs, and Places APIs markets by virtue of reducing the number of app developers and others for whom other companies can effectively compete.

272.    These tying arrangements allow Google to maintain supra-competitive prices for digital-mapping products and services that are ultimately passed on to users, who are also harmed by virtue of having fewer options available at lower prices.

273.    Defendants have engaged in unlawful tying, including negative tying, with the specific intent to monopolize the Maps APIs, Routes APIs, and Places APIs markets.

274.    Defendants' tying arrangements have caused competing digital-mapping-stack providers substantial damages as a direct and proximate cause of this unlawful conduct because Google has foreclosed other digital-mapping-stack providers from competing for potential app developers and others for reasons having nothing to do with the merits of Defendants' products and services.

275.    There is no valid procompetitive business justification for Defendants'

anticompetitive conduct. To the extent that Defendants offer one, it is pretextual and not cognizable. Any procompetitive benefits of defendants' conduct do not outweigh the anticompetitive harms. And even if the procompetitive benefits are determined to outweigh the anticompetitive harms, Defendants alleged anticompetitive actions were not reasonably specific to accomplish the purported procompetitive justifications.

276.     As a direct and proximate result of Defendants' anticompetitive restraints, app developers and the Class members have suffered injury to their business and property throughout the Class Period. The precise amount of damages that Plaintiffs and the Class members are entitled to recover as a result of the foregoing injuries is substantial and will be fully ascertained at trial.

277.     Defendants' monopolization of the relevant markets is an ongoing wrong that causes incalculable and irreparable injury for which there is no adequate remedy at law. Unless Defendants are enjoined by an appropriate order of this Court, the asserted harm will continue unabated.

**COUNT THREE: Monopoly Leveraging in Violation of Sherman Act Sec. 2**
**(15 U.S.C. § 2)**

278.     Plaintiffs hereby incorporate by reference the allegations above as if fully set forth herein.

279.     Google has monopoly power in the Maps APIs, Routes APIs, and Places APIs markets.

280.     Through the anticompetitive conduct described herein, Google has leveraged each of these markets in an effort to gain monopoly power and further dominances in the digital-mapping products and services markets.

281.     Defendants have done so willfully, and unless restrained by the Court, they will continue to willfully leverage that power by further anticompetitive, illegal, deceptive, and unreasonably exclusionary conduct.

282.     Defendants have acted with the intent to unlawfully maintain and gain monopoly power in each of these markets, and their unlawful conduct has enabled them to do so in violation of Sherman Act Section 2.

283.     Defendants have used and leveraged their monopoly power and dominance in Google search to anticompetitively and unlawfully disadvantage and harm Plaintiffs and the Class members in the markets for digital-mapping products and services.

284.     As a direct and proximate results of Defendants' anticompetitive restraints, Plaintiffs and the Class members have suffered injury to their business and property throughout the Class Period.

285.     Defendants' unlawful conduct had directly caused significant monetary damages to Plaintiff. The precise amount of damages that Plaintiffs are entitled to recover as a result of the foregoing injuries is substantial and will be fully ascertained at trial.

286.     And Defendants' monopolization of the relevant markets and monopoly leveraging are ongoing wrongs that cause incalculable and irreparable injury for which there is no adequate remedy at law. Unless Defendants are enjoined by an appropriate order of this Court, the asserted harm will continue unabated.

**COUNT FOUR: Exclusive Dealing and Tying in Violation of Clayton Act Section 3**
**(15 U.S.C. § 14)**

287.     Plaintiffs hereby incorporate by reference the allegations above as if fully set forth herein.

288.     Google has monopoly power in the Maps APIs, Routes APIs, and Places APIs

markets.

289.     Defendants have willfully and intentionally entered into anticompetitive, exclusionary, and unjustified agreements with app developers and others, creating high entry barriers and unreasonably excluding competition in the attendant markets.

290.     These exclusionary dealing agreements and tying of products as described above are unreasonably restrictive in terms of breadth, duration, and market coverage.

291.     This web of exclusive-dealing agreements cannot be justified by any purportedly procompetitive purpose. Google's exclusive-dealing agreements are thus not only unduly restrictive and unreasonable in length, but they also serve the anticompetitive purpose of cutting competitors off from resources that they need to compete with Google.

