Justin S. Nematzadeh
**NEMATZADEH PLLC**
101 Avenue of the Americas, Suite 909
New York, New York 10013
Telephone:    (646) 799-6729
jsn@nematlawyers.com
*Attorney for Plaintiffs and the Class*
*Admitted via pro hac vice*

John G. Balestriere*
Matthew W. Schmidt (State Bar No. 302776)**
**BALESTRIERE FARIELLO**
225 Broadway, 29th Floor
New York, New York 10007
Telephone:    (212) 374-5401
Facsimile:    (212) 208-2613
john.balestriere@balestrierefariello.com
matthew.schmidt@balestrierefariello.com
*Attorneys for Plaintiffs and the Class*
*Pro hac vice application forthcoming
** Admission application forthcoming*

Mario Simonyan (State Bar No. 320226)
**ESQGo, PC**
303 North Glenoaks Boulevard, Suite 200
Burbank, California 91502
Telephone:  (424) 363-6233
mario@esqgo.com
*Attorney for Plaintiffs and the Class*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DREAM BIG MEDIA, INC., GETIFY SOLUTIONS, INC., and SPRINTER SUPPLIER LLC, Individually and on Behalf of all Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>ALPHABET INC. and GOOGLE LLC,<br><br>Defendants. | Case No.: 22-cv-02314-JWS<br><br>PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS<br><br>Date:      September 30, 2022<br>Time:     9:00 a.m.<br>Judge:   Hon. Jeffrey S. White<br><br>ORAL ARGUMENT REQUESTED |

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................... ii

I.      INTRODUCTION ............................................................................................ 1

II.     STATEMENT OF ISSUES ............................................................................. 5

III.    STATEMENT OF FACTS ............................................................................... 5

        A.  The Relevant Products Markets are Maps APIs, Routes APIs, and Places APIs ............. 5

        B.  Defendants' Engaged in a Relentless Campaign of Acquiring Mapping Competitors ..... 5

        C.  Defendants Commit Tying, Bundling, Exclusivity, and Self-Preferencing .................... 5

        D.  Defendants Exercise Monopoly Power (and at the Least, Market Power) ...................... 8

IV.     ARGUMENT ................................................................................................... 8

        A.  Plaintiffs Allege Tying in Violation of Section 1 Under Per Se and Rule of Reason ...... 8

            1.  Relevant Products Markets are Maps APIs, Routes APIs, and Places APIs ............. 8

            2.  Plaintiffs Allege Negative and Positive Tying ...................................................... 11

            3.  Plaintiffs Allege Monopoly Power, and at the Least, Sufficient Market Power ...... 13

        B.  Plaintiffs allege anticompetitive practices in totality in violation of Section 2 ............. 15

        C.  Plaintiffs Allege Attempted Monopolization in violation of Section 2 ......................... 17

        D.  Plaintiffs Allege a Violation of CUCL ................................................................... 18

        E.  Undoing the Waze Transaction is Not Sought; No Statute of Limitations Issues Exist . 18

V.      CONCLUSION ............................................................................................... 18

1

## <u>TABLE OF AUTHORITIES</u>

2

### <u>CASES</u>

3

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
    836 F.3d 1171 (9th Cir. 2016)..........................................................................12

4

*AliveCor, Inc. v. Apple Inc.*,
    2022 WL 833628 (Mar. 21, 2022)......................................................................1

5

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
    592 F.3d 991 (9th Cir. 2010)............................................................................15

6

7

*Blue Sky Color of Imagination, LLC v. Mead Westvaco Corp.*,
    2010 WL 4366849 (C.D. Cal. Sept. 23, 2010)...................................................16

8

*Cascade Health Sol v. PeaceHealth*,
    515 F. 3d 883 (9th Cir. 2008)....................................................................11, 15

9

10

*Cost Mgmt. Servs., Inc. v. Washington Natural Gas Co.*,
    99 F.3d 937 (9th Cir. 1996)...............................................................................8

11

*Cytokinetics, Inc v. Pharm-Olam Intl., Ltd.*,
    2015 WL 1056324 (N.D. Cal. Mar. 10, 2015)....................................................5

12

13

*Dang v. San Francisco Forty Niners*,
    964 F. Supp. 2d 1097 (N.D. Cal. 2013).............................................................9

14

*Datagate, Inc. v. Hewlett-Packard Co.*,
    60 F. 3d 1421 (9th Cir. 1995)..........................................................................12

15

16

*Datel Holdings Ltd. v. Microsoft Corp.*,
    712 F. Supp. 2d 974 (N.D. Cal. 2010)..............................................................11

17

*Delano Farms Co. v. California Table Grape Comm'n*,
    623 F. Supp. 2d 1144 (E.D. Cal. 2009).............................................................9

18

19

*Digidyne Corp. v. Data Gen. Corp.*,
    734 F.2d 1336 (9th Cir. 1984)..........................................................................13

20

*Dytch v. Yoon*,
    2011 WL 839421 (9th Cir. Mar. 7, 2011)...........................................................5

21

22

*Fed. Trade Comm'n v. Facebook, Inc.*,
    560 F. Supp. 3d 1 (D.D.C. 2021)......................................................................12

23

*GreenCycle Paint, Inc. v. PaintCare, Inc.*,
    250 F. Supp. 3d 438 (N.D. Cal. 2017)..............................................................18

24

25

*Gumwood HP Shopping Partners, L.P. v. Simon Prop. Grp., Inc.*,
    2013 WL 3214983 (N.D. Ind. Mar. 13, 2012)...................................................13

26

*Hannah's Boutique, Inc. v. Surdej*,
    2013 WL 4553313 (N.D. Ill. Aug. 28, 2013).....................................................13

27

28

*Hicks v. PGA Tour, Inc.,*
  165 F. Supp. 3d 898 (N.D. Cal. Feb. 9, 2016) .................................................... 18

*High Tech. Careers v. San Jose Mercury News,*
  996 F.2d 987 (9th Cir. 1993) .......................................................................... 8

*Hytera Commc'ns Corp. Ltd. v. Motorola Solutions, Inc.,*
  2022 WL 3645908 (N.D. Ill. Aug. 24, 2022) .................................................. 16

*Image Tech. Servs., Inc. v. Eastman Kodak Co.,*
  125 F.3d 1195 (9th Cir. 1997) ........................................................................ 9

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.,*
  933 F.3d 1136 (9th Cir. 2019) ...................................................................... 16

*In re Pool Prods. Distrib. Market Antitrust Litig.,*
  940 F. Supp. 2d 367 (E.D. La. 2013) ............................................................ 17

*In re Webkinz Antitrust Litig.,*
  2010 WL 4168845 (N.D. Cal. Oct. 20, 2010) ................................................... 1

*In re Webkinz Antitrust Litig.,*
  695 F. Supp. 2d 987 (N.D. Cal. 2010) ............................................................ 9

*Klein v. Facebook, Inc.,*
  2022 WL 141561 (N.D. Cal. Jan. 14, 2022) .................................................... 8

