David C. Kiernan (State Bar No. 215335)
dkiernan@jonesday.com
Craig E. Stewart (State Bar No. 129530)
cestewart@jonesday.com
Lin W. Kahn (State Bar No. 261387)
lkahn@jonesday.com
JONES DAY
555 California Street, 26th Floor
San Francisco, California 94104
Telephone: +1.415.626.3939
Facsimile: +1.415.875.5700

Catherine T. Zeng (State Bar No. 251231)
czeng@jonesday.com
JONES DAY
1755 Embarcadero Road
Palo Alto, California 94303
Telephone: +1.650.739.3939
Facsimile: +1.650.739.3900

Attorneys for Defendants
ALPHABET INC. and GOOGLE LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| DREAM BIG MEDIA, INC., GETIFY SOLUTIONS, INC., and SPRINTER SUPPLIER LLC, Individually and on Behalf of all Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>ALPHABET INC. and GOOGLE LLC,<br><br>Defendants. | Case No. 3:22-cv-02314-JSW<br><br>**DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT**<br><br>Date:       May 5, 2023<br>Time:       9:00 a.m.<br>Judge:     Hon. Jeffrey S. White |

1

## NOTICE OF MOTION AND MOTION

Please take notice that on May 5, 2023, at 9:00 AM, or as soon thereafter as the matter may be heard, in the Courtroom of the Honorable Jeffrey S. White of the United States District Court for the Northern District of California, Oakland Division, located at 1301 Clay St., Oakland, California, defendants Alphabet Inc. and Google LLC (collectively "Google") will and hereby do move to dismiss the First Amended Complaint, ECF 50.

## RELIEF SOUGHT

Google requests dismissal of all causes of action with prejudice under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.

Dated: February 17, 2023

JONES DAY

By: */s/ David C. Kiernan*
David C. Kiernan

Attorneys for Defendants
Alphabet Inc. and Google LLC

1

2

## TABLE OF CONTENTS

Page

NOTICE OF MOTION AND MOTION ............................................................................... i

RELIEF SOUGHT ............................................................................................................... i

INTRODUCTION ............................................................................................................... 1

STATEMENT OF ISSUES TO BE DECIDED ................................................................. 2

BACKGROUND ................................................................................................................ 2

      A.     Ruling on First Motion to Dismiss .......................................................... 2

      B.     Amended Complaint ................................................................................. 3

ARGUMENT ...................................................................................................................... 4

I.      LEGAL STANDARD ............................................................................................. 4

II.     PLAINTIFFS HAVE FAILED TO STATE A TYING CLAIM. ...................... 4

      A.     Plaintiffs Have Not Alleged a Conditioned Sale ..................................... 5

      B.     Plaintiffs Have Not Alleged Facts Showing They Were Coerced Into Making (or Refraining From Making) Any Purchase. ............................... 6

      C.     Plaintiffs Fail to Adequately Allege Market Power in the Relevant Markets ......... 8

            1.     Plaintiffs Have Not Defined a Valid Relevant Market. ............... 8

            2.     Plaintiffs Do Not Allege Market Power in Any of the Alleged Relevant Markets. ................................................................. 9

            3.     Plaintiffs' Other Market Power Allegations Are Defective. ...................... 11

III.    PLAINTIFFS' OTHER ANTITRUST THEORIES ALSO FAIL. .................................. 13

      A.     Plaintiffs Have Not Stated an Exclusive Dealing Claim ........................ 13

      B.     Plaintiffs Have Not Stated a Valid Section 2 Claim. ............................. 14

IV.    PLAINTIFFS HAVE FAILED TO STATE A UCL CLAIM ..................................... 15

CONCLUSION .................................................................................................................. 15

1

# TABLE OF AUTHORITIES

2

**Page(s)**

Cases

3

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.,*
4     836 F.3d 1171 (9th Cir. 2016) .................................................................................. 4

5 *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP,*
    592 F.3d 991 (9th Cir. 2010) .................................................................................. 13
6

7 *Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ................................................................................................ 4

8 *Bell Atl. Corp. v. Twombly,*
9     550 U.S. 544 (2007) ................................................................................................ 4

10 *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.,*
    509 U.S. 209 (1993) .............................................................................................. 12
11

12 *Cascade Health Sols. v. PeaceHealth,*
    515 F.3d 883 (9th Cir. 2008) .................................................................................. 14

13 *City of San Jose v. Off. of the Comm'r of Baseball,*
14     776 F.3d 686 (9th Cir. 2015) .................................................................................. 15

15 *Data Gen. Corp. v. Grumman Sys. Support Corp.,*
    36 F.3d 1147 (1st Cir. 1994) ................................................................................... 5
16

17 *Dominick v. Collectors Universe, Inc.,*
    No. 12-CV-04782-ODW, 2012 WL 4513548 (C.D. Cal. Oct. 1, 2012) .................................. 11

18 *Eagle v. Star–Kist Foods, Inc.,*
19     812 F.2d 538 (9th Cir. 1987) .................................................................................. 15

20 *Fed. Trade Comm'n v. Facebook, Inc.,*
    560 F. Supp. 3d 1 (D.D.C. 2021) ........................................................................... 10
21

22 *Fed. Trade Comm'n v. Qualcomm Inc.,*
    969 F.3d 974 (9th Cir. 2020) .................................................................................. 14

