1  David C. Kiernan, Bar No. 215335
   dkiernan@jonesday.com
2  Craig E. Stewart, Bar No. 129530
   cestewart@jonesday.com
3  Lin W. Kahn, Bar No. 261387
   lkahn@jonesday.com
4  JONES DAY
   555 California Street, 26th Floor
5  San Francisco, California 94104
   Telephone:    +1.415.626.3939
6  Facsimile:    +1.415.875.5700

7  Catherine T. Zeng, Bar No. 251231
   czeng@jonesday.com
8  JONES DAY
   1755 Embarcadero Road
9  Palo Alto, California 94303
   Telephone:    +1.650.739.3939
10 Facsimile:    +1.650.739.3900

11 Attorneys for Defendants
   Alphabet Inc. and Google LLC

12                    UNITED STATES DISTRICT COURT

13                  NORTHERN DISTRICT OF CALIFORNIA

14                      SAN FRANCISCO DIVISION

15

16
   **DREAM BIG MEDIA, INC., GETIFY**          **Case No. 22-CV-2314-RS**
17 **SOLUTIONS, INC., and SPRINTER**
   **SUPPLIER LLC, Individually and on Behalf**  **DEFENDANTS' MOTION TO DISMISS**
18 **of All Others Similarly Situated,**       **SECOND AMENDED COMPLAINT**

19            **Plaintiffs,**

20            **v.**                            Date:      May 9, 2024
                                                Time:      1:30 p.m.
21 **ALPHABET INC. and GOOGLE LLC,**           Judge:     Hon. Richard Seeborg

22            **Defendants.**

23                                              Date Action Filed: April 13, 2022

24

25

26

27

28

**NOTICE OF MOTION AND MOTION**

Please take notice that on May 9, 2024 at 1:30 p.m., or as soon thereafter as the matter may be heard, in the Courtroom of the Honorable Richard Seeborg of the United States District Court for the Northern District of California, San Francisco Division, located at 450 Golden Gate Avenue, San Francisco, CA 94102, defendants Alphabet Inc. and Google LLC (collectively "Google") will and hereby do move to dismiss the Second Amended Complaint, ECF 70.

**RELIEF SOUGHT**

Google requests dismissal of all causes of action with prejudice under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.

Dated: February 9, 2024

JONES DAY

By: _/s/ David C. Kiernan_
David C. Kiernan

Attorneys for Defendants
Alphabet Inc. and Google LLC

INTRODUCTION ............................................................................................. 1

STATEMENT OF ISSUES TO BE DECIDED ........................................... 2

BACKGROUND ............................................................................................. 2

      A.     Prior Motion to Dismiss Rulings ............................................ 2

      B.     Plaintiffs' Newest Tying Theory in the Second Amended Complaint ................... 4

LEGAL STANDARD ..................................................................................... 5

ARGUMENT ................................................................................................... 6

I.     PLAINTIFFS' AMENDMENTS DO NOT SAVE THEIR DEFECTIVE TYING CLAIM ................................................................................................. 6

      A.     Plaintiffs Fail to Plausibly Allege that Google's Terms Impose a Tie ................... 7

      B.     Plaintiffs' Prior Allegations Regarding Equivalent or Superior Maps API Suppliers Are Fatal Judicial Admissions ................ 10

II.    PLAINTIFFS' TYING CLAIM ALSO FAILS FOR FAILURE TO ALLEGE COGNIZABLE MARKETS OR MARKET POWER ....................... 14

      A.     Plaintiffs' Product Markets Are Legally Insufficient Because They Improperly Lump Together Individual API Services ................ 15

      B.     Plaintiffs' Market Power Allegations Are Implausible and Inadequate ............. 17

           1.    Plaintiffs' Indirect Market Power Allegations are Inadequate ................. 17

           2.    Plaintiffs' Purported Direct Market Power Allegations are Conclusory and Irrelevant ................ 20

III.   PLAINTIFFS' OTHER ANTITRUST THEORIES LIKEWISE FAIL ......................... 22

      A.     Plaintiffs Have Not Stated an Exclusive Dealing Claim ....................... 22

      B.     Plaintiffs Fail to State a Sherman Act Section 2 Claim ......................... 23

      C.     Plaintiffs Fail to State a UCL Claim for the Same Reasons ................. 24

CONCLUSION ............................................................................................... 25

## TABLE OF AUTHORITIES

Page

CASES

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
836 F.3d 1171 (9th Cir. 2016) .................................................................. 6

*Airs Aromatics, LLC v. Victoria's Secret Stores Brand Mgmt., Inc.*,
744 F.3d 595 (9th Cir. 2014) .................................................................. 11

*Alexander v. Citigroup Glob. Markets. Inc.*,
2013 WL 12077818 (C.D. Cal. Apr. 10, 2013) ........................................ 7

*Allen-Myland, Inc. v. Int'l Bus. Machines Corp.*,
33 F.3d 194 (3d Cir. 1994) .................................................................... 12

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
592 F.3d 991 (9th Cir. 2010) .................................................................. 22

*Apple iPod iTunes Antitrust Litig.*,
2009 WL 10678940 (N.D. Cal. Oct. 30, 2009) ........................................ 10

*Arnold v. Petland, Inc.*,
2009 WL 816327 (S.D. Ohio Mar. 26, 2009) .......................................... 13

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ......................................................................... 5, 10

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .............................................................................. 5

*Brandriff v. Dataw Island Owners' Ass'n, Inc.*,
2010 WL 11534504 (D.S.C. Sept. 30, 2010) .......................................... 13

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*,
140 F.3d 494 (3d Cir. 1998) .................................................................. 14

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993) .............................................................................. 20

*Cascade Health Sols. v. PeaceHealth*,
515 F.3d 883 (9th Cir. 2008) .................................................................. 23

Motion To Dismiss SAC
No. 22-CV-2314-RS

*Casper v. SMG*,
  2006 WL 3111132 (D.N.J. Oct. 31, 2006), *aff'd sub nom. Atl. Exposition Servs. Inc. v. SMG*, 262 F. App'x 449 (3d Cir. 2008) .......................................................... 13

*CCBN.Com, Inc. v. Thomson Fin., Inc.*,
  270 F. Supp. 2d 146 (D. Mass. 2003) .................................................................. 9

*Chickasaw Nation v. United States*,
  534 U.S. 84 (2001) .............................................................................................. 8

*Daniels-Hall v. Nat'l Educ. Ass'n*,
  629 F.3d 992 (9th Cir. 2010) .............................................................................. 6

*Data Gen. Corp. v. Grumman Sys. Support Corp.*,
  36 F.3d 1147 (1st Cir. 1994) .............................................................................. 6

*Dominick v. Collectors Universe, Inc.*,
  2012 WL 4513548 (C.D. Cal. Oct. 1, 2012) ................................................. 20, 21

*Edge Sys. LLC v. Ageless Serums LLC*,
  2021 WL 3812875 (C.D. Cal. May 11, 2021) ................................................... 10

*Feitelson v. Google Inc.*,
  80 F. Supp. 3d 1019 (N.D. Cal. 2015) ........................................................... 22, 23

*FTC v. Facebook, Inc.*,
  560 F. Supp. 3d 1 (D.D.C. 2021) ....................................................................... 18

*FTC v. Qualcomm Inc.*,
  969 F.3d 974 (9th Cir. 2020) ....................................................................... 15, 23

*Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*,
  386 F.3d 485 (2d Cir. 2004) .............................................................................. 16

*Georgia-Pac. v. Officemax Inc.*,
  2013 WL 5273007 (N.D. Cal. Sept. 18, 2013) .................................................. 7

*Glen Holly Ent., Inc. v. Tektronix, Inc.*,
  352 F.3d 367 (9th Cir. 2003) ............................................................................. 24

*Hicks v. PGA Tour, Inc.*,
  897 F.3d 1109 (9th Cir. 2018) ..................................................................... 15, 25

Motion To Dismiss SAC
No. 22-CV-2314-RS

*Hip Hop Beverage Corp. v. Monster Energy Co.*,
  2016 WL 7324091 (C.D. Cal. Oct. 26, 2016), *aff'd*, 733 F. App'x 380 (9th Cir.
  2018) ........................................................................................................................ 19

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*,
  602 F.3d 237 (3d Cir. 2010)..................................................................................... 2

*Illinois Tool Works Inc. v. Indep. Ink, Inc.*,
  547 U.S. 28 (2006) ................................................................................................. 17

*In re Ebay Seller Antitrust Litig.*,
  2010 WL 760433 (N.D. Cal. Mar. 4, 2010), *aff'd sub nom. In re eBay Seller*
  *Antitrust Litig.*, 433 F. App'x 504 (9th Cir. 2011) ............................................... 21