292.     This conduct has substantially foreclosed competition in the relevant markets.

293.     These exclusionary agreements violate Clayton Act Section 3, 15 U.S.C. § 14, because these agreements constitute anticompetitive acts intended to maintain defendants' monopolies, including in the Maps APIs, Routes APIs, and Places APIs markets

294.     As a direct and proximate result of defendants' anticompetitive and monopolistic conduct, Plaintiffs and the Class members have been damaged in fact.

295.     Plaintiffs and the Class are also entitled to an injunction, pursuant to 15 U.S.C. § 26, to prevent Google from persisting in its unlawful behavior to their detriment.

**COUNT FIVE: Unfair Competition Law – Unfair or Unfair Business Practices (Cal. Bus. & Prof. Code. §§ 17200, *et seq.*)**

296.      Plaintiffs hereby incorporate by reference the allegations above as if fully set forth herein.

297.      Defendants' conduct, acts, and practices, as described herein, violate California's Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200, *et seq.*), which

prohibits any unlawful, unfair, or fraudulent business act or practice.

298.     Plaintiffs may bring this action under California's Unfair Competition Law because Defendants have offices and continuing operations in California, including Mountain View, California. Further, Defendant Google's California office is responsible for, in part, making or implementing decisions relating to digital-mapping products.

299.     Defendants have engaged in unlawful tying or bundling, including technological tying, of Google products and services, including through its search, GCP, and digital-mapping products and services.

300.     Plaintiffs. have standing to bring this Unfair Competition Law claim as it has suffered injury in fact and lost money or property as a result of Defendants' unlawful and unfair competition. Specifically, the conduct, acts, and practices of Defendants' force app developers to use Defendants' digital-mapping products and services if they use Google's other products and services.

301.     Defendants' conduct, acts, and practices, as described herein, violate the Sherman Act, and thus constitute a violation of California's Unfair Competition Law, under the "unlawful" prong of UCL. Cal. Bus. & Prof. Code § 17200.

302.     As a direct result of Defendants' anticompetitive conduct, acts, and practices, which unlawfully disadvantage Plaintiff, the asserted harm will continue unabated.

303.     Plaintiffs and the Class are also entitled to treble damages based on monetary injuries caused to them by Google's unlawful conduct.

## XIII. PRAYER FOR RELIEF

WHEREFORE, on behalf of itself and the Class members, Plaintiffs respectfully asks the Court for a judgment at trial for the following:

a.     Certification of this case as a class action on behalf of the Class pursuant to Fed.

R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), an order that notice of this class action be given to Class members, as provided by Fed. R. Civ. P. 23(c)(2), and appointment of Plaintiffs as class representative and its attorneys as class counsel;

b.      An order declaring that Defendants' actions violate the law;

c.      Awards to Plaintiffs and the proposed Class members treble to the amount of damages actually sustained by reason of Defendants' antitrust violations alleged herein plus the reasonable costs of this action, including, without limitation, attorneys' fees;

d.      Orders of such equitable relief as are necessary to correct the anticompetitive market effects caused by Defendants' unlawful conduct; and

e.      Awards of such other relief that the Court deems reasonable and appropriate.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

1

2

3

4

Dated: April 13, 2022

5

6                                          /s/ Mario Simonyan
                                           Mario Simonyan (State Bar No. 320226)
7                                          **ESQGo, PC**
                                           303 North Glenoaks Boulevard, Suite 200
8                                          Burbank, CA 91502
                                           Telephone:     (424) 363-6233
9                                          mario@esqgo.com
                                           *Attorney for Plaintiffs and the Class*
10

11                                         Justin S. Nematzadeh*
                                           **NEMATZADEH PLLC**
12                                         101 Avenue of the Americas, Suite 909
                                           New York, New York 10013
13                                         Telephone:     (646) 799-6729
                                           jsn@nematlawyers.com
14                                         *Attorney for Plaintiffs and the Class*
                                           *Pro hac vice application forthcoming*
15

16                                         John G. Balestriere*
                                           Matthew W. Schmidt (State Bar No. 302776)
17                                         **BALESTRIERE FARIELLO**
                                           225 Broadway, 29th Floor
18                                         New York, New York 10007
                                           Telephone:     (212) 374-5401
19                                         Facsimile:     (212) 208-2613
                                           john.balestriere@balestrierefariello.com
20                                         matthew.schmidt@balestrierefariello.com
                                           *Attorneys for Plaintiffs and the Class*
21                                         *Pro hac vice application forthcoming*

22

23

24

25

26

27

28