*Levitt v. Yelp! Inc.,*
  765 F.3d 1123 (9th Cir. 2014) ...................................................................... 18

*Masimo Corp. v. Tyco Health Care Group, L.P.,*
  2006 WL 1236666 (C.D. Cal. Mar. 22, 2006) ................................................ 15

*Moore v. James H. Matthews & Co.,*
  550 F.2d 1207 (9th Cir. 2003) ...................................................................... 12

*Mozart Co. v. Mercedes-Benz of N. Am., Inc.,*
  833 F.2d 1342 (9th Cir. 1987) ........................................................................ 2

*Newcal Indus., Inc. v. Ikon Office Sol.,*
  513 F.3d 1038 (9th Cir. 2008) ........................................................................ 8

*Newcal Indus., Inc. v. Ikon Office Solutions, Inc.,*
  2011 WL 1899404 (N.D. Cal. May 19, 2011) ................................................ 12

*Ploss v. Kraft Foods Grp., Inc.,*
  197 F. Supp. 3d 1037 (N.D. Ill. 2016) ........................................................... 13

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.,*
  124 F.3d 430 (3d Cir. 1997) .......................................................................... 10

*RealPage, Inc. v. Yardi Sys., Inc.,*
  852 F. Supp. 2d 1215 (C.D. Cal. 2012) ......................................................... 10

*Reilly v. Apple Inc.,*
  2022 WL 74162 (N.D. Cal. Jan. 7, 2022) ...................................................... 10

*Rumble, Inc. v. Google LLC*,
  2022 WL 3018062 (N.D. Cal. July 29, 2022) ................................................................. 16

*Sambreel Holdings LLC v. Facebook, Inc.*,
  906 F. Supp. 2d 1070 (S.D. Cal. 2012) ........................................................................ 12

*Smith v. eBay Corp.*,
  2012 WL 1951971 (N.D. Cal. May 29, 2012) ................................................................... 1

*Smith v. eBay Corp.*,
  2012 WL 27718 (N.D. Cal. Jan. 5, 2012) ...................................................................... 11

*Spindler v. Johnson & Johnson Corp.*,
  2011 WL 13278876 (N.D. Cal. Jan. 21, 2011) ............................................................... 10

*Streamcast Networks, Inc. v. Skype Techs., S.A.*,
  547 F. Supp. 2d 1086 (C.D. Cal. 2007) ........................................................................ 10

*Suture Express, Inc. v. Cardinal Health 200, LLC*,
  963 F. Supp. 2d 1212 (D. Kan. Aug. 1, 2013) ............................................................... 11

*Tanaka v. Univ. of S. Cal.*,
  252 F.3d 1059 (9th Cir. 2001) ..................................................................................... 10

*Teradata Corp. v. SAP SE*,
  2018 WL 6528009 (N.D. Cal. Dec. 12, 2018) ................................................................ 12

*Thompson v. Metro. Multi-List, Inc.*,
  934 F.2d 1566 (11th Cir. 1991) ................................................................................... 14

*United Energy Trading, LLC v. Pac. Gas & Elec. Co.*,
  200 F. Supp. 3d 1012 (N.D. Cal. 2016) ................................................................. 14, 17

*Universal Hosp. Servs., Inc. v. Hill-Rom Holdings, Inc.*,
  2015 WL 6994438 (W.D. Tex. Oct. 15, 2015) ................................................................ 11

*William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*,
  668 F.2d 1014 (9th Cir. 1981) ..................................................................................... 17

**STATUTES**

15 U.S.C. §§ 1, 2 ....................................................................................................... 1

15 U.S.C. § 14 ........................................................................................................... 1

Cal. Bus. & Prof. Code § 17200 .................................................................................. 1

**RULES**

Federal Rule of Civil Procedure 8(a) ........................................................................... 1

## I. INTRODUCTION

Plaintiffs Dream Big Media, Inc., Getify Solutions, Inc., and Sprinter Supplier LLC (together, "Plaintiffs") and the Class hereby oppose Defendants Alphabet Inc. and Google LLC's (together, "Defendants" or "Google") Motion to Dismiss (ECF No. 29, "Defs.' MTD") the Complaint for violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, Section 3 of the Clayton Act, 15 U.S.C. §§ 14, and California's Unfair Competition Law ("CUCL"), Cal. Bus. & Prof. Code § 17200. (ECF No. 1.)[1] Antitrust complaints must satisfy Federal Rule of Civil Procedure ("Rule") 8(a). *AliveCor, Inc. v. Apple Inc.*, 2022 WL 833628, at *4 (Mar. 21, 2022). Detailed factual allegations are not required if the complaint contains sufficient factual allegations to state a claim to relief that is plausible on its face. *Id.*[2] A claim has facial plausibility when plaintiff pleads factual content that allows the court to draw a reasonable inference that defendant is liable. *Smith v. eBay Corp.*, 2012 WL 1951971, at *3 (N.D. Cal. May 29, 2012). This standard is not a probability requirement; it asks for a "sheer possibility" that defendant acted unlawfully. *Id.*

Plaintiffs have alleged tying arrangements, where Defendants have an agreement to sell one product on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier. *Id.* Defendants' tying violates *per se* liability under Section 1 because (i) Defendants tied together the sale of two distinct products, (ii) Defendants possess enough economic power in the tying product market to coerce its customers into purchasing the tied product, and (iii) the tying arrangement affects a not insubstantial volume of commerce in the tied product market. *In re Webkinz Antitrust Litig.*, 2010 WL 4168845, at *1 (N.D. Cal. Oct. 20, 2010). And tying violates the rule of reason under Section 1 because Plaintiffs allege a contract, combination, or conspiracy among two or more entities, in restraint of interstate commerce, that injures competition, and that Plaintiffs suffer antitrust injury. *Smith*, 2012 WL 1951971, at *3. Adverse effects on competition occur, as do here, when the tying arrangement will either harm existing competitors or create barriers to entry to new competitors in the market for the

---

[1] All ¶_ references herein are to the Complaint, and any terms not defined herein have the meanings defined in the Complaint.
[2] All internal citations and quotations are omitted herein, unless stated otherwise.

1

tied product or will force buyers into giving up the purchase of substitutes for the tied product. *Id.*[3]

Defendants only argue that Plaintiffs fail to plead (i) relevant product markets, (ii) there having been tying, and (iii) market power. Defs.' MTD at 5-11. All three arguments fail.

***Relevant Product Markets***: Plaintiffs allege the distinct particular circumstances and uses of Maps APIs (used to display a digital map), Routes APIs (used to embed navigation tools on a digital map), and Places APIs (used to embed information about venues on a digital map) (all defined below), the distinct free tiers and pricing for them, and Defendants, competitors, market participants, direct users, and analysts' recognition of them being distinct. The three are not economic substitutes for each other, and no products are their economic substitutes because they are not reasonably interchangeable for the same purposes, they have distinct core functionalities, distinct perceptions by Defendants, Plaintiffs, and industry participants, and have distinct pricing patterns and sensitivities. Plaintiffs demonstrate lack of reasonable interchangeability of use, and they need not allege cross-elasticity of demand regarding price or non-price terms under which users would switch to alternatives. Still, Plaintiffs allege drastic price increases in Google Maps' Maps APIs, Routes APIs, and Places APIs over several years, all without Defendants' dominance in the market slipping and without Plaintiffs and direct users replacing the APIs or using other types of APIs instead (they cannot). Plaintiffs have no obligation to address every possible substitute; it is telling that Defendants do not present a plausible alternative substitute—because there is none.