23 *Feitelson v. Google Inc.,*
24     80 F. Supp. 3d 1019 (N.D. Cal. 2015) ................................................................... 13

25 *Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.,*
    386 F.3d 485 (2d Cir. 2004) ................................................................................... 9
26

27 *Glen Holly Ent., Inc. v. Tektronix, Inc.,*
    352 F.3d 367 (9th Cir. 2003) .................................................................................. 15

28

*Hip Hop Beverage Corp. v. Monster Energy Co.*,
  No. 16-CV-1421-SVW-FFM, 2016 WL 7324091 (C.D. Cal. Oct. 26, 2016),
  *aff'd*, 733 F. App'x 380 (9th Cir. 2018) ................................................................................ 10

*Irving v. Lennar Corp.*,
  No. CIV S-12-290 KJM EFB, 2013 WL 1308712 (E.D. Cal. Apr. 1, 2013) ........................... 9

*Lee v. Life Ins. Co. of N. Am.*,
  23 F.3d 14 (1st Cir. 1994) ..................................................................................................... 8

*MetroNet Servs. Corp. v. Quest Corp.*,
  383 F.3d 1124 (9th Cir. 2004) ............................................................................................. 14

*Mozart Co. v. Mercedes-Benz of N. Am., Inc.*,
  833 F.2d 1342 (9th Cir. 1987) ............................................................................................... 5

*Newcal Indus., Inc. v. Ikon Office Sol.*,
  513 F.3d 1038 (9th Cir. 2008) ............................................................................................... 8

*Omega Env't, Inc. v. Gilbarco, Inc.*,
  127 F.3d 1157 (9th Cir. 1997) ............................................................................................. 13

*Rebel Oil Co. v. Atl. Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995) ......................................................................................... 11, 12

*Reveal Chat Holdco, LLC v. Facebook, Inc.*,
  471 F. Supp. 3d 981 (N.D. Cal. 2020) ................................................................................. 15

*Sambreel Holdings LLC v. Facebook, Inc.*,
  906 F. Supp. 2d 1070 (S.D. Cal. 2012) ........................................................................ 5, 6, 14

*SC Innovations, Inc. v. Uber Techs., Inc.*,
  434 F. Supp. 3d 782 (N.D. Cal. 2020) ................................................................................. 13

*Spectrum Sports, Inc. v. McQuillan*,
  506 U.S. 447 (1993) ............................................................................................................ 14

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*,
  875 F.2d 1369 (9th Cir. 1989) ............................................................................................... 9

*U.S. Steel Corp. v. Fortner Enters., Inc.*,
  429 U.S. 610 (1977) .......................................................................................................... 6, 7

*Water, Inc. v. Everpure, Inc.*,
  No. CV 09-3389, 2009 WL 10670419 (C.D. Cal. Oct. 28, 2009) ......................................... 12

Rules

Fed. R. Civ. P., Rule 12(b)(6) ....................................................................................................... i

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Treatises

P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 501 (updated Aug. 2022) ..................................... 11

P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 651b1 (updated Aug. 2022) ................................. 15

P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 1700d3 (updated Aug. 2022) ........................... 6, 7

1

**INTRODUCTION**

2     Plaintiffs' 157-page, 646-paragraph amended complaint is long on words and irrelevant

3 detail, but devoid of anything that states a valid claim.  Despite being advised of what they

4 needed to plead and being given ample opportunity to do so, plaintiffs fail to allege new facts

5 establishing an illegal tie, exclusive dealing arrangement, or any other antitrust violation.  Rather,

6 the sole basis for plaintiffs' core claim continues to be a provision in Google's Terms of Service

7 that this Court ruled is not anticompetitive.  The Court's ruling applies equally to the new

8 complaint and requires that it be dismissed, this time with prejudice.

9     As this Court ruled, the Terms of Service do not create a tie because they do not require

10 that plaintiffs or anyone else buy Google mapping API services together or refrain from buying

11 from a competitor.  Nothing in plaintiffs' amended allegations changes that conclusion.  Plaintiffs

12 assert that it is not practical for developers to purchase non-Google mapping API services if they

13 cannot use them with or near a Google mapping API service.  But that is the same argument

14 plaintiffs advanced in support of their original complaint.  This Court correctly rejected it,

15 holding that Google has the right to control how its mapping content will be used or displayed

16 and that exercising that right does not create a tie or otherwise violate the antitrust laws.  That

17 ruling disposes of the new complaint as well.

18     Second, plaintiffs have not adequately alleged that they were coerced into making (or

19 refraining from making) any purchase.  To the contrary, they allege that Google has numerous

20 competitors and that those competitors offer each of the mapping API services at issue here—

21 including the alleged tying services—at the same or better prices and quality as Google.

22 Plaintiffs' concession that the alleged tying services were available on the same or better terms

23 defeats any claim that they were forced into buying any Google products.