*Innovative Health LLC v. Biosense Webster, Inc.*,
  2020 WL 6122369 (C.D. Cal. Oct. 7, 2020) .......................................................... 17

*Intel Corp. v. Fortress Inv. Grp. LLC*,
  2022 WL 16756365 (9th Cir. Nov. 8, 2022)........................................................... 21

*Intel Corp. v. Seven Networks, LLC*,
  562 F. Supp. 3d 454 (N.D. Cal. 2021) ................................................................... 16

*Irving v. Lennar Corp.*,
  2013 WL 1308712 (E.D. Cal. Apr. 1, 2013)........................................................... 18

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*,
  466 U.S. 2 (1984) ......................................................................................... 6, 12, 13

*Lambrix v. Tesla, Inc.*,
  2023 WL 8265916 (N.D. Cal. Nov. 17, 2023).................................................. 15, 25

*Lee v. Life Ins. Co. of N. Am.*,
  23 F.3d 14 (1st Cir. 1994) ...................................................................................... 14

*Little Rock Cardiology Clinic, P.A. v. Baptist Health*,
  573 F. Supp. 2d 1125 (E.D. Ark. 2008) ................................................................. 16

*Med Vets Inc. v. VIP Petcare Holdings, Inc.*,
  2019 WL 1767335 (N.D. Cal. Apr. 22, 2019), *aff'd*, 811 F. App'x 422
  (9th Cir. 2020)......................................................................................... 17, 18, 19

*MetroNet Servs. Corp. v. Quest Corp.*,
  383 F.3d 1124 (9th Cir. 2004)................................................................................. 23

*Moore v. Regents of the Univ. of Cal.*,
    2016 WL 4917103 (N.D. Cal. Sept. 15, 2016) (Seeborg, J.) ............................ 11

*Mozart Co. v. Mercedes-Benz of N. Am., Inc.*,
    833 F.2d 1342 (9th Cir. 1987) ................................................................... 6

*Omega Env't, Inc. v. Gilbarco, Inc.*,
    127 F.3d 1157 (9th Cir. 1997) ................................................................. 22

*Oracle Am., Inc. v. CedarCrestone, Inc.*,
    938 F. Supp. 2d 895 (N.D. Cal. 2013) ...................................................... 14

*Paladin Assocs., Inc. v. Montana Power Co.*,
    328 F.3d 1145 (9th Cir. 2003) ................................................................. 12

*Queen Villas Homeowners Assn. v. TCB Prop. Mgmt.*,
    149 Cal. App. 4th 1 (2007) ....................................................................... 8

*Rebel Oil Co. v. Atl. Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) ................................................................... 19

*Reilly v. Apple Inc.*,
    2022 WL 74162 (N.D. Cal. Jan. 7, 2022) ................................................. 15

*Reveal Chat Holdco, LLC v. Facebook, Inc.*,
    471 F. Supp. 3d 981 (N.D. Cal. 2020) ...................................................... 24

*Rick-Mik Enterprises, Inc. v. Equilon Enterprises LLC*,
    532 F.3d 963 (9th Cir. 2008) ...................................................... 12, 17, 18

*S. Cal. Elec. Firm v. S. Cal. Edison Co.*,
    2023 WL 4317362 (C.D. Cal. Apr. 7, 2023) ............................................. 17

*Sambreel Holdings LLC v. Facebook, Inc.*,
    906 F. Supp. 2d 1070 (S.D. Cal. 2012) ............................................ 3, 4, 7

*SC Innovations, Inc. v. Uber Techs., Inc.*,
    434 F. Supp. 3d 782 (N.D. Cal. 2020) ...................................................... 20

*Spindler v. Johnson & Johnson Corp.*,
    2011 WL 13278876 (N.D. Cal. Jan. 21, 2011) ......................................... 15

*Swenson v. Nat'l R.R. Passenger Corp.*,
    2016 WL 1573323 (E.D. Cal. Apr. 19, 2016) ..................................... 10, 11

*Tal v. Hogan*,
   453 F.3d 1244 (10th Cir. 2006)................................................................ 2

*Top Rank, Inc. v. Haymon*,
   2015 WL 9948936 (C.D. Cal. Oct. 16, 2015) .................................... 9, 10

*U.S. Steel Corp. v. Fortner Enters., Inc.*,
   429 U.S. 610 (1977) ............................................................................... 12

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001) ................................................................. 21

*Water, Inc. v. Everpure, Inc.*,
   2009 WL 10670419 (C.D. Cal. Oct. 28, 2009) ..................................... 22


**OTHER AUTHORITIES**

P. Areeda & H. Hovencamp, *Antitrust Law* ¶ 565 (updated Aug. 2022) ..................................... 16

P. Areeda & H. Hovencamp, *Antitrust Law* ¶ 651b1 (updated Aug. 2022).................................. 24

P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 1700d3 (updated Aug. 2022) .............................. 12

P. Areeda & H. Hovencamp, *Antitrust Law* ¶ 1740c4 (updated Aug. 2022).............................. 14

**INTRODUCTION**

Plaintiffs—yet again—have filed a sprawling 156-page, 698-paragraph complaint brimming with irrelevant information, rote conclusions, and antitrust jargon but devoid of the well-pled factual allegations necessary to state a claim. Plaintiffs make minor line edits to evade the prior grounds for dismissal, including changing their previous multi-directional tying claim to a one-way negative tie, with Google Maps API services as the tying product and Google Routes and Places API services as the tied products. In other words, Plaintiffs claim that if they licensed Maps API services from Google, they were precluded from using routes or places APIs from any competitors. But despite plaintiffs' tinkering, all the fundamental defects with their negative tying and related Sherman Act claims persist. Because plaintiffs are now on their third attempt and are no closer to stating a valid claim, the Second Amended Complaint should be dismissed with prejudice.

Plaintiffs' latest tying claim fails for four independent reasons. First, plaintiffs' newly minted one-way negative tying theory runs headlong into the Google Maps Platform Terms of Service ("Terms") on which plaintiffs rely. The Terms only restrict using *Google's mapping API services* with a *non-Google Map*, not the inverse scenario on which plaintiffs' one-way tying theory rests—using non-Google mapping APIs (*e.g.*, competing places or routes APIs) with a Google Map. Plaintiffs allege no facts showing that Google has ever interpreted or enforced the Terms in the manner alleged, whether against plaintiffs or anyone else. Plaintiffs cannot assert a valid tying claim based on a misreading of Google's Terms and not a *single* example of the Terms being enforced in the manner alleged.

Second, plaintiffs do not adequately allege that they were coerced into using Google's mapping API services. Plaintiffs now drop their prior allegations that competitors offer equivalent or superior maps API services, but they offer no explanation for this 180-degree reversal and are therefore bound to their prior judicial admissions. These admissions are fatal to plaintiffs' claim. They demonstrate that a developer who wanted to avoid Google's purported restrictions could have done so—by simply obtaining one of the allegedly equivalent or better competing map API services in the first place. Bedrock antitrust principles prevent a plaintiff

from bringing a tying claim based on a contractual restriction that the plaintiff voluntarily agreed to and could have avoided.

Third, plaintiffs still fail to allege cognizable product markets. Instead, without any valid basis, they lump together individual API services that can be licensed separately. A tying claim fails at the outset without plausibly alleged product markets.

Fourth, plaintiffs do not adequately allege market power. Antitrust law is clear: a plaintiff must plausibly allege a dominant market share, barriers to entry, *and* barriers to expansion from existing competitors. All three are required because an alleged high market share alone says nothing about "market power"—an antitrust term of art—if existing competitors can easily take share from a dominant firm behaving anticompetitively. Plaintiffs' sole allegation of a high market share rests on an anonymous quote referring to an unknown and undefined "business-to-business" market. And the alleged share, 90% of the market, is implausible given plaintiffs' allegations that there are at least twelve other competitors in the market, some of which allegedly provided an equivalent if not superior map API service. Plaintiffs likewise include no facts regarding barriers to expansion, instead only robotically reciting that such barriers exist.

In short, after three attempts, plaintiffs' complaint is still just a series of "conclusory statements strung together with antitrust jargon" that is insufficient to state a claim. *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 258 (3d Cir. 2010); *Tal v. Hogan*, 453 F.3d 1244, 1261 (10th Cir. 2006) ("the use of antitrust buzz words does not supply the factual circumstances necessary to support" a claim) (quotation marks omitted). The Court should dismiss it with prejudice.

## STATEMENT OF ISSUES TO BE DECIDED

Does the Second Amended Complaint ("SAC") state a valid claim for relief under the federal antitrust laws or the California Unfair Competition Law?