***Negative and Positive Tying***:  Based, in part, on findings in the House Antitrust Proposals (defined below), Google Maps uses monopoly power (and at the least, market power) to effectuate exclusionary tying. The main tying product is Google Maps' Maps APIs, and the tied products are Google Maps' Routes APIs and Places APIs: once Plaintiffs use Google Maps' Maps APIs to form the base of a digital map, Defendants prohibit them from using any Routes APIs or Places APIs from competitors to embed onto or use in conjunction with the digital map, despite the preference of Plaintiffs to use competitors' Routes APIs or Places APIs that are significantly cheaper (some even for free) and of comparable quality. And technically and practically, if Plaintiffs want to use Google Maps' Routes APIs or Places APIs without using Google Maps' Maps APIs, they cannot;

---

[3] *Mozart Co. v. Mercedes-Benz of N. Am., Inc.*, 833 F.2d 1342, 1352 (9th Cir. 1987) (elements for establishing tying under Section 1 are the same as establishing tying under Clayton Act Section 3).

they must use Google Maps' Maps APIs. *Id*. Defendants use, revise, and enforce the Terms of Service ("TOS") to effectuate the negative and positive tying. In addition to the language in the TOS, Plaintiffs have alleged Defendants effectuating negative and positive tying. In practice, Defendants' aggressive enforcement has led Plaintiffs to have switched entirely to the Google Maps ecosystem even in cases where they preferred using non-Google companies; the findings in the House Antitrust Proposals are consistent with this in terms of market participants more generally. Through interviews with market participants, the House Antitrust Subcommittee learned that Defendants have been aggressively enforcing tying.

*Sufficient Market Power*: Google Maps demonstrates direct monopoly power (and at the least, sufficient market power). That no meaningful competitors have emerged for several years, despite Google Maps' byzantine pricing escalation, tying, bundling, exclusive dealing, self-preferencing, and riddled quality issues—Google Maps has done an abysmal, if not intentional or reckless, job of maintaining quality and accurate business-mapping features—is the quintessential, direct demonstration of Google Maps' monopoly power. Google Maps' direct demonstration of monopoly power has been its ability to sustain egregious prices and dominance, all while foreclosing Plaintiffs from using preferable competitors that offer materially cheaper, if not free, Maps APIs, Routes APIs, and Places APIs that are of comparable quality, if not better.

And Plaintiffs allege circumstantial facts concerning Google Maps' monopoly power (and at the least, sufficient market power). As included in the House Antitrust Proposals, in the directly salient business-to-business market, which is Google Maps APIs directly to the Plaintiffs, Google Maps captures over 90% market share. Barriers to entry for Maps APIs, Routes APIs, and Places APIs that Defendants helped erect are staggering, i.e. high fixed costs, access to data, market tipping, network effects, and high switching costs for Plaintiffs. Defendants have an insurmountable advantage over Maps APIs, Routes APIs, and Places APIs competitors due to the sheer volume of tracking of and processing user and location data acquired daily through a panoply of products and services. Defendants benefitted from amassing such sensitive, confidential location data before the passage of new data restrictions hampering startups. It is incredible for Defendants, on the one hand, to discredit the allegations that Google Maps captures over 90% market share in

the directly salient business-to-business market, which is Google Maps APIs directly to the Plaintiffs, and demand more-surgical precision in the allegations, where on the other hand, according to the House Antitrust Proposals, Google stated that it "doesn't maintain information in the normal course of business about market share[.]" Ex. 1 ("House Antitrust Proposals"), at 178.

To successfully plead monopolization under Section 2, plaintiff must allege that defendant has monopoly power in a relevant market, is willfully acquiring or maintaining monopoly power through exclusionary conduct, and causal antitrust injury. *AliveCor*, 2022 WL 833628, at *5. Conduct under Section 2 is anticompetitive if it "tends to impair the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way." *Id.* at *9. To successfully plead attempted monopolization under Section 2, a plaintiff must allege (i) predatory or anticompetitive conduct, (ii) pursued with the specific intent to control prices or destroy competition, (iii) a dangerous probability that the defendant will achieve monopoly power, and (iv) injury stemming from the complained-of anticompetitive behavior. *Id.*

In totality, Plaintiffs allege negative and positive tying, bundling, exclusive dealing, and self-preferencing that together violate Section 2 as monopoly maintenance. Plaintiffs allege bundling: to access Google Maps' APIs, Plaintiffs must have an API key secured only through a GCP account (defined below), which they must establish to pay for the APIs. This is another basis of Defendants using Google Maps' monopoly power to entrench market power in cloud computing. The forcing of Plaintiffs to entirely enter Google Maps' ecosystem is also a form of exclusive dealing because these users can only use Google Maps' APIs, to the exclusion of competitors' Maps APIs, Routes APIs, and Places APIs—and they face high switching costs.

Defendants' other arguments are unpersuasive. Critically, it is telling what Defendants do ***not*** argue: anticompetitive harm allegations are addressed more thoroughly in Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Strike the Class Action Allegations because Defendants in their MTD did not argue against Plaintiffs having sufficiently alleged substantial foreclosure of competition, the not insubstantial volume of commerce that was affected, Article III or antitrust standing, anticompetitive harm outweighing any procompetitive justifications, and damages. Nor can they because such allegations are compelling. Defendants

cannot raise arguments against these issues for the first time in their reply. *Dytch v. Yoon*, 2011 WL 839421, at *3 (9th Cir. Mar. 7, 2011) (parties cannot raise new issue for the first time in their reply); *Cytokinetics, Inc v. Pharm-Olam Intl., Ltd.*, 2015 WL 1056324, *4 (N.D. Cal. Mar. 10, 2015).

## II.   STATEMENT OF ISSUES

1.   Have Plaintiffs alleged valid claims for relief under federal antitrust laws or the CUCL?

2.   Have Plaintiffs alleged a valid basis for tolling the statute of limitations?

## III.   STATEMENT OF FACTS

### A.  The Relevant Products Markets are Maps APIs, Routes APIs, and Places APIs

Digital mapping has become a critical resource and essential utility. ¶¶63, 127. Application ("app") programming interfaces ("APIs") enable users to use or call the digital-mapping resources from a supplying business. ¶3. Digital-mapping APIs can be broken down into three distinct relevant products markets: Maps APIs, Routes APIs, and Places APIs. ¶¶3, 73-76, 254, 268. For example, a programmer developing a food-delivery app or website that needs to guide delivery drivers to its customers may call on Maps APIs for creating a digital map, then call on Routes APIs for adding directions on the digital map to provide navigation information to the driver, and then call on Places APIs to add information about the restaurant on the digital map. ¶4. Embedding Routes APIs or Places APIs on Maps APIs in a digital map allows the user to attract its customers. ¶5. Maps APIs, Routes APIs, and Places APIs are each different global relevant product markets, and even Google Maps categorizes these as a separate products with separate pricing. ¶74-76.