24     Third, plaintiffs continue to fail to allege a valid relevant market or power in that market.

25 As before, their relevant market definition is invalid because it improperly lumps together

26 numerous separate products with different functions.  And their allegation of market power is

27 inadequate because it improperly relies on a conclusory allegation of Google's purported market

28 share in a purported "business to business" market that is both undefined and untethered to the

Mot. to Dismiss First Amended Complaint
No. 22-CV-2314-JSW

1  API service markets plaintiffs allege.

2      The amended complaint should be dismissed with prejudice.

3                    **STATEMENT OF ISSUES TO BE DECIDED**

4      Have plaintiffs stated a valid claim for relief under the federal antitrust laws or the

5  California Unfair Competition Law?

6                              **BACKGROUND**

7      **A.      Ruling on First Motion to Dismiss.**

8      This Court dismissed plaintiffs' original complaint for multiple reasons.  The Court held

9  that plaintiffs had not stated a claim for "positive" tying because the "Terms of Service do not

10  require that a customer purchase any Google mapping API service as a condition of using another

11  Google mapping API service."  ECF 45 at 4–5.  Similarly, the Court ruled that the Terms of

12  Service do not create a "negative" tie because the Terms of Service merely govern "how

13  customers of its mapping services may use or display Google's content" and "do not preclude

14  Google customers from using a competitor's mapping services altogether."  *Id*. at 5.  As the Court

15  observed, customers who do not want to abide by Google's restriction are free to select another

16  mapping service.  *Id*.

17      The Court also ruled that plaintiffs had not shown they were coerced into purchasing

18  unwanted Google products or refraining from purchasing competitors' products.  Plaintiffs

19  asserted that they purchased Google mapping API services and wanted to buy competitors'

20  services, but the Court concluded that these allegations were "conclusory" and thus "insufficient

21  to establish coercion."  *Id*. at 6.

22      Finally, the Court ruled that plaintiffs alleged neither a valid relevant product market nor

23  power in that market.  Their alleged market definition consisted only of "categories of digital

24  mapping API services" and plaintiffs failed to adequately allege the absence of economic

25  substitutes for those distinct services.  *Id*. at 8.  As for market power, plaintiffs alleged that

26  Google has 90% of the "business-to-business market" but the Court ruled that this was

27  insufficient because the "business-to-business" market was undefined and plaintiffs had not

28  shown it was the same as the product markets plaintiffs alleged.  *Id*. at 8–9.  The Court also found

plaintiffs' allegations of purported "direct demonstrations" of market power to be conclusory and thus insufficient.  *Id.* at 9.

## B.  Amended Complaint

Plaintiffs go to great lengths to make it appear that they are offering new allegations that cure the deficiencies of their original complaint, but they fail to do so.  On the pivotal issues, the core allegations remain the same.  As before, the primary claim is a tying claim (which is in turn the predicate for plaintiffs' other claims) and the sole basis for that claim is section 3.2.2(e) in Google's Terms of Service.  That section prohibits use of Google mapping content with or near a non-Google map:

> (e) No Use With Non-Google Maps.  To avoid quality issues and/or brand confusion, Customer will not use the Google Maps Core Services with or near a non-Google Map in a Customer Application.  For example, Customer will not (i) display or use Places content on a non-Google map, (ii) display Street View imagery and non-Google maps on the same screen, or (iii) link a Google Map to non-Google Maps content or a non-Google map.

FAC ¶ 198.  Plaintiffs do not claim that Google has done anything beyond this provision to allegedly restrict their use of non-Google services.  As before, they do not claim that Google conditions the sale of any Google mapping API service on the purchaser also buying a separate Google API service.  They have dropped their earlier unsupported allegation that Google "unilaterally" adds unwanted mapping API services when a customer orders a Google mapping API service.  *See* ECF 45 at 5 n.2 (finding conclusory allegation insufficient).  Nor do they claim that Google will sell its mapping API services only if the customer agrees not to purchase from other suppliers.  The *only* basis for the alleged tie is the bare language of section 3.2.2(e).

On coercion, plaintiffs each allege, in nearly identical boilerplate paragraphs, that they "would have preferred to explore and use" competitors' API services rather than Google services.  FAC ¶¶ 507, 525, 543.  None of them, however, alleges that Google's API services had any unique advantage over competitors' products that compelled them to buy from Google in the first place.  To the contrary, as they did in their original complaint, they allege that for each of the alleged Google products, competitors offer APIs that are "even better quality, that are alleged to be materially cheaper, and are even alleged to be offered free."  *Id.* ¶ 266; *id*. ¶ 401 (competitors

1    "offer materially cheaper, if not free, maps APIs, routes APIs, and places APIs that are of

2    comparable quality, if not better"); *id*. ¶ 153 (same as to Mapbox).  Plaintiffs further allege that at

3    least 12 different companies offer such competing products, including Apple, Mapbox, Bing,

4    Mapquest, Telenav, TomTom, and OpenStreetMap.  *Id*. ¶ 151.

5         As for market definition and market power, plaintiffs again rely on the same basic

6    allegations.  They assert that the relevant markets are maps API services, places API services, and

7    routes API services.  *Id*. ¶ 5.  Changing course from their earlier complaint, they allege that each

8    of these purported "products" is both a tying product and a tied product.  *Id*. ¶¶ 10–11.  They

9    claim that Google has market power with respect to all of these products, relying on the same

10   alleged 90% share of the "business-to-business" market this Court previously found deficient and

11   on purported direct evidence of Google's prices and alleged lack of quality.  *Id*. ¶¶ 133, 395.

12                                  **ARGUMENT**

13   **I.     LEGAL STANDARD.**

14        A complaint must contain "more than labels and conclusions, and a formulaic recitation of

15   the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555

16   (2007) (quotation marks and citations omitted).  No weight is given to "[t]hreadbare recitals of

17   the elements of a cause of action, supported by mere conclusory statements."  *Ashcroft v. Iqbal*,

18   556 U.S. 662, 678 (2009).