## BACKGROUND

### A.     Prior Motion to Dismiss Rulings

Plaintiffs' initial complaints alleged a multi-directional tie among Google's digital mapping API services: Maps APIs, Places APIs, and Routes APIs. Plaintiffs alleged that they

wanted to use maps, places, or routes APIs from Google's competitors along with Google's

mapping API services on their websites or applications. But they alleged that Google's Terms

prevented them from doing so. And this purportedly injured them because, for each of Google's

mapping API services, competitors allegedly offer mapping API services that are equivalent or

better than Google's at equivalent or cheaper prices.

Judge White dismissed the initial complaint on numerous grounds. First, he found that

Google's Terms did not impose either a positive or negative tie. ECF 45 at 4–5. Instead, the

Terms merely govern "how customers of its mapping services may use or display Google's

content" and "do not preclude Google customers from using a competitor's mapping services

altogether." *Id.* at 5.

Second, Judge White found that plaintiffs had not adequately alleged coercion. While

plaintiffs asserted that they were precluded from using or displaying Google's mapping API

services with APIs from competitors on their websites or applications, the Court concluded that

these allegations were "conclusory" and thus "insufficient to establish coercion." *Id.* at 6.

Finally, Judge White ruled that plaintiffs alleged neither valid relevant product markets

nor market power within those markets. Their alleged market definition consisted only of

"categories of digital mapping API services," and plaintiffs failed to adequately allege the

absence of economic substitutes for those distinct services. *Id.* at 8. As for market power,

plaintiffs alleged that Google has 90% of a "business-to-business market," but the Court ruled

that this was insufficient because the alleged "business-to-business" market was undefined and

plaintiffs had not shown it was the same as the product markets plaintiffs alleged. *Id.* at 8–9. The

Court also found plaintiffs' allegations of purported "direct demonstrations" of market power to

be conclusory and thus insufficient. *Id.* at 9.

Plaintiffs filed a First Amended Complaint (ECF 50) and Google again moved to dismiss.

Following reassignment of the case (ECF 59), this Court ordered supplemental briefing on two

questions: (1) whether *Sambreel Holdings LLC v. Facebook, Inc.*, 906 F. Supp. 2d 1070 (S.D.

Cal. 2012), is distinguishable; and (2) whether plaintiffs could validly state a multi-directional

tying theory. This Court ultimately agreed with Google that, regardless of whether a multi-

directional tying claim could ever be cognizable, plaintiffs had not adequately alleged such a claim. ECF 67 at 6–7. Accordingly, the Court granted Google's motion to dismiss (*id.* at 7) without reaching Google's other arguments for dismissal. *Compare* ECF 67; *with* ECF 51. In its order, the Court provided the following guidance: "Plaintiffs are not precluded from electing to proceed under a three-way tying theory, but if they do so they must be prepared to show why it is viable, beyond the fact that the cases discussed above did not dismiss claims at the pleading stage. Defendants, in turn, are not prohibited from invoking *Sambreel* in any future motion to dismiss, but are encouraged to focus on such other arguments as they may have." ECF 67 at 7.

## B.  Plaintiffs' Newest Tying Theory in the Second Amended Complaint

Plaintiffs have amended their complaint to abandon their multi-directional claim and now allege only a one-way negative tying claim, with Google Maps API services as the alleged tying product and Google Routes and Places API services as the alleged tied products.

According to plaintiffs, "[o]nce [they] started using any of Google's Maps APIs," they were "unable to use a competitor's places or routes APIs." SAC ¶¶ 530, 550, 573. As before, plaintiffs predicate their tying claim entirely on Google's Terms, which provide in relevant part:

> (e) No Use With Non-Google Maps. To avoid quality issues and/or brand confusion, *Customer will not use the Google Maps Core Services with or near a non-Google Map* in a Customer Application. For example, Customer will not (i) display or use Places content on a non-Google map, (ii) display Street View imagery and non-Google maps on the same screen, or (iii) link a Google Map to non-Google Maps content or a non-Google map.

Ex. A TOS § 3.2.3(e) (emphasis added).[1]

Plaintiffs interpret this provision as preventing them and other developers not simply from using Google mapping API services with or near a non-Google map as the Terms provide, but also as prohibiting the inverse–*i.e.*, using non-Google places or routes APIs with a Google Map. *E.g.,* SAC ¶¶ 18, 203–04. But that is not what the Terms say (*see infra*, pp. 7–10), and tellingly, Plaintiffs do not allege any instance of Google interpreting or enforcing its Terms—against plaintiffs or any other developer—in that manner.

---

[1] All "Ex. __ " references are to the Declaration of Jeremy R. Kauffman filed concurrently herewith and are properly considered for the reasons explained in Google's concurrently filed Request for Judicial Notice.

Plaintiffs continue to allege that there are at least 12 competitors for maps API services: Apple Maps, Mapbox, OpenStreetMap, 51Degrees, Bing, MapQuest, Comtech Telecommunications Corp., Telenav Inc., the United States Geological Survey, HERE Technologies ("HERE"), TomTom, and Esri. SAC ¶ 154. But to try to support their claim that Google Maps API services is the tying product, plaintiffs have now dropped their prior allegations that competitors supplied an equivalent, if not superior, maps API service for an equivalent or cheaper price. *See* Ex. B (Redline of Second Amended Complaint), ¶¶ 17, 20, 158, 276, 303, 331–332, 411, 570, 572.[2] Plaintiffs essentially just strike "maps APIs" from their prior allegations, as shown in the example below:

> ~~401~~411.     Google Maps' direct demonstration of monopoly power has been its ability to sustain egregious, supracompetitive prices, all while foreclosing Plaintiffs from using preferable competitors that have been known to offer materially cheaper, if not free, ~~maps~~places APIs, and routes APIs, ~~and places APIs~~ that are of comparable quality, if not better.

Plaintiffs do not allege any facts explaining this change of position. They have added a conclusory assertion that Google Maps has a "data advantage" over competitors and benefits from "being a default app on Android mobile phones." SAC ¶¶ 528, 548. But even if that were true, plaintiffs allege no facts showing that it was not equally true and known to them when they alleged in their previous complaint that competitors' mapping APIs were as good or better. And they do not allege any facts to show that this purported "advantage" or "benefit" coerced their mapping API licensing decisions.

## LEGAL STANDARD

A complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quotation marks and citations omitted). No weight is given to "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*,

---

[2] Google attaches a redline showing the changes made between the First Amended Complaint and operative Second Amended Complaint. Citations in this brief to paragraph numbers in the redline are to the revised paragraphs (reflected in blue).

556 U.S. 662, 678 (2009). Only well-pled factual allegations must be accepted: The Court is not "required to accept as true allegations that . . . are merely conclusory." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).

## ARGUMENT

**I.     PLAINTIFFS' AMENDMENTS DO NOT SAVE THEIR DEFECTIVE TYING CLAIM.**

To state a valid tying claim, a plaintiff must allege: "(1) that [defendant] tied together the sale of two distinct products or services; (2) that [defendant] possesses enough economic power in the tying product market to coerce its customers into purchasing the tied product; and (3) that the tying arrangement affects a not insubstantial volume of commerce in the tied product market." *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1178 (9th Cir. 2016) (citations omitted). The concern of tying law is that, by conditioning the sale of the tying product on the purchase of a separate product, the arrangement might "foreclose[] competition on the merits in a product market distinct from the market for the tying item." *Jefferson Par. Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 21 (1984).

Plaintiffs assert their tying claim under sections 1 and 2 of the Sherman Act, and also under section 3 of the Clayton Act. Failure to allege conditioned sales or sufficient foreclosure dooms plaintiffs' claims under either statute. *See Mozart Co. v. Mercedes-Benz of N. Am., Inc.*, 833 F.2d 1342, 1352 (9th Cir. 1987) ("the elements for establishing a Sherman Act § 1 claim and a Clayton Act § 3 claim are virtually the same"); *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1182 n. 61 (1st Cir. 1994) (rejecting "positive and negative tying" claim under section 2 after concluding that the claim failed under section 1).