### B.  Defendants' Engaged in a Relentless Campaign of Acquiring Mapping Competitors

Google Maps' growth can be traced to serial acquisitions. ¶¶78-121. Critically, Defendants purchased Waze in 2013 for $1.3 billion. ¶¶89-90. Defendants' own documents revealed that by 2012, Google Maps was the top provider of digital maps in desktop, mobile, and API, and it was closely tracking Waze's fast growth. ¶¶89, 126.

### C.  Defendants Commit Tying, Bundling, Exclusivity, and Self-Preferencing

Prior to 2018, Google Maps offered meaningful amounts of free tiers of its Maps APIs, Routes APIs, and Places APIs, luring direct users to build their apps or websites with Google Maps. ¶19. However, around May 2018 and continuing thereafter, Google Maps introduced a single "pay-

as-you-go" pricing plan for the core mapping APIs, including Maps APIs, Routes APIs, and Places APIs. ¶¶20, 206. Developers have reported that ever since Google Maps enforced unexpected, drastic pricing changes and enforced tying and exclusive dealing, their costs have skyrocketed, even up 1,400% and 20x in instances. ¶¶20, 206-09.

Competitors in Maps APIs, Routes APIs, and Places APIs exist, but Google Maps' dominance dwarfs them, and the competitors' potential ability to serve Plaintiffs has only dwindled over the past several years in proportion to Defendants' ramping up of the alleged unlawful conduct. *Id.* Indeed, those competitors offer Maps APIs, Routes APIs, and Places APIs mostly at significantly reduced prices to Google—and some even for free—and with comparable data and quality, if not better. ¶¶10, 122. Based, in part, on a report by the U.S. House Committee on the Judiciary, Subcommittee on Antitrust, Commercial and Administrative Law, the "House Antitrust Proposals," flexing a stranglehold over crucial digital-mapping markets, Google Maps uses monopoly power (and at the least, market power) to effectuate exclusionary tying. *See* ¶154. The main tying product is Google Maps' Maps APIs, and the tied products are Google Maps' Routes APIs and Places APIs: once Plaintiffs use Google Maps' Maps APIs to form the base of a digital map, Defendants' prohibit them from using any Routes APIs or Places APIs from competitors to embed onto or use in conjunction with the digital map, despite the preference of Plaintiffs to use competitors' Routes APIs or Places APIs that are significantly cheaper (some even for free) and of comparable quality (if not better). ¶¶12, 153-63. And technically and practically, if Plaintiffs want to use Google Maps' Routes APIs or Places APIs without using Google Maps' Maps APIs, they cannot; they must use Google Maps' Maps APIs. *Id.*

Defendants use, revise, and enforce TOS to prohibit Plaintiffs from using ***any*** component of the Google Maps Core Services, including, without limitation, each of Google Maps' Maps APIs, Routes APIs, and Places APIs, with Maps APIs, Routes APIs, and Places APIs provided by non-Google firms—indeed not even near or in conjunction with each other on the same application. ¶¶12, 153, 156-58. For example, "Google Maps Content means any content provided through the Services (whether created by Google or its third-party licensors), including map and terrain data, imagery, trace data, and places data (including business listings) . . . Customer will not use the

Google Maps Core Services with or near a non-Google Map in a Customer Application. For example, Customer will not (i) display or use Places content on a non-Google map, (ii) display Street View imagery and non-Google maps on the same screen, ***or (iii) link a Google Map to non-Google Maps content or a non-Google map***." ¶157 (emphasis added). Plaintiffs could not use advertising overlays from sources other than Google's APIs if done on a digital map including Google Maps' Maps APIs, Routes APIs, or Places APIs; only Defendants are permitted to enable advertising and the manner it is overlayed on a digital map based on Google Maps' APIs. ¶171.

Plaintiffs also allege positive tying. *See* ¶¶14, 164. For example: even if a direct user requests a specific JavaScript-related Google Maps' Maps API, Defendants unilaterally add on unnecessary, non-responsive APIs, such as Places APIs, to that request and charge for those additional APIs. ¶¶14, 164. Plaintiffs also address other examples of positive tying. *Id.*

In addition to the language in the TOS, Plaintiffs have alleged Defendants effectuating tying in practice to them and the Class. *See* ¶¶12-13, 152-64. During the Class Period, Plaintiffs used Google Maps' Maps APIs and through the tying (both negative and positive) and exclusive dealing, they were forced to use other of Google Maps' APIs or could not use other providers' digital-mapping APIs—for example, Routes APIs and Places APIs. *Id.* In practice, Defendants' aggressive enforcement has led Plaintiffs to have switched entirely to the Google Maps ecosystem even in cases where they preferred using non-Google companies. *See* ¶¶153-71.

Defendants' TOS and practices have also forced Plaintiffs to use a bundle of Google Maps' Maps APIs, Routes APIs, and Places APIs, as once the direct user elects to use one of Google Maps' APIs, they must use only Google Maps' APIs. ¶160. To access Google Maps' Maps APIs, Routes APIs, and Places APIs, Plaintiffs must have an API key secured only through a Google Cloud Platform ("GCP") account, which they must establish and link payment-card details to pay for the APIs. ¶¶6, 65-67. That Plaintiffs, the Class, and such massive companies face the tying, bundling, and exclusive dealing to wall them into the Google Maps' ecosystem (for example, Ford, Lyft, and Uber), plus the circumstantial allegations of Google Maps' massive market share in the business-to-business segment (that affecting Plaintiffs and Class members) of over 90%,

demonstrate that the alleged exclusive dealing has worked to substantially foreclose competition. ¶¶9, 21, 109, 122, 125, 129-130, 160, 214-17.

### D. Defendants Exercise Monopoly Power (And at the Least, Market Power)

Google Maps demonstrates direct monopoly power (and at the least, sufficient market power). ¶¶120-21, 128, 197-98, 223-24, 255, 270-71. That no meaningful competitors have emerged for several years, despite Google Maps' byzantine pricing escalation, tying, bundling, exclusive dealing, self-preferencing, and riddled quality issues—Google Maps has done an abysmal, if not intentional or reckless, job of maintaining quality and accurate business-mapping features—is the quintessential, direct demonstration of Google Maps' monopoly power. ¶¶23, 120-21, 128, 186, 191, 197-98, 221-24, 255, 270-71. Google Maps' direct demonstration of monopoly power has been its ability to sustain egregious prices and dominance, all while foreclosing Plaintiffs from using preferable competitors that offer materially cheaper, if not free, Maps APIs, Routes APIs, and Places APIs that are of comparable quality, if not better. *See* ¶187. And Plaintiffs allege circumstantial facts concerning Google Maps' monopoly power. As included in the House Antitrust Proposals, in the directly salient business-to-business market, which is Google Maps APIs directly to the Plaintiffs, Google Maps captures over 90% market share. ¶¶109, 129, 130. Barriers to entry for Maps APIs, Routes APIs, and Places APIs that Defendants helped erect are staggering, i.e. high fixed costs, access to data, market tipping, network effects, and high switching costs for Plaintiffs. ¶¶132, 135, 229. Defendants have an insurmountable advantage over Maps APIs, Routes APIs, and Places APIs competitors due to the sheer volume of tracking of and processing user and location data acquired daily through a panoply of products, which they amassed before the passage of data restrictions hampering startups. ¶¶131, 134, 142, 146-47, 151.