19   **II.    PLAINTIFFS HAVE FAILED TO STATE A TYING CLAIM.**

20        To state a tying claim, a plaintiff must allege:  "(1) that [defendant] tied together the sale

21   of two distinct products or services; (2) that [defendant] possesses enough economic power in the

22   tying product market to coerce its customers into purchasing the tied product; and (3) that the

23   tying arrangement affects a not insubstantial volume of commerce in the tied product market."

24   *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1178 (9th Cir. 2016) (citations

25   omitted).

26        As before, plaintiffs assert their tying claim under sections 1 and 2 of the Sherman Act,

27   and also under section 3 of the Clayton Act.  Failure to allege conditioned sales or sufficient

28   foreclosure dooms plaintiffs' claims under either statute.  *See Mozart Co. v. Mercedes-Benz of N.*

1  *Am., Inc.*, 833 F.2d 1342, 1352 (9th Cir. 1987) ("the elements for establishing a Sherman Act § 1

2  claim and a Clayton Act § 3 claim are virtually the same"); *Data Gen. Corp. v. Grumman Sys.*

3  *Support Corp.*, 36 F.3d 1147, 1182 n.61 (1st Cir. 1994) (rejecting "positive and negative tying"

4  claim under section 2 after concluding that the claim failed under section 1).

5         **A.**     **Plaintiffs Have Not Alleged a Conditioned Sale.**

6        Plaintiffs have added nothing to the complaint to overcome this Court's ruling that it is not

7  a tying arrangement for Google to restrict how customers use and display Google's own content.

8  The Court relied on *Sambreel Holdings LLC v. Facebook, Inc.*, 906 F. Supp. 2d 1070 (S.D. Cal.

9  2012), which rejected a tying claim against Facebook's policy prohibiting its users from

10  overlaying the plaintiffs' software application on the Facebook display.  Just as in this case, the

11  plaintiffs there alleged that Facebook's policy was a "negative tie" because it effectively required

12  that its users agree not to use a product that competed with Facebook.  *Id*. at 1080.  The court

13  concluded that no tie existed because Facebook had not "precluded its users from maintaining

14  Sambreel applications for use on other websites" but had only "require[d] that its users disable

15  certain products before using its website."  *Id*.  As the court observed, Facebook "has [the] right

16  to dictate the terms on which it will permit its users to take advantage of the Facebook social

17  network."  *Id*.

18        This Court concluded that the same analysis applies here because, like Facebook, Google

19  is only specifying how its own content may be displayed and used and is not precluding

20  developers from using non-Google mapping services if they wish to.  Plaintiffs try to evade this

21  ruling by asserting that the "practical" effect of section 3.2.2(e) is to cause them to use only

22  Google mapping API services because it is allegedly not feasible to purchase a competitor's

23  service if that service cannot be used "with or near" Google mapping content.  FAC ¶¶ 140, 142,

24  198.  Plaintiffs allege that developers want to display all mapping content "on one app, on one

25  webpage, on one website, or on one other type of digital display or screen."  *Id*. ¶ 546.  Plaintiffs

26  made this same argument in support of their original complaint, contending that they wanted to

27  "overlay" non-Google content on Google content rather than displaying it separately on their app

28  or website.  *See* ECF 36 at 6–7, 11.

Mot. to Dismiss First Amended Complaint
No. 22-CV-2314-JSW

Plaintiffs' argument was incorrect then and it is incorrect now.  Even accepting plaintiffs' factual allegations as true, the Facebook policy at issue in *Sambreel* was even more restrictive than Google's Terms of Service:  rather than restricting only certain uses of third-party content as Google does, *see* FAC ¶ 198, Facebook's policy prevented *any* use of the plaintiffs' application anywhere on Facebook.com, precluding plaintiffs' application from displaying *any* advertising on Facebook.  The court nonetheless dismissed the complaint because Facebook had not "precluded its users from maintaining Sambreel applications for use on other websites" but had only "require[d] that its users disable certain products before using its website."  906 F. Supp. 2d at 1080.  As the court stated, "Facebook has a right to protect the infrastructure it has developed, and the manner in which its website will be viewed," *id*. at 1076, even if the effect is to preclude the use on its website of competitors' applications.  That ruling applies equally here and by itself defeats plaintiffs' claim.

**B.     Plaintiffs Have Not Alleged Facts Showing They Were Coerced Into Making (or Refraining From Making) Any Purchase.**

Plaintiffs also continue to fail to allege facts showing that they were coerced into buying Google products or refraining from purchasing from a competitor.  As noted, plaintiffs again allege that, for each of the alleged Google mapping API services, competitors offer APIs that are "even better quality, that are alleged to be materially cheaper, and are even alleged to be offered free."  FAC ¶ 266; *see supra*, pp. 3–4.  These allegations defeat any claim of coercion because no coercion can exist if buyers can obtain the tying product from competitors at the same or better quality and price.  As the Supreme Court explained, "the question is whether the seller has some advantage not shared by his competitors in the market for the tying product.  Without any such advantage differentiating his product from that of his competitors, the seller's product does not have the kind of uniqueness considered relevant in prior tying-clause cases."  *U.S. Steel Corp. v. Fortner Enters., Inc.*, 429 U.S. 610, 620–21 (1977).  As a leading antitrust treatise puts it, "[o]bviously, the buyer cannot be forced to take the tied product on the seller's terms when the buyer can obtain the tying product on equally advantageous terms from other sources."  P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 1700d3 (updated Aug. 2022).  In that circumstance, the buyer

1    is free to not buy from the defendant at all, and can instead buy both the tying and tied products

2    from a competitor, thus defeating any claim of coercion.