Plaintiffs still fail to allege a tying arrangement. First, they do not plausibly allege that Google's Terms prohibit the conduct that plaintiffs claim to want to engage in and that allegedly constitutes a tie. Second, plaintiffs' complete and unexplained reversal on a central component of their claim—the existence of competitors in the alleged Maps API market that offer an equally good or superior alternative to Google's Maps API services—renders their tying claim

implausible.[3]

**A.    Plaintiffs Fail to Plausibly Allege that Google's Terms Impose a Tie.**

Plaintiffs' tying claim rests entirely on the theory that Google's Terms prevent developers from using routes or places APIs from a competitor with Google's Maps API services, which in turn coerces developers into licensing Google's Places or Routes API services. *See, e.g.*, SAC ¶¶ 2–3, 10–11, 18–21, 24. But the plain language of the Terms demonstrates otherwise. *Alexander v. Citigroup Glob. Markets. Inc.*, 2013 WL 12077818, at *6 (C.D. Cal. Apr. 10, 2013) (dismissing securities-law claims predicated on erroneous reading of "Client Agreement").[4]

The relevant provision states that customers "will not use the Google Maps Core Services *with or near a non-Google Map* in a Customer Application." Ex. A, TOS § 3.2.3(e) (emphasis added). This language imposes only a one-way restriction on developers using Google's API services (*e.g.*, Routes or Places) with or near a non-Google Map. It says nothing about the inverse scenario at issue in the SAC, using non-Google content with or near a *Google Map*. Indeed, the title of the section—"No Use With Non-Google Maps"—confirms that its sole focus is on using Google's API services with a non-Google Map, not the inverse. *See Georgia-Pac. v. Officemax Inc.*, 2013 WL 5273007, at *8–9 (N.D. Cal. Sept. 18, 2013) (relying on heading of contract provision as further evidence of its limited scope).

Plaintiffs refer to the third example in section 3.2.3(e), which states that a customer will not "link a Google Map to non-Google Maps content or a non-Google map." SAC ¶ 203. But their argument that this example restricts using or displaying non-Google content on a Google Map contradicts section 3.2.3(e)'s plain language and structure. Where section 3.2.3(e) seeks to restrict the "use" or "display" of content, it uses those express terms, as in the title and first sentence ("use") and in the first two examples ("display"). The third example, by contrast, does

---

[3] As Google's previous motions and supplemental briefing demonstrated, the reasoning in *Sambreel* precludes plaintiffs' tying claim. *See* ECF 62 at 2–7. Google continues to urge that the tying claim be dismissed on that ground. But Google heeds the Court's suggestion that it focus its briefing for this motion on the other arguments that the Court did not need to reach in the prior briefing.

[4] Google raised this argument in its earlier motions. ECF 41 at 9–10; ECF 51 at 14. It now takes on new significance given plaintiffs' new one-way tying theory (*i.e.*, that developers cannot use competing routes and places APIs with Google Maps API services).

not use the terms, but refers only to "link." Plaintiffs' argument improperly disregards this critical difference. *See Queen Villas Homeowners Assn. v. TCB Prop. Mgmt.*, 149 Cal. App. 4th 1, 9 (2007) ("When two [different] words are used in a contract, the rule of construction is that the words have different meanings."). And by ignoring that difference, plaintiffs effectively re-write the entire provision, transforming it from a narrow one-directional restriction (as shown by the title and operative provision) into a broad two-way prohibition. That incorrect interpretation must be rejected. *See Chickasaw Nation v. United States*, 534 U.S. 84, 90 (2001) (reasoning that an ambiguous example cannot be used to rewrite the unambiguous provision being illustrated).

The only plausible reading of example (iii) is that it means what it says—it is limited to "linking" a Google Map to a non-Google Map or non-Google Map content (such as via a hyperlink that opens a non-Google map when a user clicks on the Google Map). It does not restrict displaying or using non-Google API services with or near a Google Map. Yet displaying or using APIs from Google and its competitors on the same page is all plaintiffs have asserted they wanted to do. *See, e.g.,* ECF 36 at 6, 7, 11 (asserting that plaintiffs were prevented from "using any Routes APIs or Places APIs from competitors to *embed onto or use in conjunction with* the digital map") (emphasis added); Ex. B ¶ 138 (alleging that plaintiffs want "to combine together (or 'layer')" maps, places, and routes APIs and have them "interact with or display with each other on a screen, app, or website"; the SAC substitutes the word "link" for "layer" without explanation or supporting facts).

Implicitly recognizing that the third example is limited to linking, plaintiffs now sprinkle the word "link" throughout the SAC and allege for the first time that they also wanted to "link" non-Google APIs to a Google Map. But the boilerplate facts they allege do not show anything new. There is no alleged prohibited link. Rather, plaintiffs still allege only that they wished to use or display non-Google API services with a Google Map. *See, e.g.*, SAC ¶¶ 529–30 (Dream Big alleging it wanted "to use places APIs or routes APIs from . . . competitors, in combination with Google Maps APIs" or "in conjunction with" Google Maps API services); *id.* ¶¶ 555–56, 568 (Getify alleging it was prevented from displaying non-Google content on the "same digital screen" or on "one app, webpage, or website" with a Google Map). None of this describes

anything that is plausibly covered by the Terms' reference to "linking."  It is instead an invalid effort to invoke the Terms' one-way restriction on use of Google content "with or near" a non-Google map and turn it into a two-way restriction, contrary to section 3.2.3(e)'s express language, including both its title and the plain language of its central, operative provision.[5]

Moreover, Plaintiffs do not allege even a *single instance* of Google enforcing its Terms—against plaintiffs or anyone else—as preventing a developer from using or displaying non-Google content with or near a Google Map.  The failure to identify a single example renders plaintiffs' claim implausible, particularly given their allegations that Google maintains a "watchful eye" over how its API services are used, requires that developers identify to Google the domains and applications that use the Services, and enforces the Terms "aggressively."  SAC ¶¶ 214, 255, 538, 558, 581.  Plaintiffs similarly fail to allege that they ever asked Google whether the Terms prohibited what they wanted to do.  See *Top Rank, Inc. v. Haymon*, 2015 WL 9948936, at *10 (C.D. Cal. Oct. 16, 2015) (dismissing tying claim where complaint lacked allegations that contract term was applied in a way that created a de facto tying arrangement); *CCBN.Com, Inc. v. Thomson Fin., Inc.*, 270 F. Supp. 2d 146, 154 (D. Mass. 2003) (dismissing tying claim where plaintiff identified no contract imposing a tying arrangement nor "any customers" upon whom the tie was imposed).

The House Antitrust Report does not salvage plaintiffs' implausible claim.  Although the report makes an overbroad statement regarding its interpretation of Google's Terms, it likewise offers no basis for this interpretation, nor any examples of a developer being prohibited from using non-Google APIs with a Google Map.  Ex. C  at 241.  Instead, the report merely claims in a conclusory fashion that "Google closely tracks and pressures developers who use Google's place data in conjunction with *mapping data from a non-Google firm*."  *Id.*  But not only is this broader

---

[5] Sprinter's allegations are even further afield.  It alleges that it licensed Google's Routes API services and wanted "to use places APIs from [Google's] competitors" but could not do so and was thus forced into "using unwanted Google's Places APIs."  SAC ¶¶ 572, 574–75.  These allegations are the opposite of plaintiffs' new one-way tying claim.  Sprinter alleges that it was coerced by its use of Routes API services into licensing other Google API services.  That allegation makes Routes API services the tying product for Sprinter—not Maps API services, as the SAC now alleges.

than what is actually restricted under the Terms—using Google Places API services with a non-Google Map—it says nothing about the inverse scenario—and the only scenario at issue in the SAC—of a developer using competing APIs with a Google Map.

Even if the Court views the Terms as ambiguous on this point, an ambiguity alone is insufficient to plausibly allege the existence of a tying arrangement. Plaintiffs cannot plausibly state a claim by alleging that an example in the Terms *could* be read in a way that creates a negative tying arrangement (even ignoring that, as explained, it cannot be read that way). The plausibility standard "asks for more than a sheer possibility." *See Iqbal*, 556 U.S. at 678. Absent any allegations that Google has endorsed or acted consistently with plaintiffs' erroneous interpretation of the Terms, plaintiffs have not *plausibly* alleged a tie. *See Top Rank*, 2015 WL 9948936, at *10 ("Given the contractual language, which at least provides for the possibility of purchasing [the alleged tied product] from non-[defendant] sources, we are reluctant to find a tying arrangement without some evidence that [defendant] applied the contract language so restrictively as to constitute a de facto tying clause." (quoting *Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 722 (7th Cir. 1979))).

Because plaintiffs have not plausibly alleged that Google prohibited developers from using or "linking" competing places and routes APIs with Google Maps API services, plaintiffs have not alleged a tying arrangement and their tying claims must be dismissed. *See Edge Sys. LLC v. Ageless Serums LLC*, 2021 WL 3812875, at *5 (C.D. Cal. May 11, 2021) (dismissing tying claim for failure to plausibly allege existence of a tying arrangement); *Apple iPod iTunes Antitrust Litig.,* 2009 WL 10678940, at *5 (N.D. Cal. Oct. 30, 2009) (tying claim was not actionable "under the per se rule or the rule of reason" where plaintiff failed to show "the threshold requirement of alleging a coercive tying relationship").