### IV.   ARGUMENT

### A. Plaintiffs Allege Tying in Violation of Section 1 Under Per Se and Rule of Reason

Defendants only argue that Plaintiffs fail to plead (i) relevant products markets, (ii) negative or positive tying, and (iii) market power. Defs.' MTD at 5-11. All three arguments fail.

### 1. Relevant Products Markets are Maps APIs, Routes APIs, and Places APIs

Neither the elements of relevant markets nor market power (approached similarly under Sections 1 and 2) need be pled with specificity. *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1044-45 (9th Cir. 2008). A complaint survives a motion to dismiss, unless the relevant market definition is facially unsustainable in that it is apparent from the complaint's face that the market suffers a fatal legal defect. *Id.* The relevant market is a factual element rather than a legal element and may survive scrutiny under a motion to dismiss subject to factual testing by summary judgment or trial. *Id.*; *Cost Mgmt. Servs., Inc. v. Washington Natural Gas Co.*, 99 F.3d 937, 950 (9th Cir. 1996); *High Tech. Careers v. San Jose Mercury News*, 996 F.2d 987, 990 (9th Cir. 1993). A defendant may raise market definition in a motion to dismiss, but the question of whether the market should include other products is better resolved at summary judgment or by a jury; the court on a motion to dismiss need not engage in extensive analyses of reasonable interchangeability or cross elasticity of demand. *Klein v. Facebook, Inc.*, 2022 WL 141561, at *6 (N.D. Cal. Jan. 14, 2022).

Examples of practical indicia of a relevant product market include industry or public recognition, the products' particular circumstances and uses, distinct prices, and sensitivity to price changes. *Id.* at *5, 7. A relevant product market encompasses the product at issue and economic substitutes for the product, which can be demonstrated by either: (i) a reasonable interchangeability of use, meaning that other products are not reasonably interchangeable for the same purposes of the relevant product market with allegations of a distinct core functionality, distinct perceptions by customers, distinct analysis by industry participants, or distinct pricing patterns; or (ii) sufficient cross-elasticity of demand, meaning that there is cross-elasticity of demand between two products where an increase in price of one product leads to an increase in demand for another. *Id.*

Plaintiffs allege the distinct particular circumstances and uses of Maps APIs, Routes APIs, and Places APIs, the distinct free tiers and pricing for them, and Defendants, competitors, market participants, direct users, and analysts' recognition of them being distinct. ¶¶3-5, 13, 63-67, 71-76, 89, 127, 254, 268. The three are not economic substitutes for each other, and no products are economic substitutes for them because they are not reasonably interchangeable for the same purposes, they have distinct core functionalities, distinct perceptions by Defendants, Plaintiffs, customers, analysts, and industry participants, and have distinct pricing patterns and sensitivities.

*See, e.g.*, *Klein*, 2022 WL 141561, at *8-10 (distinct relevant products markets based on defendant's own documents reflecting distinct features, public recognition of distinct features, and distinct functionalities); *Newcal*, 513 F.3d at 1045; *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th Cir. 1997) (relevant market is field in which meaningful competition exists); *Dang v. San Francisco Forty Niners*, 964 F. Supp. 2d 1097, at 1107 (N.D. Cal. 2013) (relevant market boundaries can be examined by practical indicia, such as industry and public recognition, the product's characteristics and uses, distinct prices, and sensitivity to price changes); *In re Webkinz Antitrust Litig.*, 695 F. Supp. 2d 987, 995 (N.D. Cal. 2010) (markets descriptions sufficiently distinct from other product markets); *Delano Farms Co. v. California Table Grape Comm'n*, 623 F. Supp. 2d 1144, 1176-77 (E.D. Cal. 2009) (market definition is a "deeply fact-intensive" inquiry; it is inappropriate to "delve into a factual inquiry" on a motion to dismiss).

This requirement is in the alternative: since Plaintiffs demonstrate lack of reasonable interchangeability of use, they need not allege cross-elasticity of demand regarding price or non-price terms under which users would switch to alternatives. *Klein*, 2022 WL 141561, at *11 (only a qualitative description required at the pleading stage showing certain factors of both the service at issue and its potential substitutes render them not reasonably interchangeable in the eyes of users). Still, Plaintiffs allege drastic price increases in Google Maps' APIs over several years, all without Defendants' dominance in the market slipping (there have been no new competitors over the past several years to challenge Defendants' dominance) and without Plaintiffs and direct users replacing the three APIs with each other or using other types of APIs (they cannot) (¶¶10, 12, 19-20, 122, 124, 153-63, 206-11, 257). *See AliveCor*, 2022 WL 833628, at *5 (cross-elasticity means that if the price of one good increases, demand for the purportedly equivalent good will increase, as consumers substitute the equivalent good for their initial, now expensive, choice); *RealPage, Inc. v. Yardi Sys., Inc.*, 852 F. Supp. 2d 1215, 1225 (C.D. Cal. 2012) (finding distinct relevant products, where price increase would not cause customers to switch to seeming substitutes).

Plaintiffs are not required to identify every alleged competitor nor every purported substitute in its pleadings. *Klein*, 2022 WL 141561, at *12. It is telling that Defendants fail to suggest a plausible alternative relevant products market. *See id.* There are none demonstrated at

this juncture before discovery; for example, it is inconceivable that non-digital forms of mapping data, routes data, or places data would substitute Maps APIs, Routes APIs, and Places APIs.[4]

### 2. Plaintiffs Allege Negative and Positive Tying

Based, in part, on findings in the House Antitrust Proposals, Google Maps uses monopoly power (and at the least, market power) to effectuate exclusionary tying. ¶154. The main tying product is Google Maps' Maps APIs, and the tied products are Google Maps' Routes APIs and Places APIs: once Plaintiffs use Google Maps' Maps APIs to form the base of a digital map, Defendants' prohibit them from using any Routes APIs or Places APIs from competitors to embed onto or use in conjunction with the digital map, despite the preference of Plaintiffs to use competitors' Routes APIs or Places APIs that are significantly cheaper (some even for free) and of comparable quality (if not better). ¶¶12, 153-63. And technically and practically, if Plaintiffs want to use Google Maps' Routes APIs or Places APIs without using Google Maps' Maps APIs, they cannot; they must use Google Maps' Maps APIs. *Id.* Defendants' use, revise, and enforce the TOS to effectuate the negative and positive tying. ¶¶12, 153, 156-58. In addition to the language in the TOS, Plaintiffs have alleged Defendants effectuating negative and positive tying in practice to them and the Class. *See* ¶¶12-14, 152-64. In practice, Defendants' aggressive enforcement has led Plaintiffs to have switched entirely to the Google Maps ecosystem even in cases where they preferred using non-Google companies; the findings in the House Antitrust Proposals are consistent with this in terms of market participants more generally. *See* ¶¶153-71.