3          That is precisely the circumstance plaintiffs allege here.  By alleging that competitors

4    offer the tying product—whether maps, routes, or places API services—at the same or better

5    quality and prices, plaintiffs have failed to allege that Google has any "advantage not shared by

6    [its] competitors in the market for the tying product," *Fortner*, 29 U.S. at 620, and have instead

7    shown that plaintiffs can obtain the tying product at "equally advantageous terms from other

8    sources," *Antitrust Law* ¶ 1700d3.  That defeats any claim that plaintiffs were coerced into buying

9    from Google, which is fatal to their tying claim.

10         The individual plaintiffs' allegations confirm as much.  Dream Big Media and Getify

11   allege that they used Google Maps API services and wanted to use routes or places API services

12   from competitors.  FAC ¶¶ 504, 522.  Sprinter alleges that it used Google Routes APIs and

13   wanted to use maps and places APIs from competitors.  *Id*. ¶ 540.  And they each allege in

14   boilerplate fashion that, having purchased Google's API services, they could not use competitors'

15   API services.  *Id*. ¶¶ 503–08, 526–29, 544–47.  But none of them alleges anywhere that they

16   could not have obtained maps API services (or in Sprinter's case, routes API services) from a

17   competitor rather than from Google.  Nor do they allege that Google's services had any

18   "advantage differentiating [Google's] product from that of [its] competitors." *Fortner*, 429 U.S.

19   at 620.  To the contrary, as noted, plaintiffs allege that *all* mapping API services—including maps

20   and routes API services—were available from competitors at the same or better quality and price

21   than from Google.

22         Plaintiffs' rote allegation that, once they purchased Google Maps API services, they were

23   "locked in" to buying only Google API services, FAC ¶¶ 512, 530, 548, does not change this

24   analysis.  First, the allegation is entirely conclusory, and need not be taken as true.  Plaintiffs do

25   not allege any facts regarding any expense they incurred in using Google's Maps API service (or

26   for Sprinter, Routes API), what expense would be involved switching to a corresponding non-

27   Google API service, or that the expense of switching would outweigh the savings from using the

28   cheaper, or even free, alternatives they allege were available for each of the API services.

Mot. to Dismiss First Amended Complaint
No. 22-CV-2314-JSW

Second, even if plaintiffs had sufficiently alleged that the switching costs were too high, that would not be enough because plaintiffs do not allege that anything prevented them from avoiding those costs by selecting non-Google API services in the first place.  They do not allege that Google imposed the alleged tie only after they made their initial purchase.  *See Lee v. Life Ins. Co. of N. Am.*, 23 F.3d 14, 20 (1st Cir. 1994) (rejecting claim of lock-in, despite allegation of high switching costs, because "students know before their matriculation that they are buying a URI 'package' that includes at least two 'tied' products—a URI education and on-campus health care services and insurance").

Dream Big Media and Getify's allegations also fail for the independent reason that the Terms of Service do not prohibit them from using non-Google routes or places API services with a Google Map.  By their express language, the Terms of Service are addressed only to using Google content with or near a non-Google Map.  FAC ¶ 198 ("No Use With Non-Google Maps. To avoid quality issues and/or brand confusion, Customer will not use the Google Maps Core Services with or near a non-Google Map in a Customer Application.").

**C.      Plaintiffs Fail to Adequately Allege Market Power in the Relevant Markets.**

"To state a valid antitrust claim under the Sherman Act, a 'plaintiff must allege both that a 'relevant market' exists and that the defendant has power within that market.'"  ECF 45 at 7 (quoting *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1044 (9th Cir. 2008)).  Like the original complaint, the amended complaint fails this requirement as well.

**1.      Plaintiffs Have Not Defined a Valid Relevant Market.**

As in the original complaint, plaintiffs allege three categories of API services as the relevant markets:  (1) maps API services, (2) routes API services, and (3) places API services. FAC ¶ 5.  While these categories track the labels Google uses for its grouping of digital mapping API services, plaintiffs do not allege facts regarding "economic substitutes" for the services in each category.  This Court found the original complaint to be insufficient because it similarly lacked such facts. ECF 45 at 8.  Plaintiffs try to fix this defect by now alleging in conclusory fashion that no substitutes exist for the three categories because it is not practical to use "non-digital" alternatives or to direct customers to separate websites. *Id.* ¶¶ 84, 129; *see also id.* ¶¶ 75–

Mot. to Dismiss First Amended Complaint
No. 22-CV-2314-JSW

78, 101–04, 122–25.  But even if non-digital alternatives are not viable, plaintiffs do not allege facts showing that lumping the services together by category is proper.  They do not allege that developers purchase categories of API services (as opposed to individual services).  Nor do they allege that the number and strength of competitors offering a viable digital substitute are the same across the various distinct services within each category.  These defects are fatal because, without such facts, there is no way to know whether, for the particular services plaintiffs or others purchased, the alleged markets will properly identify "the group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business." *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir. 1989); *Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*, 386 F.3d 485, 496 (2d Cir. 2004) ("The goal in defining the relevant market is to identify the market participants and competitive pressures that restrain an individual firm's ability to raise prices or restrict output.").