**B.     Plaintiffs' Prior Allegations Regarding Equivalent or Superior Maps API Suppliers Are Fatal Judicial Admissions.**

Although a plaintiff may amend a complaint to allege new or different facts, "[t]he court need not accept the truth of a plaintiff's *inconsistent* factual allegations." *Swenson v. Nat'l R.R. Passenger Corp.*, 2016 WL 1573323, at *5 (E.D. Cal. Apr. 19, 2016) (emphasis added); *see also*

*Airs Aromatics, LLC v. Victoria's Secret Stores Brand Mgmt., Inc.*, 744 F.3d 595, 600 (9th Cir. 2014) (a plaintiff "cannot amend pleadings to directly contradict an earlier assertion made in the same proceeding"). Instead, the plaintiffs' initial allegations are treated as a "judicial admission" that they will be held to unless they adequately explain the error or inconsistency. *See Moore v. Regents of the Univ. of Cal.*, 2016 WL 4917103, at *4 (N.D. Cal. Sept. 15, 2016) (Seeborg, J.) (granting motion to dismiss because initial statement in complaint "serves as a judicial admission" absent explanation for the error, which was not presented). Put differently, "[a] litigant may take inconsistent positions in its pleadings, but must explain the inconsistency so the court may accord the explanation due weight." *Swenson*, 2016 WL 1573323, at *5 (refusing to assume the truth of later allegations that were inconsistent with prior allegations).

This framework is designed to prevent the type of unexplained 180-degree reversal of central facts that plaintiffs attempt here. Plaintiffs' entire tying claim now rests on their bare-bones allegations that Google had market power over Maps APIs and had a "data advantage" over competitors, such that developers have no meaningful choice but to use Google Maps API services. *See* SAC ¶¶ 528, 548. Yet this is the opposite of what plaintiffs previously alleged in two separate complaints (and reiterated in briefing defending those complaints). Before, plaintiffs repeatedly stated that there were no less than 12 competitors to Google in the alleged maps APIs market—and that many of these competitors offered maps APIs that were as good or better than Google's Maps API services. ECF 1, ¶ 10 ("competitors offer Maps APIs, Routes APIs, or Places APIs, mostly at significantly reduced prices to Google—and some even for free— and with comparable data and quality, if not better"); *see also id.* ¶¶ 24, 4, 122; ECF 50, ¶¶ 16, 137, 153–154, 266, 294, 322–323, 381, 401, 411 (similarly alleging the existence of numerous competitors that provide an equivalent or better map API than Google); ECF 36 (Opp. to MTD) at 11 (noting in "Statement of Facts" that "competitors offer Maps APIs . . . mostly at significantly reduced prices to Google—and some even for free—and with comparable data and quality, if not better"); *id.* at 13 (similar); ECF 54 at 6 ("competitors' maps APIs . . . are alleged to offer comparable quality, if not better, and be materially cheaper, if not free" than Google's Maps API services).

- 11 -

Plaintiffs offer no explanation for their about-face on one of the most central factual allegations to their tying claim. Their 180-degree reversal is particularly striking given that their previous allegations purportedly reflected their personal views and experiences. For example, plaintiffs previously alleged that "*Sprinter believes* that competitors' maps APIs . . . offer extra features or at the least, have comparable quality, if not better,*" yet now delete that allegation without explanation. Ex. B (Redline) ¶ 572 (emphasis added); *see also id.* ¶¶ 549, 570 (similar).

Plaintiffs' judicial admissions regarding the alleged availability of equivalent or superior maps APIs are fatal to their tying claim. "Not all tying arrangements are illegal. Rather, ties are prohibited where a seller 'exploits,' 'controls,' 'forces,' or 'coerces' a buyer of a tying product into purchasing a tied product." *Rick-Mik Enterprises, Inc. v. Equilon Enterprises LLC*, 532 F.3d 963, 971 (9th Cir. 2008); *Paladin Assocs., Inc. v. Montana Power Co.,* 328 F.3d 1145, 1159 (9th Cir. 2003) (it is "[e]ssential . . . that the seller *coerced* a buyer to purchase the tied product" (emphasis in original)). The requisite coercion can only exist when the defendant has some unique "advantage not shared by competitors in the market for the tying product." *U.S. Steel Corp. v. Fortner Enters., Inc.*, 429 U.S. 610, 620 (1977). If the tying product is available in a competitive market, then "one seller's decision to sell the two [products] in a single package imposes no unreasonable restraint on either market." *Jefferson Parish*, 466 U.S. at 11–12. That is because a "buyer cannot be forced to take the tied product on the seller's terms when the buyer can obtain the tying product on equally advantageous terms from other sources." P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 1700d3 (updated Aug. 2022); *see also Allen-Myland, Inc. v. Int'l Bus. Machines Corp.*, 33 F.3d 194, 200 (3d Cir. 1994) (economic power over the tying product is a prerequisite because without it, "buyers wanting to purchase the tied product from another source will simply avoid the tie by buying the tying product from another supplier").

As the Supreme Court has recognized, "if one of a dozen food stores in a community were to refuse to sell flour [the tying product] unless the buyer also took sugar it would hardly tend to restrain competition if its competitors were ready and able to sell flour by itself." *Jefferson Parish*, 466 U.S. at 11–12. Here, because plaintiffs' own admissions show that they could have avoided the tying arrangement by simply licensing maps API services from one of the dozen

competitors that allegedly offered them on equal or better terms, plaintiffs have failed to plausibly allege a tying claim. *See Arnold v. Petland, Inc.*, 2009 WL 816327, at *8 (S.D. Ohio Mar. 26, 2009) (plaintiffs failed to plead that defendant could "force plaintiffs to purchase the tied products" where allegations showed that defendant's pet store franchise [the tying product] was "only one of several or many competing pet store franchises available"); *Casper v. SMG*, 2006 WL 3111132, at *6 (D.N.J. Oct. 31, 2006) (finding lack of antitrust injury where purchasers could obtain the tying product [a convention center] elsewhere and thereby "avoid the tie" and a forced purchase of the tied product), *aff'd sub nom. Atl. Exposition Servs. Inc. v. SMG*, 262 F. App'x 449 (3d Cir. 2008); *Brandriff v. Dataw Island Owners' Ass'n, Inc.*, 2010 WL 11534504, at *6 (D.S.C. Sept. 30, 2010) (rejecting tying claim where potential real estate buyers could "buy property in one of the numerous other comparable communities" in the area to avoid purchasing the tied product: homeowners association membership that was required in one neighborhood).

Plaintiffs' boilerplate allegations regarding Google's purported "data advantage" based on "cross-app data sharing" and being the "default app on Android mobile phones" do not save their claim. SAC ¶¶ 9, 207, 275, 453, 528, 548. These allegations are conclusory and should be disregarded, particularly given that they conflict with plaintiffs' prior judicial admissions that Google's competitors are in fact the ones with the superior product and given that plaintiffs offer no explanation for their change of position. Plaintiffs allege no facts showing that Google's alleged "data advantage" is unique to Google or that none of the other 12 competitors (including Apple and Microsoft) do not benefit from "cross-app data sharing" or default app placement. Moreover, they allege no facts showing that these purported advantages coerced their mapping API licensing decisions. Likewise, while plaintiffs suggest that Google developed its Street View product under a more lenient regulatory framework (SAC ¶¶ 251, 442), they offer no factual allegations as to whether Google's *existing* competitors had the same advantage or pre-existing street view features—instead only conclusorily stating that "[c]ompetitors are alleged to be unable to use similar methods," *id.* ¶ 251.

Finally, plaintiffs cannot avoid dismissal with conclusory allegations that they were "locked in" to the purported tying arrangement. SAC ¶¶ 284, 455, 537, 557, 580. Bedrock

antitrust principles prohibit the Court from narrowly focusing on the developers' choices *after* they have "knowingly and voluntarily accepted" Google's Terms. *Oracle Am., Inc. v. CedarCrestone, Inc.*, 938 F. Supp. 2d 895, 904 (N.D. Cal. 2013). A defendant's power to coerce buyers into purchasing the tied products (or not purchasing them from a competitor) must be measured from the "the time the alleged tying arrangement was made"—not *after*. *Antitrust Law* ¶ 1740c4 (noting that "[a]ll the Justices in *Kodak* agreed on this point"). Accordingly, a lock-in theory of a tying claim is only viable where the defendant "changed its policy" to effectuate the lock-in or "misrepresented its tying practices" or where the "tying policy was otherwise not generally known." *Oracle*, 938 F. Supp. 2d at 904. Because plaintiffs have not alleged any of these scenarios, their lock-in theory is not viable. *See id.* (dismissing tying claim for failure to allege these facts); *Lee v. Life Ins. Co. of N. Am.*, 23 F.3d 14, 20 (1st Cir. 1994) (rejecting claim of lock-in, despite allegation of high switching costs, because "students know before their matriculation that they are buying a URI 'package' that includes at least two 'tied' products—a URI education and on-campus health care services and insurance").