These factually rich allegations satisfy Plaintiffs' pleading standard of negative and positive tying. *See, e.g.*, *Cascade Health Sol v. PeaceHealth*, 515 F. 3d 883, 913 (9th Cir. 2008) (tying

---

[4] Google cites inapposite authority to argue that Plaintiffs only refer to "broad categories of services, not the separate individual products Google offers" (Defs.' MTD at 9), which contradicts Plaintiffs' detailed factual allegations on the qualities of the distinct relevant products markets. *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001) ("UCLA women's soccer program" was not a relevant market because plaintiff wanted to attend college "close to her family"); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997) ("ingredients, supplies, materials, and distribution services used [in] operation of Domino's pizza stores" is not a relevant market); *Reilly v. Apple Inc.*, 2022 WL 74162, at *4 (N.D. Cal. Jan. 7, 2022) (rejecting a single-brand market); *Spindler v. Johnson & Johnson Corp.*, 2011 WL 13278876, at *3 (N.D. Cal. Jan. 21, 2011) (no relevant market for simply "pharmaceutical services"); *AliveCor*, 2022 WL 833628, at *6-7 (plaintiffs' allegations contradicted contours of relevant product market); *Streamcast Networks, Inc. v. Skype Techs., S.A.*, 547 F. Supp. 2d 1086, 1094 (C.D. Cal. 2007) (plaintiffs did not establish that two different technologies constituted the same product market).

where defendant was the only provider of tertiary services in the relevant geographic market and forced unwanted purchases of secondary services); *Smith v. eBay Corp.*, 2012 WL 27718, at *6 (N.D. Cal. Jan. 5, 2012) (defendant's policies "effectively" forced plaintiffs to use PayPal as the sole method of payment, even though other methods existed); *Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974, 996 (N.D. Cal. 2010) (tying where Microsoft's gaming consoles conditioned the use of Microsoft's memory cards); *RealPage*, 852 F. Supp. 2d at 1223-24 (negative tie where defendant's software licenses conditioned licensees' use of defendant's accounting software on agreement not to use competitors' vertical-cloud services (the tied product)); *Suture Express, Inc. v. Cardinal Health 200, LLC*, 963 F. Supp. 2d 1212, 1220-21 (D. Kan. Aug. 1, 2013) (tying through incentives that in practicality induced purchasers not to purchase products from a competitor); *Universal Hosp. Servs., Inc. v. Hill-Rom Holdings, Inc.*, 2015 WL 6994438, at *5-7 (W.D. Tex. Oct. 15, 2015) (same in connection with discounts and rebates).

The precise terms of the TOS and other contracts at issue, changes to them throughout the Class Period, their meaning, how they were interpreted and enforced, and whether Defendants actually forced tying—all which Plaintiffs nevertheless have well alleged—are factual issues that can be **proven** at summary judgment or trial. *See, e.g.*, *Newcal*, 513 F.3d at 1052; *Newcal Indus., Inc. v. Ikon Office Solutions, Inc.*, 2011 WL 1899404, at *5 (N.D. Cal. May 19, 2011) (allegations were sufficient to raise factual questions, despite defendants' arguments regarding language in forms). A showing that the buyer was coerced, as Plaintiffs were, by the tying arrangement into making the purchase is sufficient to show that the buyer was not merely "acting independently." *Datagate, Inc. v. Hewlett-Packard Co.*, 60 F. 3d 1421, 1427 (9th Cir. 1995); *Moore v. James H. Matthews & Co.*, 550 F.2d 1207, 1216 (9th Cir. 2003) (coercion where a cemetery contract required buyers of cemetery lots to buy gravesite care service and monuments from the seller with up to 350% price mark-ups); *Teradata Corp. v. SAP SE*, 2018 WL 6528009, at *14 (N.D. Cal. Dec. 12,

2018) (tying and coercion, whether implied or de facto, could suffice, despite defendant's contention that customers can still purchase stand-alone products).[5]

### 3.   Plaintiffs Allege Monopoly Power, and at the Least, Sufficient Market Power

Direct allegations of market power can include supracompetitive prices, restricted output, diminished quality, or exclusion of competition. *Klein*, 2022 WL 141561, at *6. Google Maps demonstrates direct monopoly power. ¶¶120-21, 128, 197-98, 223-24, 255, 270-71. That no meaningful competitors have emerged for several years, despite Google Maps' byzantine pricing escalation, tying, bundling, exclusive dealing, self-preferencing, and riddled quality issues— Google Maps has done an abysmal, if not intentional or reckless, job of maintaining quality and accurate business-mapping features—is the quintessential, direct demonstration of Google Maps' monopoly power (and at the least, market power). ¶¶23, 120-21, 128, 186, 191, 197-98, 221-24, 255, 270-71. Google Maps' direct demonstration of monopoly power has been its ability to sustain egregious prices and dominance, all while foreclosing Plaintiffs from using preferable competitors that have been known to offer materially cheaper, if not free, Maps APIs, Routes APIs, and Places APIs that are of comparable quality, if not better. *See* ¶187. Decisions crediting such direct demonstrations of market power are legion. *See, e.g.*, *Cost Mgmt.*, 99 F.3d at 950-51 (monopoly power defined as power to control prices or exclude competition); *Digidyne Corp. v. Data Gen. Corp.*, 734 F.2d 1336, 1340-41 (9th Cir. 1984) (*per se* tying is where supplier has ability "to induce his customers for one product to buy a second product from him that would not be purchased solely on the merit of that second product."); *RealPage*, 852 F. Supp. 2d at 1227 (plaintiff sufficiently

---

[5] The facts in *Paladin Assocs., Inc. v. Montana Power Co.*, are inapposite, where the Ninth Circuit found no coercion because the intent to charge a balancing penalty only concerned one customer. 328 F.2d 1145, 1161 (9th Cir. 2003); *see also Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1178 (9th Cir. 2016) (no tying where conditions imposed were on independent servicers). However, the TOS is enforced on *all* Plaintiffs, not just at Defendants' discretion. Defendants rely on inapposite authority because here, Defendants effectively prohibit Plaintiffs from purchasing competitors' products. *See Sambreel Holdings LLC v. Facebook, Inc.*, 906 F. Supp. 2d 1070, 1080-81 (S.D. Cal. 2012) (no allegations that Facebook precluded its users from maintaining Sambreel applications for use on websites other than Facebook); *F.T.C. v. Facebook, Inc.*, 560 F. Supp. 3d 1, 29 (D.D.C. 2021) (Facebook's policy prohibited apps from integrating, linking, or redirecting to any app designed for use *within Facebook's own website*, not other freestanding apps).