### 2.   Plaintiffs Do Not Allege Market Power in Any of the Alleged Relevant Markets.

Even if plaintiffs' three purported markets were validly defined, plaintiffs have not properly alleged that Google has market power in any of those markets.  Instead, plaintiffs ask this Court to infer market power in these alleged markets based on a reference to Google's alleged share of a *different* undefined market—a purported  "business to business" market. *E.g.*, FAC ¶ 133.  But this allegation fails because it is not tethered to the relevant markets as defined by the complaint.  *See Irving v. Lennar Corp.*, No. CIV S-12-290 KJM EFB, 2013 WL 1308712, at *17 (E.D. Cal. Apr. 1, 2013) (finding allegation of defendant's market power nationally to be insufficient because "[i]f [plaintiffs] are relying on Yuba County or some other area as the relevant market, they have not specifically described it nor identified defendants' power *in that market*") (emphasis added).

Plaintiffs' sole source for a "business-to-business" market and Google's purported share of that "market" is the House Report.  Plaintiffs quote the Report as referring to providers of "business-to-business mapping software," as distinct from navigation apps sold to consumers. FAC ¶ 223.  But the quoted passages leave unanswered whether the Report is referring to

Mot. to Dismiss First Amended Complaint
No. 22-CV-2314-JSW

1   mapping APIs sold to developers such as plaintiffs and, even more fundamentally, the passages

2   do not show what Google's share is in the three API markets plaintiffs allege.  Therefore, the

3   Report cannot be used to show Google's power in any of those alleged markets.  Plaintiffs must

4   allege facts showing Google's market share as to the specific markets alleged, not some other

5   market of unknown composition.  As before, plaintiffs have failed to do so.

6          Plaintiffs' 90% market share reference is also defective for two other reasons.  First, the

7   House Report never "found" that Google's market share was 90%.  FAC ¶ 220.  Rather, the

8   Report merely quotes a single anonymous "market participant" who believed Google to have a

9   90% market share.  *Cf. Fed. Trade Comm'n v. Facebook, Inc.*, 560 F. Supp. 3d 1, 18 (D.D.C.

10  2021) ("bare assertions" of market share were "too conclusory to plausibly establish market

11  power in any context").  Indeed, the Report's lack of any finding regarding Google Maps

12  contrasts with other sections of the Report that do affirmatively conclude that a given firm has

13  "market power" or "monopoly power."  *Compare, e.g.*, ECF 35-1 at 15, 254 (concluding that

14  "Amazon has significant and durable market power in the U.S. online retail market") & 16, 334

15  (concluding that "Apple has significant and durable market power in the mobile operating system

16  market"), *with* 14–15, 234–45 (introduction and section on Google Maps that reaches no

17  conclusion on whether or to what extent Google has "market power").

18         Second, this 90% figure is implausible on the face of the complaint.  As noted, the

19  amended complaint recognizes that there are at least *12 competitors* for mapping API services.

20  FAC ¶ 151.  This lengthy list of competitors—at least some of which allegedly offer better and

21  less expensive APIs than Google (*id.* ¶¶ 16, 153–54)—renders plaintiffs' 90% market share

22  allegation facially implausible.  *See Hip Hop Beverage Corp. v. Monster Energy Co.*, No. 16-CV-

23  1421-SVW-FFM, 2016 WL 7324091, at *6 (C.D. Cal. Oct. 26, 2016) (finding "Plaintiffs

24  allegations implausible in light of unexplained inconsistencies" such as defendant having

25  substantial market power despite the existence of entrenched competitors (citation omitted)),

26  *aff'd*, 733 F. App'x 380 (9th Cir. 2018).[1]

27  ───────────────────
    [1] Plaintiffs' conclusory assertion that Google's alleged 80% share of the consumer navigation app

28  market shows market power in the three alleged API markets, FAC ¶ 227, is also groundless.

(continued)

Mot. to Dismiss First Amended Complaint
No. 22-CV-2314-JSW

1

### 3. Plaintiffs' Other Market Power Allegations Are Defective.

Plaintiffs' attempt to pad their faulty market share allegation with other purported allegations of market power fares no better. Plaintiffs suggest that Google's market power is adequately plead through allegations of (1) supracompetitive prices and quality issues; (2) anticompetitive contract terms; and (3) data-privacy violations. FAC ¶ 395. According to plaintiffs, Google has committed these alleged wrongs "all without any meaningful competitors having entered the relevant antitrust products markets." *Id*. ¶ 395. But the relevant inquiry is not narrowly focused on whether "meaningful competitors" have entered the market. Rather, market power is a defendant's ability to raise prices without losing customers to newly entering competitors or to "existing competitors" expanding. *See Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995); *see also* P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 501 (updated Aug. 2022) ("A defendant firm has market power if it can raise price above the competitive without a total loss of sales."). Plaintiffs fail to allege that Google has engaged in any of these purported wrongs without losing *customers* over time to the numerous competitors that plaintiffs admit are already in the market.