Further, plaintiffs' lock-in theory independently fails because they allege no well-pled facts regarding what switching costs, if any, they would incur, or that the expense of switching would outweigh any savings from using the alternatives they allege were available. *See Oracle*, 938 F. Supp. 2d at 908 (plaintiff relying on lock-in must allege "high switching and information costs"); *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 515 (3d Cir. 1998) (explaining that a lock-in tying theory requires "switching costs significant enough to constitute a lock in"). Instead, they mechanically recite only that switching providers would cost "money, time, and effort." SAC ¶¶ 537, 557, 580. They also claim an "opportunity cost [from] having [their app or website's] mapping unavailable to the public" while they switched providers, *id.*; but they never support those bare conclusions with well-pled facts.

## II.     PLAINTIFFS' TYING CLAIM ALSO FAILS FOR FAILURE TO ALLEGE COGNIZABLE MARKETS OR MARKET POWER.

The SAC continues to have the same fatal flaws that Judge White previously recognized in dismissing the original complaint, and which this Court did not need to reach when it

1    dismissed plaintiffs' First Amended Complaint on different grounds.  The SAC should be

2    dismissed for these additional reasons as well.

3          **A.      Plaintiffs' Product Markets Are Legally Insufficient Because They**

4                   **Improperly Lump Together Individual API Services.**

5          "Where a complaint fails to adequately allege a relevant market underlying its antitrust

6    claims, those claims must be dismissed."  *Reilly v. Apple Inc.*, 2022 WL 74162, at *4 (N.D. Cal.

7    Jan. 7, 2022); *Qualcomm*, 969 F.3d at 992 (a "threshold step in any antitrust case is to accurately

8    define the relevant market").  Defining the relevant market is particularly important in tying cases

9    because a tying claim is based on the theory that a seller with market power in the tying market

10   uses that power to exclude sellers in a separate tied market.  *Spindler v. Johnson & Johnson*

11   *Corp.*, 2011 WL 13278876, at *3 (N.D. Cal. Jan. 21, 2011); *see also Lambrix v. Tesla, Inc.*, 2023

12   WL 8265916, at *7–8 (N.D. Cal. Nov. 17, 2023) (dismissing tying claims under both per se and

13   rule of reason standards because plaintiffs failed to allege a cognizable market).

14         Plaintiffs' market definitions fail because "[a] plausible market requires alleged facts

15   explaining why the products included in the market *are substitutes for one another* as well as

16   alleged facts explaining why seemingly similar products excluded from the market are not

17   substitutes for those in the market."  *Reilly*, 578 F. Supp. 3d at 1109 (emphasis added); *see also*

18   *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018) (a relevant market "must

19   encompass the product at issue as well as all economic substitutes for the product," or products

20   that are reasonably interchangeable).  Plaintiffs allege that "maps APIs," "routes APIs," and

21   "places APIs" services are each a "relevant product market."  SAC ¶¶ 64, 66–88 (maps), ¶¶ 89–

22   112 (places), ¶¶ 113–132 (routes).  But as Judge White recognized in granting Google's motion to

23   dismiss the original complaint, "Plaintiffs have simply taken the labels that Google applies to its

24   categories of digital mapping API services and alleged, in conclusory fashion, that those

25   categories are the relevant product markets."  ECF 45 at 8.

26         Plaintiffs have done nothing to remedy this deficiency.  They continue to allege that a

27   number of disparate API services are within a single market.  SAC ¶¶ 69–79 (maps), ¶¶ 92–105

28   (places), ¶¶ 116–126 (routes); *cf.* https://mapsplatform.google.com/pricing/.  Yet plaintiffs still

offer no valid explanation for why these individual API services should be lumped together into the three categories of product markets they allege.  Plaintiffs allege that no substitutes exist for the three categories of API services because, for example, it is impractical for developers to use "non-digital" alternatives or direct customers to separate websites.  SAC ¶¶ 87, 111, 132.  But even if that were true, plaintiffs do not allege facts showing why it is proper to aggregate several disparate API services into categories.  For example, they do not allege that developers license categories of API services (as opposed to individual services).  Nor could they, as their own complaint indicates that the API services are available a la carte.  SAC ¶¶ 63, 85.  Plaintiffs likewise fail to allege that the number and strength of competitors offering a viable digital substitute are the same across the various distinct services within each category.  *See Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*, 386 F.3d 485, 496 (2d Cir. 2004) ("The goal in defining the relevant market is to identify the market participants and competitive pressures that restrain an individual firm's ability to raise prices or restrict output.").  While plaintiffs conclusorily allege that the API services within each category "support the same, overarching purpose of each product category," SAC ¶¶ 7, 70, 93, 117, this is insufficient to establish that the individual API services are substitutes.  Flour and sugar both support the same overarching purpose of facilitating baking, but that does not make the two products economic substitutes for each other.

Rather than define a market based on substitutes, plaintiffs appear to have defined three markets based on *complements*.  *See Antitrust Law* ¶ 565 (explaining the distinction between substitutes and complements, which are goods that are "most efficiently made or used together").  This is fatal to plaintiffs' market definitions because "as a matter of law, complementary products sold separately are not in the same product market."  *Little Rock Cardiology Clinic, P.A. v. Baptist Health*, 573 F. Supp. 2d 1125, 1146 (E.D. Ark. 2008) (dismissing complaint that alleged that cardiology and hospital services to be a single product market); *see also Intel Corp. v. Seven Networks, LLC*, 562 F. Supp. 3d 454, 461 (N.D. Cal. 2021) (rejecting alleged market where plaintiff "has not pled any specific facts to suggest that the complementary patents [included in the market definition] could plausibly be substitutes as well"); *S. Cal. Elec. Firm v. S. Cal. Edison Co.*, 2023 WL 4317362, at *7 (C.D. Cal. Apr. 7, 2023) (services that were complements, not

substitutes, could not be combined into a single market).  Because the individual API services can be licensed separately (SAC ¶¶ 63, 85) and plaintiffs offer no valid justification for grouping these API services into categories, plaintiffs' alleged market definitions are insufficient as a matter of law and their tying claim must be dismissed.  *See* ECF 45 at 8.

**B.  Plaintiffs' Market Power Allegations Are Implausible and Inadequate.**

Plaintiffs' tying claims fail for the independent reason that they have not adequately alleged that Google has market power in the alleged tying product—maps API services.  "[I]n all cases involving a tying arrangement, the plaintiff must prove that the defendant has market power in the tying product."  *Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 46 (2006); *see also Rick-Mik Enterprises,* 532 F.3d at 972 ("A failure to allege power in the relevant market is a sufficient ground to dismiss an antitrust complaint."); *Innovative Health LLC v. Biosense Webster, Inc.*, 2020 WL 6122369, at *3 (C.D. Cal. Oct. 7, 2020) (dismissing a tying claim under rule of reason because complaint did not allege defendant had market power in the tying market).  At the pleading stage, market power can be alleged directly or indirectly.  *Med Vets Inc. v. VIP Petcare Holdings, Inc.*, 2019 WL 1767335, at *5 (N.D. Cal. Apr. 22, 2019), *aff'd*, 811 F. App'x 422 (9th Cir. 2020).  Plaintiffs have not plausibly alleged either.

**1.  Plaintiffs' Indirect Market Power Allegations are Inadequate.**

Market power can be alleged indirectly through allegations that (1) the defendant has a high share of the relevant market; (2) there are barriers to entry from new competitors; and (3) there are barriers to expansion by existing competitors.  *Med Vets*, 2019 WL 1767335, at *5. All three elements must be plausibly alleged.  Even assuming plaintiffs have adequately alleged barriers to new entry, they have failed to plausibly allege a high share of the relevant market or barriers to expansion.