alleged market power through defendant's use of software license agreements to lock in customer

base, who faced prohibitively high switching costs and threat of significant business interruption).[6]

The strongest circumstantial evidence of market power is defendant having a dominant

market share of the relevant market and significant barriers to entry. *Klein*, 2022 WL 141561, at

*6. Plaintiffs satisfy both. For example, as included in the House Antitrust Proposals, in the directly

salient business-to-business market, which is Google Maps APIs directly to the Plaintiffs, Google

Maps captures over 90% market share. ¶¶109, 129, 130. Barriers to entry for Maps APIs, Routes

APIs, and Places APIs that Defendants helped erect are staggering, like high fixed costs and

network effects. ¶¶132, 135. Defendants have an insurmountable advantage over Maps APIs,

Routes APIs, and Places APIs competitors due to the sheer volume of tracking of and processing

user and location data acquired daily through a panoply of products. ¶¶131, 134, 142, 146, 151.

Defendants yield this blunt weapon to erect entry barriers through a treasure-trove of competitively

valuable information. ¶¶136-37, 143. Defendants benefitted from amassing such sensitive,

confidential location data before the passage of new data restrictions hampering startups. ¶147.

These allegations satisfy the pleading standards at this stage. *See, e.g.*, *AliveCor*, 2022 WL

833628, at *8-9 (finding dominant market share, crediting allegations of high switching costs and

consumer lock-in, stating that courts have found rough market share estimates to be sufficient at

pleading); *Klein*, 2022 WL 141561, at *16-20 (plaintiffs sufficiently alleged barriers to entry in the

form of network effects and switching costs and a market share estimate) (collecting cases); *Cost*

*Mgmt.*, 99 F.3d at 950-51 (monopoly power allegations based on market share and ability to exclude

competitors); *Teradata*, 2018 WL 6528009, at *15-16 (market power based on estimated market

shares and locked-in customers due to severe switching costs, despite defendant's argument about

---

[6] *See also Ploss v. Kraft Foods Grp., Inc.*, 197 F. Supp. 3d 1037, 1071-72 (N.D. Ill. 2016) (monopoly power based on direct evidence of raised prices and excluding competitors); *Hannah's Boutique, Inc. v. Surdej*, 2013 WL 4553313, at *3-5 (N.D. Ill. Aug. 28, 2013) ("Defendants, however, do not cite any case requiring a plaintiff to allege a specific market size or percentage market share" in response to arguments against monopoly power in the relevant market; crediting plaintiff's allegations concerning defendants' actual actions, such as price raises and foreclosing purchasing options); *Gumwood HP Shopping Partners, L.P. v. Simon Prop. Grp., Inc.*, 2013 WL 3214983, at *11 (N.D. Ind. Mar. 13, 2012) (market power through effectiveness of the alleged tie—holding renewals at desirable mall locations contingent on renewals at less desirable ones—supported the inference that defendant had market power in one or more of the relevant markets or even in the aggregate); *Christou v. Beatport, LLC*, 849 F. Supp. 2d 1055, 1066-68 (D. Col. 2012) (finding that plaintiff alleged sufficient market power without the need to specify market shares).

contradictory allegations about scope of relevant product market); *United Energy Trading, LLC v. Pac. Gas & Elec. Co.*, 200 F. Supp. 3d 1012, 1023 (N.D. Cal. 2016) (market power based on market share estimate); *Webkinz*, 2010 WL 4168845, at *3 (plaintiffs sufficiently alleged economic power in the tying product market, despite arguments against salience of share data); *Thompson v. Metro. Multi-List, Inc.*, 934 F.2d 1566, 1577-78 (11th Cir. 1991) (material issue as to defendants' market power based on few realistic substitutes and entry barriers). It is incredible for Defendants, on the one hand, to discredit the allegations that Google Maps captures over 90% market share in the directly salient business-to-business market, which is Google Maps APIs directly to the Plaintiffs, and demand more-surgical precision in the allegations, where on the other hand, according to the House Antitrust Proposals, Google itself said that it "doesn't maintain information in the normal course of business about market share in its products." Ex. 1 (House Antitrust Proposals), at 178.

**B. Plaintiffs allege anticompetitive practices in totality in violation of Section 2**

In totality, Plaintiffs allege negative and positive tying, bundling, exclusive dealing, and self-preferencing that violate Section 2 as monopoly maintenance. Plaintiffs allege bundling: to access Google Maps' Maps APIs, Routes APIs, and Places APIs, Plaintiffs must a GCP account API key, which they must establish and link payment-card details to pay for the APIs. ¶¶6, 65-67. Defendants use Google Maps' monopoly power to entrench market power in cloud computing. ¶123. Plaintiffs are not separately charged for the GCP, the product is "baked into" the cost for the APIs. Bundling is the practice of offering, for a single price, two or more goods or services that could be sold separately. *Cascade Health Sol. v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008); *Masimo Corp. v. Tyco Health Care Group, L.P.* 2006 WL 1236666, at *9 (C.D. Cal. Mar. 22, 2006) (rebates offered by Tyco to hospitals that purchased both oximetry and non-oximetry products).

The forcing of Plaintiffs to entirely enter Google Maps' ecosystem is also a form of exclusive dealing because these users can only use Google Maps' Maps APIs, Routes APIs, and Places APIs, to the exclusion of competitors' Maps APIs, Routes APIs, and Places APIs—and they face high switching costs. ¶160. The anticompetitive ramifications of the exclusive dealing are exemplified by even behemoth companies being beholden to Google Maps, such as Lyft, Uber, and Ford, with which Defendants in 2020 executed a juggernaut of an exclusive-dealing arrangement

that would span six years, entail several billions of dollars, and not only lock Ford into Google Maps and Google Automotive Services, but also obligate Ford to use GCP rather than staying with Microsoft Azure. ¶¶21, 214-17. That Plaintiffs, the Class, and such massive companies face the tying, bundling, and exclusive dealing to wall them into the Google Maps' ecosystem, plus the circumstantial allegations of Google Maps' market share in the business-to-business segment (that affecting Plaintiffs and Class members) of over 90%, demonstrate that the exclusive dealing has substantially foreclose competition. ¶¶9, 21, 109, 122, 125, 129-130, 214, 216. *See Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 (9th Cir. 2010) (exclusive dealing involves an agreement between a vendor and a buyer that prevents the buyer from purchasing a good from another vendor); *Blue Sky Color of Imagination, LLC v. Mead Westvaco Corp.*, 2010 WL 4366849, at *4 (C.D. Cal. Sept. 23, 2010) (exclusive dealing where arrangement prevents smaller competitors from selling goods to retailer); *Hytera Commc'ns Corp. Ltd. v. Motorola Solutions, Inc.*, 2022 WL 3645908, at *13-16 (N.D. Ill. Aug. 24, 2022) (allegations supported inference that exclusive dealing could foreclose substantial competition in market).