Each set of allegations is also defective in its own right. First, while plaintiffs allege that Google charged supracompetitive prices, FAC ¶¶ 400–12, these allegations are either conclusory or amount to nothing more than an allegation that Google raised its prices at one point (with no facts indicating that the increase was supracompetitive). *See Dominick v. Collectors Universe, Inc.*, No. 12-CV-04782-ODW, 2012 WL 4513548, at *7 (C.D. Cal. Oct. 1, 2012) (ruling that an allegation of "'artificially high' prices cannot be equated to supracompetitive prices unless a plaintiff provides evidence to the contrary"). Plaintiffs offer no allegation of restricted output, which is required because, without such a restriction, no basis exists for concluding that allegedly high prices are in fact supracompetitive rather than merely the reflection of a superior product. *See, e.g., id*. (dismissing complaint because plaintiff had not adequately "allege[d] *both* restrictive

---

Plaintiffs allege no facts showing any relationship between app sales to consumers and API services sold to developers like plaintiffs. Their vague suggestion that Google has "blocked" mapping competitors from access to needed data, FAC ¶ 227, is both unsupported by any facts and contrary to their allegation that numerous competitors offer better quality mapping services than Google. Such conclusory and internally inconsistent allegations need not be taken as true.

Mot. to Dismiss First Amended Complaint
No. 22-CV-2314-JSW

output and supra-competitive prices") (emphasis added); *see also Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 233 (1993) (rejecting claim of supracompetitive pricing because where "output is expanding at the same time prices are increasing, rising prices are equally consistent with growing product demand").[2]

Second, plaintiffs allege that Google's imposition of purportedly anticompetitive contract terms itself indicates market power. *E.g.*, FAC ¶¶ 192–200, 413–17. But that contention is circular: the only alleged anticompetitive term is the provision in the Terms of Service that allegedly creates the tie. If that were enough to show market power, market power would exist in every tying case because the plaintiff must always allege that the defendant imposed a restriction that tied its products together. Allowing such circular allegations would effectively eliminate the requirement that a plaintiff plead market power.

Third, plaintiffs suggest that Google's alleged data-privacy violations show market power. *E.g., id*. ¶¶ 169–85, 213. Google is aware of no case holding that data-privacy issues are a measure of a company's market power. And plaintiffs never actually allege that Google Maps (1) reduced privacy (2) without a corresponding benefit and (3) without losing users in the relevant API markets. Rather, plaintiffs simply catalog the mere existence of investigations, lawsuits, or settlements, without any attempt to allege facts showing that any purported privacy issues affected the value of Google's mapping API services to developers. *Id.* ¶¶ 422–32.

Finally, plaintiffs lob various allegations relating to barriers to entry. *Id.* ¶¶ 188–91, 232–39, 436–43. But a plaintiff does not adequately allege market power by virtue of barriers to entry alone, even when combined with an allegation of a dominant share. "Market power cannot be inferred solely from the existence of entry barriers and a dominant market share" because market power also "depends largely on the ability of existing firms" to respond to anticompetitive actions by the defendant. *Rebel Oil*, 51 F.3d at 1441. Plaintiffs fail to allege that any of the existing

---

[2] Plaintiffs' discussion of Google's revenues generally, FAC ¶ 398, is also deficient. Google Maps' revenues "in the abstract say[] nothing about the defendant's market power in the relevant market." *Water, Inc. v. Everpure, Inc.*, No. CV 09-3389, 2009 WL 10670419, at *8 (C.D. Cal. Oct. 28, 2009). Similarly, allegations of an unquantified number of quality issues, FAC ¶¶ 418–421, in a product with 1 billion users do not suggest market power.

1    competitors—of which there are at least 12—would have been unable to increase output in

2    response to a supracompetitive price increase from Google.  *SC Innovations, Inc. v. Uber Techs.,*

3    *Inc*., 434 F. Supp. 3d 782, 793 (N.D. Cal. 2020) (dismissing complaint for failure to adequately

4    allege market power where plaintiff did not allege that the lesser of two dominant firms could not

5    increase output in response to a supracompetitive price increase).

6    **III.    PLAINTIFFS' OTHER ANTITRUST THEORIES ALSO FAIL.**

7           **A.    Plaintiffs Have Not Stated an Exclusive Dealing Claim.**

8           As in the original complaint, plaintiffs' two causes of action for "exclusive dealing" rest

9    on the same alleged factual predicate as their tying claims—*i.e.*, that Google's Terms of Service

10   prevent developers from purchasing any competitor's mapping API services.  FAC ¶¶ 605, 613.

11   This Court rejected this claim in the original complaint because plaintiffs had failed to adequately

12   allege that "Google prevents its customers from purchasing competitors' API services."  ECF 45

13   at 9 (citing *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996

14   (9th Cir. 2010)).  The same is true of the amended complaint.  As shown above, Google does not

15   prevent developers from purchasing from competitors.[3]

16          Even if Google required exclusive use of its products, plaintiffs' claim would still fail.

17   Plaintiffs are required to allege facts that the exclusive dealing "foreclose[s] competition in a

18   substantial share of the line of commerce affected," *Allied Orthopedic*, 592 F.3d at 996 (quotation

19   marks and citations omitted), defined as, at a minimum, 40% to 50% of the relevant market, *see*

20   *Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1029–30 & n.8 (N.D. Cal. 2015); *Omega Env't,*

21   *Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162–64 (9th Cir. 1997).  If that threshold is met, courts

22   then consider the length of the agreement, the customer's ability to terminate the agreement, and

23   whether alternative channels to competitors still exist.  *See Feitelson*, 80 F. Supp. 3d at 1030.