**Market Share.**  Plaintiffs base their market share allegations entirely on the House Antitrust Report, which quoted an anonymous source stating that Google had a 90% share of a "business-to-business market."  *E.g.*, SAC ¶¶ 150, 231.  But plaintiffs offer no well-pled allegations that an undefined "business-to-business" market is the same as the maps API market they allege as the tying market.  This disconnect alone renders plaintiffs' reliance on the 90%

figure insufficient. *Rick-Mik Enterprises,* 532 F.3d at 973 (complaint failed "to allege market power in the relevant market" where the "statistics alleged in the complaint do not distinguish between" sales in the directly relevant market versus "other potential types of sales" in related but different markets); *Irving v. Lennar Corp.*, 2013 WL 1308712, at *17 (E.D. Cal. Apr. 1, 2013) (dismissing complaint alleging market power in a different market). The decision in *Med Vets* is instructive. There, the court dismissed the complaint despite plaintiffs' reliance on the defendant's *own documents* conceding a 95% market share because the document referred to a different, albeit related market, and plaintiffs had not bridged the gap between the two. 2019 WL 1767335 at *6 & n.12.[6]

Plaintiffs' reliance on the 90% market share figure also amounts to nothing more than a "bare assertion" that is too "conclusory to plausibly establish market power." *FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1, 18 (D.D.C. 2021) (collecting cases). The House Antitrust Report merely relayed an anonymous statement without endorsing it or otherwise concluding that Google has market power—despite plaintiffs' continued false statements to the contrary. *See* Ex. C at 234–36; *see also* ECF 51 at 16 (MTD highlighting plaintiffs' false allegation of the report "finding" market power); ECF 54 at 17–18 (opposition not responding to this argument); SAC ¶ 150 (repeating this false assertion). The House Antitrust Report's refusal to conclude that Google has market power is significant because elsewhere it *does* conclude that the firm in question had market power. *Compare* Ex. C at 254 & 334 (concluding that Amazon and Apple have "significant and durable market power"); *with id.* at 234–36 (reaching no conclusion as to Google's market power).

---

[6] Plaintiffs' allegation regarding Google's supposed 80% share of the "turn-by-turn" market for "consumer mapping applications"—which is even further afield from plaintiffs' defined market of map API services—is defective for the same reasons. Indeed, plaintiffs did not even bother responding to this argument in prior briefing. *See* ECF 45 at 9 n.4 (Judge White refusing to consider this allegation based on plaintiffs' failure to address Google's arguments on it); *see also* ECF 51 at 10–11 n.1 (Google's motion to dismiss the First Amended Complaint explaining why 80% allegation remained defective); ECF 54 at 13–14 (plaintiffs' opposition summarily stating that Google's share of consumer navigation apps "adds to Plaintiffs'" arguments, without explaining why or how). And plaintiffs still offer no well-pled allegations that would justify relying on this purported share of an entirely different market. *See, e.g.*, SAC ¶¶ 236–237, 239 (conclusory allegations regarding the "indirectly relevant" navigation app market).

Plaintiffs' 90% market share allegation is also entirely implausible when considered alongside the SAC's other allegations.  Plaintiffs continue to allege the existence of 12 competitors in the alleged maps API market.  *See* SAC ¶¶ 152, 154.  Yet plaintiffs offer no plausible explanation why these 12 competitors (including Apple and Microsoft) collectively have a mere 10% of a maps API market—an inconsistency that is particularly perplexing given plaintiffs' prior allegations that these competitors offered equivalent if not superior maps API services.  *See Hip Hop Beverage Corp. v. Monster Energy Co.*, 2016 WL 7324091, at *6 (C.D. Cal. Oct. 26, 2016) (finding "Plaintiffs allegations implausible in light of unexplained inconsistencies" such as defendant having substantial market power despite the existence of entrenched competitors (citation omitted)), *aff'd*, 733 F. App'x 380 (9th Cir. 2018).

**Barriers to Expansion.**  Even if the Court accepted plaintiffs' woefully deficient market share allegations, and even assuming plaintiffs have adequately alleged barriers to new entry, plaintiffs still fail to plead market power because they have not plausibly alleged barriers to expansion from existing competitors.  "A mere showing of substantial or even dominant market share alone cannot establish market power sufficient to carry out a predatory scheme."  *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1439 (9th Cir. 1995).  The plaintiff must also "show that new rivals are barred from entering the market ***and*** show that existing competitors lack the capacity to expand their output to challenge the predator's high price."  *Id.* (emphasis added); *Med Vets*, 2019 WL 1767335, at *7 (granting motion to dismiss because, even if plaintiffs' barrier to entry allegations were sufficient, plaintiffs failed "to include any allegation bearing on barriers to expansion").  This is a prerequisite to alleging market power because, if existing competitors can respond to a firm behaving anticompetitively, the defendant will "quickly lose market share."  *See Rebel Oil*, 51 F.3d at 1439, 1441.  A firm subject to this risk lacks "market power"—even if it presently holds a high share of the market.  *See id.* at 1441, 1443.

While plaintiffs' latest complaint sprinkles in conclusory assertions on barriers to expansion from existing competitors, it continues to lack any well-pled facts.  *See, e.g.*, Ex. B (Redline) ¶ 35 (adding the word "existing" before "competitors" without explaining why existing competitors would not capture market share from Google in the event of supracompetitive

prices); *id.* ¶¶ 38, 83, 107, 128, 152, 156–157 (conclusory allegations such as, "Defendant's

existing competitors have been unable to make a dent into nor challenge Google Maps'

dominance"). Plaintiffs assert that Google has prevented existing competitors from expanding by

coercing developers who licensed Google Places and Routes API services into licensing maps

API services from Google rather than a competitor. *E.g.,* SAC ¶¶ 405, 422, 466. But that

assertion is inconsistent with plaintiffs' one-way tying theory, which posits that Google uses its

economic power over *Maps API services* to coerce the licensing of *Routes and Places API*

*services*, not the opposite. And it is inconsistent with plaintiffs' continued allegations that

competitors offer equivalent or better alternatives to Google's Places and Routes API services,

*see, e.g.*, Ex. B (Redline) ¶¶ 17, 276, 411, 529, 549, 570, 572, which means that Google lacks any

economic power over those services that it could use to coerce the licensing of Maps API

services. Because desirable alternative routes and places APIs allegedly exist, any developer not

wanting to license Google's Maps API services could choose a competitor's routes or places API

services in the first place. Plaintiffs allege no facts to the contrary. Their one-way tying theory

and their own allegations preclude any such contention. Plaintiffs' failure to allege barriers to

expansion requires dismissal of their claim. *SC Innovations, Inc. v. Uber Techs., Inc.*, 434 F.

Supp. 3d 782, 793 (N.D. Cal. 2020) (dismissing complaint for failure to adequately allege market

power where plaintiff did not allege that the lesser of two dominant firms could not increase

output in response to a supracompetitive price increase).

**2.  Plaintiffs' Purported Direct Market Power Allegations are Conclusory and Irrelevant.**

Direct allegations of market power require allegations of "*both* restricted output *and*

supra-competitive prices." *Dominick v. Collectors Universe, Inc.*, 2012 WL 4513548, at *7 (C.D.

Cal. Oct. 1, 2012). Both are required because where "output is expanding at the same time prices

are increasing, rising prices are equally consistent with growing product demand." *Brooke Grp.*

*Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 233 (1993). Direct evidence (let alone

allegations) of market power "is only rarely available," *United States v. Microsoft Corp.*, 253

F.3d 34, 51 (D.C. Cir. 2001), and the SAC is no exception. Plaintiffs offer no factual allegations

of restricted output, instead only adding bare conclusions. *See* Ex. B (Redline), ¶¶ 468, 588 (conclusory allegations of "decreased output" with no supporting facts). Accordingly, even if plaintiffs had adequately alleged supracompetitive prices, they have still failed to plead direct evidence of market power.

And plaintiffs have not even adequately alleged supracompetitive prices in the first place. While plaintiffs allege in conclusory fashion that Google charged "supracompetitive" or "higher" prices, *e.g.*, SAC ¶¶ 83, 403, 410, their only *factual* allegations on this issue amount to nothing more than an allegation that Google raised its prices one time in mid-2018. SAC ¶¶ 82, 107, 128, 165–170, 339–345. But "price increases can be the natural result of growing demand (or increasing marginal costs)," so "[e]ven in a concentrated market, the occurrence of a price increase does not in itself permit a rational inference of . . . supracompetitive pricing." *Intel Corp. v. Fortress Inv. Grp. LLC,* 2022 WL 16756365, at *2 (9th Cir. Nov. 8, 2022) (quoting *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 237 (1993)); *see also In re Ebay Seller Antitrust Litig.*, 2010 WL 760433, at *5 (N.D. Cal. Mar. 4, 2010) ("Evidence that eBay has raised prices over a period of years, and that several of its employees believe that the company may have raised them too high, proves nothing with respect to whether the prices are supracompetitive."), *aff'd sub nom. In re eBay Seller Antitrust Litig.*, 433 F. App'x 504 (9th Cir. 2011). Accordingly, plaintiffs' standalone allegations of a one-time price increase more than five years ago does not plausibly allege supracompetitive prices. *Dominick*, 2012 WL 4513548, at *7 (allegation of "'artificially high'" or "higher" prices "cannot be equated to supracompetitive prices" absent additional alleged facts).