App developers have told the House Antitrust Subcommittee that Defendants use control over digital mapping to self-preference Google products in other business lines. ¶¶172-73. Defendants misleadingly favor their own non-maps-related products that compete with products offered by direct users of Google Maps' Maps APIs, Routes APIs, and Places APIs. ¶152. A key is unequal rights to map caching. ¶¶174-75. Without caching, a map is drawn each time it is requested, a much slower and expensive process. ¶175. The TOS prohibit direct users from caching. ¶¶176-77. However, market participants note that Google's own products built on Google Maps face no similar restrictions, enabling them to load faster and cheaper than those run by third parties. ¶178.

Together, the negative and positive tying, bundling, exclusive dealing, and self-preferencing constitute unlawful monopoly maintenance under Section 2. *See, e.g.*, *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1152 (9th Cir. 2019) ("[T]he law requires that the character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole . . . we must give plaintiffs the full benefit of their proof without tightly compartmentalizing the various factual components and

wiping the slate clean after scrutiny of each . . . we conclude that the complaint adequately pleads that the [agreements work in tandem] to restrain competition."); *Rumble, Inc. v. Google LLC*, 2022 WL 3018062, at *3-4 (N.D. Cal. July 29, 2022) (Section 2 claim should be addressed in totality and not be broken into distinct theories under self-preferencing, tying, and dominance).

### C. Plaintiffs Allege Attempted Monopolization in violation of Section 2

"[T]o the extent that "monopoly leveraging" is defined as an attempt to use monopoly power in one market to monopolize another market, this theory remains a viable theory under Section 2. … [I]f there is a dangerous probability that a monopoly will be created by leveraging conduct, *then the conduct will be reached under the doctrine of attempted monopoly*." *Cost Mgmt.*, 99 F.3d at 952. ("CMS has alleged that WNG has used its monopoly power in the gas delivery market in an attempt to monopolize the market for gas sales.").

Defendants' conduct goes far beyond aggressive competition. ¶197. Their anticompetitive actions intend to and in fact have excluded rivals and harmed the competitive process. ¶197. This conduct is not competition on the merits or otherwise privileged. ¶197. Even worse, the conduct has been planned and thoroughly executed over many years—it is willful. ¶197. These allegations and the anticompetitive actions alleged herein establish specific intent to monopolize through either direct evidence of "unlawful design" or circumstantial evidence "principally of illegal conduct." *William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*, 668 F.2d 1014, 1027 (9th Cir. 1981). This inference may be drawn from conduct with an unreasonable restraint of trade in violation of Section 1. *Id.* at 1028; *United Energy Trading, LLC v. Pac. Gas & Elec. Co.*, 200 F. Supp. 3d 1012, 1023 (N.D. Cal. 2016) (intent may be inferred from allegations of anti-competitive conduct).

Generally, a "lower quantum" of market share is required for an attempt claim. *AliveCor*, 2022 WL 833628, at *8. Plaintiffs' market-share allegations well-exceed this threshold. *RealPage*, 852 F. Supp. 2d at 1228-29 (plaintiff sufficiently alleged attempted monopolization, despite "flimsy contentions regarding market share," based, in part, on entry barriers and licensing agreement terms having constituted anticompetitive conduct); *In re Pool Prods. Distrib. Market Antitrust Litig.*, 940 F. Supp. 2d 367, 387 (E.D. La. 2013) (dangerous probability of success because defendant had a 33% market share (indirect) and was actually able to impose restrictive agreements (direct proof);

17

"its alleged establishment of an artificial [entry barrier] is the type of invidious conduct that can elevate a firm with a market share of less than 50% to a dangerous probability of monopolization").

### D. Plaintiffs Allege a Violation of CUCL

Plaintiffs' claim for relief under CUCL survives because it is based on the same conduct and theory of its antitrust claims. Cal. Bus. & Prof. Code § 17200; *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1136 (9th Cir. 2014); *GreenCycle Paint, Inc. v. PaintCare, Inc.*, 250 F. Supp. 3d 438, 451 (N.D. Cal. 2017); *Hicks v. PGA Tour, Inc.*, 165 F. Supp. 3d 898, 911 (N.D. Cal. Feb. 9, 2016).

### E. Undoing the Waze Transaction is Not Sought; No Statute of Limitations Issues Exist

Defendants brandish a sword against a non-existent battle. Plaintiffs allege facts about the Waze transaction to help demonstrate the progression of Google Maps' empire. *Smith*, 2012 WL 1951971, at *2 (denying striking allegations regarding defendant's acquisitions before the statute of limitations, where plaintiffs argued that the allegations help demonstrate the "historical progression of the … business empire"). The Waze acquisition is not an essential element of Plaintiffs' claims for relief; Plaintiffs do not claim that the acquisition must be undone. It would be incredible for Defendants to attempt to use the Waze transaction to crater the entire Complaint on statute of limitations grounds, as not-so-clearly articulated in a footnote without any cite to caselaw, relying only on an apparently current version of the TOS without any indication of the changes in the TOS in prior versions. *See* Defs.' MTD, at 16 n.6. There is no statute of limitations issue here: Plaintiffs allege the start of the Class Period within four years of when they filed the complaint; they all suffered injury only within the Class Period; and none of their claims for relief accrued before the Class Period. ¶¶2, 8, 28-31, 33-38, 40-42, 46, 48, 74-76, 122, 197 232-34. Defendants ignore Plaintiffs' aim of also securing injunctive and declaratory relief. *Klein*, 2022 WL 141561, at *40-41. It is inconceivable that dismissal is warranted on statute of limitations grounds, especially considering the continuing violation doctrine. *Klein*, 2022 WL 141561, at *32-34 ("Facebook's argument ignores the Ninth Circuit's clear guidance that, if a defendant commits the same anticompetitive act multiple times, each new act restarts the statute of limitations for *all* the acts.").

## V.    CONCLUSION

The Court should deny Defendants' Motion to Dismiss.

Dated: August 30, 2022
        New York, New York

/s/ Justin S. Nematzadeh

Justin S. Nematzadeh*
**NEMATZADEH PLLC**
101 Avenue of the Americas, Suite 909
New York, New York 10013
Telephone:   (646) 799-6729
jsn@nematlawyers.com
*Attorney for Plaintiffs and the Class*
*\*Admitted via pro hac vice*

John G. Balestriere*
Matthew W. Schmidt (State Bar No. 302776)
**BALESTRIERE FARIELLO**
225 Broadway, 29th Floor
New York, New York 10007
Telephone:   (212) 374-5401
Facsimile:   (212) 208-2613
john.balestriere@balestrierefariello.com
matthew.schmidt@balestrierefariello.com
*Attorneys for Plaintiffs and the Class*
*\*Pro hac vice application forthcoming*

Mario Simonyan (State Bar No. 320226)
**ESQGo, PC**
303 North Glenoaks Boulevard, Suite 200
Burbank, CA 91502
Telephone:   (424) 363-6233
mario@esqgo.com
*Attorney for Plaintiffs and the Class*