24          Plaintiffs do not allege any facts showing foreclosure of competition.  Indeed, plaintiffs do

25

26   [3] Plaintiffs refer to Google's alleged contracts with Ford, Uber, and Lyft.  FAC ¶¶ 285-91. But
     they do not allege any facts showing that these contracts are for the kind of mapping API services
27   at issue in this case.  Nor do they allege any facts showing the state of competition in the market
     for the unidentified products those companies purchased or that the contracts foreclosed
28   competition in that market.

Mot. to Dismiss First Amended Complaint
                                                                          No. 22-CV-2314-JSW

1   not allege a properly defined relevant market or Google's share of that market; nor do they

2   attempt to identify what percentage of Google's customers would opt to use a competitor's API

3   services absent the purported exclusivity or any of the other factors.  Plaintiffs' failure to allege

4   any of these critical facts defeats their claim.

5           **B.**        **Plaintiffs Have Not Stated a Valid Section 2 Claim.**

6           To establish liability for monopolization under Section 2, a plaintiff must demonstrate the

7   defendant "(1) possessed monopoly power in the relevant market, (2) willfully acquired or

8   maintained that power through exclusionary conduct and (3) caused antitrust injury."  *MetroNet*

9   *Servs. Corp. v. Quest Corp.*, 383 F.3d 1124, 1130 (9th Cir. 2004).  To state a claim of attempted

10  monopolization under Section 2, a plaintiff must show "'(1) that the defendant has engaged in

11  predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous

12  probability of achieving monopoly power.'"  *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883,

13  893 (9th Cir. 2008) (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993)).

14          Plaintiffs allege that Google's "exclusionary conduct" was engaging in "negative tying,

15  exclusive dealing, and self-preferencing."  FAC ¶¶ 623, 636.  As shown above, plaintiffs have not

16  validly alleged negative tying or exclusive dealing.  That defeats their Section 2 claim based on

17  the same conduct.  *See, e.g., Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir.

18  2020) ("If, in reviewing an alleged Sherman Act violation, a court finds that the conduct in

19  question is *not* anticompetitive under § 1, the court need not separately analyze the conduct under

20  § 2."); *Sambreel*, 906 F. Supp. 2d at 1082 (dismissing Section 2 claim after concluding complaint

21  failed to state a Section 1 claim).

22          Plaintiffs' allegation that Google engages in "self-preferencing," FAC ¶¶ 300–12, also

23  fails to state a Section 2 claim.  Plaintiffs assert that Google permits map caching for Google's

24  "own products" (such as "local search" or "hotel finder") but not in third-party websites or apps

25  that use Google's digital mapping API services.  *Id.* ¶ 306.  According to plaintiffs, this

26  disadvantages competitors to Google's "non-mapping products" (*e.g.*, a competitor that offers a

27  "hotel finder" product).  *Id.* ¶ 303.  But plaintiffs do not allege that they purchase any such non-

28  mapping product.  Nor do they allege that they compete with Google as to any such non-mapping

product.  Rather, they allege only that they purchase Google's mapping API services.  Because they are neither a purchaser nor a competitor in any allegedly affected market for non-mapping products, and do not allege facts showing they were injured by any impact on competition in that market, they lack standing to sue over any effect in that market.  *Glen Holly Ent., Inc. v. Tektronix, Inc.*, 352 F.3d 367, 372 (9th Cir. 2003) ("the party alleging the injury must be either a consumer of the alleged violator's goods or services or a competitor of the alleged violator in the restrained market") (quoting *Eagle v. Star–Kist Foods, Inc.*, 812 F.2d 538, 540 (9th Cir. 1987)).

Plaintiffs allege that Google's alleged policy of not permitting map caching raises the cost and "degrade[s] the quality of Plaintiffs and Class members' experience with Maps APIs, Places APIs, or Routes APIs."  FAC ¶ 301.  But that allegation does not describe any harm to competition.  To the contrary, it means, at most, that Google has limited the functionality of the products it sells to developers, which would enhance opportunities for competing API service providers to market their own products, not foreclose them from doing so.  Google's alleged caching policy thus does not exclude rivals and is not an antitrust violation.  *See* P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 651b1 (updated Aug. 2022) (developing a less desirable product does not "exclude rivals from the market" and is not monopolistic).

Finally, plaintiffs' Section 2 claims fail because of their failure (as shown above) to allege a properly defined relevant market and Google's share of that market.  To state a valid Section 2 claim, plaintiffs must allege both.  *Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 1000 (N.D. Cal. 2020).

## IV.    PLAINTIFFS HAVE FAILED TO STATE A UCL CLAIM.

Because plaintiffs' California Unfair Competition Law claim is based on the same conduct and theory of anticompetitive harm as their antitrust claims, the inadequacy of the antitrust allegations also defeats that state-law claim.  ECF 45 at 9–10; *City of San Jose v. Off. of the Comm'r of Baseball,* 776 F.3d 686, 691–92 (9th Cir. 2015).

### CONCLUSION

The First Amended Complaint should be dismissed with prejudice.

1    Dated: February 17, 2023                    JONES DAY

2

3                                                By: */s/ David C. Kiernan*
                                                    David C. Kiernan
4
                                                 Attorneys for Defendants
5                                                Alphabet Inc. and Google LLC

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Mot. to Dismiss First Amended Complaint
No. 22-CV-2314-JSW