Plaintiffs' other allegations are irrelevant. For example, plaintiffs suggest that alleged data-privacy violations show market power, but Google is aware of no case holding that data-privacy issues are a valid proxy for market power. And in any event, plaintiffs never allege *facts* showing that Google has reduced privacy, that it did so without a corresponding benefit, or that it did so without losing customers. *Cf.* Ex. B (Redline) ¶ 437 (adding a conclusion merely reciting these elements without anything more). Instead, plaintiffs merely reference the existence of investigations, lawsuits, or settlements, without attempting to show that any of the purported

privacy issues affected the value of Google's digital mapping API services to developers. SAC ¶¶ 221–228, 436–450. Plaintiffs also allege that Google's imposition of a purported tying condition in its Terms itself indicates market power. SAC ¶¶ 424–428. But this is circular: if the mere existence of a tying condition were sufficient to show market power, then market power would necessarily exist in every alleged tying case (because the plaintiff must always allege the existence of a tying condition). Permitting this type of circular allegation would effectively eliminate the requirement that a plaintiff plead market power in the tying market.[7]

### III. PLAINTIFFS' OTHER ANTITRUST THEORIES LIKEWISE FAIL.

#### A. Plaintiffs Have Not Stated an Exclusive Dealing Claim.

As with their prior complaints, plaintiffs' causes of action for "exclusive dealing" rest on the same alleged factual predicate as their tying claims—*i.e.*, that Google's Terms prevent developers from licensing competitors' routes or places APIs. SAC ¶¶ 3, 282–287, 643–662. Judge White previously rejected this claim because plaintiffs failed to adequately allege that "Google prevents its customers from purchasing competitors' API services." ECF 45 at 9 (citing *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 (9th Cir. 2010)). The same is true of the SAC. As shown above, Google does not prevent developers from licensing API services from competitors in the manner plaintiffs complain of here.

Even if Google required exclusive use of its API services, plaintiffs' claims would still fail. Plaintiffs are required to allege facts that the exclusive dealing "foreclose[s] competition in a substantial share of the line of commerce affected." *Allied Orthopedic*, 592 F.3d at 996 (quotation marks and citations omitted); *see also Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1029–30 & n.8 (N.D. Cal. 2015); *Omega Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162–64 (9th Cir. 1997). If that threshold is met, courts then consider the length of the agreement, the customer's ability to terminate the agreement, and whether alternative channels to competitors

---

[7] Plaintiffs' allegation regarding Google's financial performance generally (SAC ¶ 409), is also deficient. Google Maps' revenues "in the abstract say[] nothing about the defendant's market power in the relevant market." *Water, Inc. v. Everpure, Inc.*, 2009 WL 10670419, at *8 (C.D. Cal. Oct. 28, 2009). Similarly, ad-hoc allegations of an unquantified number of quality issues, *e.g.*, SAC ¶¶ 429–434, in a product with 1 billion users do not suggest market power.

1    still exist. *See Feitelson*, 80 F. Supp. 3d at 1030.

2        Plaintiffs do not allege any facts showing foreclosure of competition. Indeed, plaintiffs do

3    not allege a properly defined relevant market or Google's share of that market (*supra,* pp. 14–22);

4    nor do they attempt to identify what percentage of Google's customers would opt to use a

5    competitor's API services absent the purported exclusivity or any of the other factors. Plaintiffs'

6    failure to these critical facts defeats their claim.[8]

7        **B.    Plaintiffs Fail to State a Sherman Act Section 2 Claim.**

8        To establish liability for monopolization under Section 2, a plaintiff must demonstrate the

9    defendant "(1) possessed monopoly power in the relevant market, (2) willfully acquired or

10   maintained that power through exclusionary conduct and (3) caused antitrust injury." *MetroNet*

11   *Servs. Corp. v. Quest Corp.*, 383 F.3d 1124, 1130 (9th Cir. 2004). To state a claim of attempted

12   monopolization under Section 2, a plaintiff must show "'(1) that the defendant has engaged in

13   predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous

14   probability of achieving monopoly power.'" *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883,

15   893 (9th Cir. 2008) (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993)).

16       Plaintiffs allege that Google's exclusionary or anticompetitive conduct was engaging in

17   "negative tying, exclusive dealing, and self-preferencing." SAC ¶¶ 667, 681. But as shown

18   above, plaintiffs have not validly alleged negative tying or exclusive dealing. That defeats their

19   Section 2 claim based on the same conduct. *See, e.g., FTC v. Qualcomm Inc.*, 969 F.3d 974, 991

20   (9th Cir. 2020) ("If, in reviewing an alleged Sherman Act violation, a court finds that the conduct

21   in question is not anticompetitive under § 1, the court need not separately analyze the conduct

22   under § 2.").

23       Plaintiffs' allegation that Google engages in "self-preferencing," SAC ¶¶ 309–21, also

24   fails to state a Section 2 claim. Plaintiffs assert that Google permits map caching for Google's

25

26   ───────────────
     [8] Plaintiffs make passing references to alleged contracts with Ford, Uber, and Lyft. SAC ¶¶ 28,
27   294, 298. But they do not allege any facts showing that these contracts are for the kind of
     mapping API services at issue in this case. Nor do they allege any facts showing the state of
28   competition in the market for the unidentified products those companies purchased or that the
     contracts foreclosed competition in that market.

"own products" (such as "local search" or "hotel finder") but not on third-party websites or apps that use Google's digital mapping API services. *Id.* ¶ 313. According to plaintiffs, this disadvantages competitors to Google's "non-mapping products" (*e.g.*, a competitor that offers a "hotel finder" product). *Id.* ¶ 311.[9] But plaintiffs do not allege that they license or compete with any such non-mapping product. Because they are neither a purchaser nor a competitor in any allegedly affected market for non-mapping products, and do not allege facts showing they were injured by any impact on competition in that market, they lack standing to sue over any effect in that market. *Glen Holly Ent., Inc. v. Tektronix, Inc.*, 352 F.3d 367, 372 (9th Cir. 2003) ("the party alleging the injury must be either a consumer of the alleged violator's goods or services or a competitor of the alleged violator in the restrained market") (quoting *Eagle v. Star–Kist Foods, Inc.*, 812 F.2d 538, 540 (9th Cir. 1987)).

Plaintiffs also contend that Google's alleged policy of not permitting map caching raises the cost and "degrade[s] the quality of Plaintiffs and Class members' experience with Maps APIs, Places APIs, or Routes APIs." SAC ¶¶ 29, 310. But that allegation does not describe any harm to competition. *See* ECF 51 at 21; *Antitrust Law* ¶ 651b1 (updated Aug. 2022) (developing a less desirable product does not "exclude rivals from the market" and is not monopolistic).

Finally, plaintiffs' Section 2 claims independently fail because they have not alleged a properly defined relevant market and Google's share of that market. *Supra,* pp. 14–22; *Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 1000 (N.D. Cal. 2020).

### C. Plaintiffs Fail to State a UCL Claim for the Same Reasons.

Plaintiffs do not allege any facts in support of their California Unfair Competition Law (UCL) claim beyond what they allege for the antitrust claims. Instead, the sole basis for the UCL claim is that Google allegedly "engaged in unlawful negative tying, exclusive dealing, self-preferencing, and monopolization (or in the alternative and at the least, attempted monopolization)." SAC ¶ 694. Because plaintiffs have not adequately alleged that Google

---

[9] Plaintiffs' effort to strike this language from the allegation fails because the Court can not only consider plaintiffs' prior allegations, it can also consider the quote as it appears in the House Report. Ex. B (Redline) ¶ 311; Ex. C, at 242–43 (House Report).

engaged in any of that conduct, they have also not alleged any basis for finding any unlawful, unfair, or fraudulent conduct under the UCL. ECF 45 at 9–10; *Hicks*, 897 F.3d at 1124 (affirming dismissal of UCL unfairness claim where antitrust claims were dismissed for failure to plead a relevant market); *Lambrix*, 2023 WL 8265916, at *9 (after concluding that plaintiffs had not stated a valid antitrust claim, dismissing UCL claim where "Plaintiffs' allegations that Defendant's actions are unfair mirror their allegations that its actions are unlawful").

## CONCLUSION

The Second Amended Complaint should be dismissed with prejudice.

Dated: February 9, 2024                    JONES DAY

                                           By: _/s/ David C. Kiernan_____
                                                David C. Kiernan

                                           Attorneys for Defendants
                                           Alphabet Inc. and Google LLC