Justin S. Nematzadeh*
**NEMATZADEH PLLC**
101 Avenue of the Americas, Suite 909
New York, New York 10013
Telephone:     (646) 799-6729
jsn@nematlawyers.com
*Attorney for Plaintiffs and the Class*
*Admitted Pro Hac Vice*

John G. Balestriere*
**BALESTRIERE FARIELLO**
225 Broadway, 29th Floor
New York, New York 10007
Telephone:     (212) 374-5401
Facsimile:      (212) 208-2613
john.balestriere@balestrierefariello.com
*Attorney for Plaintiffs and the Class*
*Admitted Pro Hac Vice*

Matthew W. Schmidt (State Bar No. 302776)
**Schmidt Law Corporation**
116A Main Street
Tiburon, California 94920
Telephone:     (415) 390-6075
matt@schmidtlc.com
*Attorney for Plaintiffs and the Class*

Mario Simonyan (State Bar No. 320226)
**ESQGo, PC**
303 North Glenoaks Boulevard, Suite 200
Burbank, California 91502
Telephone:  (424) 363-6233
mario@esqgo.com
*Attorney for Plaintiffs and the Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

2024-03-21, JSN to MS, Neat

| | |
|---|---|
| DREAM BIG MEDIA, INC., GETIFY SOLUTIONS, INC., and SPRINTER SUPPLIER LLC, Individually and on Behalf of all Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>ALPHABET INC. and GOOGLE LLC,<br><br>Defendants. | Case No.: 22-cv-02314-RS<br><br>CLASS ACTION<br><br>PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT<br><br>Date:     May 9, 2024<br>Time:    1:30 P.M.<br>Judge:  Hon. Richard Seeborg<br><br>ORAL ARGUMENT REQUESTED |

1

2

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ..................................................................................................ii

INTRODUCTION ............................................................................................................1

STATEMENT OF ISSUES ..............................................................................................3

BRIEF SUMMARY OF FACTS IN RESPONSE TO ORDER ...................................3

ARGUMENT ....................................................................................................................5

      1.     Negative Tying Is Alleged Under Sherman Act Sections 1 & 3 and Clayton
            Act Section 3. .....................................................................................................5

            A.     The Digital Maps API Market, Digital Places API Market, and
                      Digital Routes API Market are Relevant Antitrsut Product Markets..........5

            B.     Plaintiffs Allege Negative Tying. ............................................................9

            C.     Plaintiff alleges Google's Monopoly Power in the Digital Maps
                      API Tying Market. .................................................................................14

            D.     Plaintiffs Allege Coercion to Purchase the Tied Products Through
                      Google's Monopoly Power in the Tying Products and the TOS,
                      Coercion to Have Purchased the Tying Products Is Not Required,
                      and Even Then, Plaintiffs Provide Examples of Coercion........................19

      2.     Exclusive Dealing Is Alleged Under Sherman Act Section 1 and Clayton
            Act Section 3. .................................................................................................23

      3.     Section 2 Violations Are Alleged in Totality.........................................................24

      4.     Plaintiffs Allege a UCL Claim. ..........................................................................25

V.     CONCLUSION ........................................................................................................25

<u>**TABLE OF AUTHORITIES**</u>

<u>**CASES**</u>

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
836 F.3d 1171 (9th Cir. 2016) .......................................................................... 22

*Airs Aromatics, LLC v. Victoria's Secret Stores Brand Mgmt., Inc.*,
744 F.3d 595 (9th Cir. 2014) ............................................................................. 21

*Alexander v. Citigroup Global Mkts., Inc.*,
2013 WL 12077818 (C.D. Cal. Apr, 10, 2013) .................................................... 14

*AliveCor, Inc. v. Apple Inc.*,
592 F. Supp. 3d 904 (N.D. Cal. 2022) .......................................................... 15, 16

*Allen-Myland, Inc. v. Int'l Bus. Mach. Corp.*,
33 F.3d 194 (3d Cir. 1994) ............................................................................ 18, 8

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
592 F.3d 991 (9th Cir. 2010) .......................................................................... 5, 24

*Am. President Lines, LLC v. Matson, Inc.*,
2022 WL 4598538 (D.D.C. Sept. 30, 2022) ............................................... 7, 19, 24

*Apple iPod iTunes Antitrust Litig.*,
2009 WL 10678940 (N.D. Cal. Oct. 30, 2009) ..................................................... 21

*Arnold v. Petland, Inc.*,
2009 WL 816327 (S.D. Ohio Mar. 26, 2009) ................................................. 16, 17

*Bay Cities Paving & Grading v. Lawyers' Mut. Ins. Co.*,
855 P.2d 1263 (Cal. 1993) ................................................................................ 11

*Blue Sky Color of Imagination, LLC v. Mead Westvaco Corp.*,
2010 WL 4366849, at *4 (C.D. Cal. Sept. 23, 2010) ........................................... 23

*Brandriff v. DATAW Island Owners' Assoc., Inc.*,
2010 WL 11534504 (D.S.C. Sept. 30, 2010) ....................................................... 22

*Brobeck, Phleger & Harrison v. Telex Corp.*,
602 F.2d 866 (9th Cir. 1979) ............................................................................. 11

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*,
140 F.3d 494 (3d Cir. 1998) .............................................................................. 20

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993) ......................................................................................... 19

*Brown v. Amazon.com, Inc.*,
2023 WL 5793303 (W.D. Wash. Sept. 7, 2023) .................................................... 7

*Casper v. SMG*,
2006 WL 3111132 (D.N.J. Oct. 31, 2006) ........................................................... 22

*CCBN.com, Inc. v. Thomson Fin., Inc.*,
   270 F. Supp. 2d 146 (D. Mass. 2003) ............................................................. 21, 22

*Chickasaw Nation v. U.S.*,
   534 U.S. 84 (2001) ............................................................................................... 14

*Christou v. Beatport, LLC*,
   849 F. Supp. 2d 1055 (D. Col. 2012) ................................................................... 19

*Feitelson v. Google Inc.*,
   80 F. Supp. 3d 1019 (N.D. Cal. 2015) ................................................................. 24

*Smith v. eBay Corp.*,
   2012 WL 27718 (N.D. Cal. Jan. 5, 2012) ....................................................... 14, 25

*Cost Mgmt. Servs., Inc. v. Washington Natural Gas Co.*,
   99 F.3d 937 (9th Cir. 1996) ............................................................................. 18-19

*Datagate, Inc. v. Hewlett-Packard Co.*,
   60 F.3d 1421 (9th Cir. 1995) ............................................................................... 20

*Datel Holdings Ltd. v. Microsoft Corp.*,
   712 F. Supp. 2d 974 (N.D. Cal. 2010) ........................................................... 16, 14

*Digidyne Corp. v. Data Gen. Corp.*,
   734 F.2d 1336 (9th Cir. 1984) ............................................................................. 16

*Dominick v. Collectors Universe, Inc.*,
   2012 WL 4513548 (C.D. Cal. Oct. 1, 2012) ......................................................... 16

*Dytch v. Yoon*,
   2011 WL 839421 (9th Cir. Mar. 7, 2011) ................................................... 10, 5, 11

*Eastman Kodak Co. v. Image Technical Servs., Inc.*,
   504 U.S. 451 (1992) ............................................................................................. 20

*Edge Sys. LLC v. Ageless Serums LLC*,
   2021 WL 3812875 (C.D. Cal. May 11, 2021) ....................................................... 21

*F.T.C. v. Facebook, Inc.*,
   560 F. Supp. 3d 1 (D.D.C. 2021) ......................................................................... 16

*Fortner Enters., Inc. v. U.S. Steel Corp.*,
   394 U.S. 495 (1969) ............................................................................................. 16

*Frame-Wilson v. Amazon.com, Inc.*,
   2023 WL 2632513 (W.D. Wash. Mar. 24, 2023) ................................................... 14

*Gardner v. StarKist Co.*,
   2020 WL 1531346 (N.D. Cal. Mar. 31, 2020) ........................................................ 8

*Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*,
   386 F.3d 485 (2d Cir. 2004) ............................................................................. 7, 18

iii

*Georgia-Pacific LLC v. OfficeMax Inc.*,
    2013 WL 5273007 (N.D. Cal. Sept. 18, 2013) ........................................................... 14

*Giordano v. Saks Inc.*,
    2023 WL 1451534 (E.D.N.Y. Feb. 1, 2023) ................................................................... 7

*Hamman v. Cava Grp., Inc.*,
    2023 WL 8374747 (S.D. Cal. Dec. 4, 2023) ...................................................... 8, 19, 24, 25

*Hannah's Boutique, Inc. v. Surdej*,
    2013 WL 4553313 (N.D. Ill. Aug. 28, 2013) ................................................................. 19

*High Tech. Careers v. San Jose Mercury News*,
    996 F.2d 987 (9th Cir. 1993) ............................................................................................ 8

*Hip Hop Beverage Corp. v. Monster Energy Co.*,
    2016 WL 7324091 (C.D. Cal. Oct. 26, 2016) ............................................................... 16

*HotChalk, Inc. v. Scottsdale Ins. Co.*,
    736 Fed. Appx. 646 (9th Cir. 2018) ............................................................................. 11

*Hytera Commc'ns Corp. Ltd. v. Motorola Solutions, Inc.*,
    2022 WL 3645908 (N.D. Ill. Aug. 24, 2022) ............................................................... 24

*Image Tech. Servs. v. Eastman Kodak Co.*,
    125 F.3d 1195 (9th Cir. 1997) ......................................................................................... 7

*In re Amazon.com, Inc. eBook Antitrust Litig Antitrust Litig.*,
    2024 WL 918030 (S.D.N.Y. 2024) ............................................................................... 14

*In re eBay Seller Antitrust Litig.*,
    2010 WL 760433 (N.D. Cal. Mar. 4, 2010) ................................................................. 17

*Intel Corp. v. Fortress Inv. Grp. LLC*
    2022 WL 16756365 (9th Cir. 2022) .............................................................................. 17

*Intel Corporation v. Seven Networks, LLC*,
    562 F. Supp. 3d 454 (N.D. Cal. 2021) ........................................................................... 8

*In re Google Digital Adver. Antitrust Litig.*,
    627 F. Supp. 3d 346 (S.D.N.Y. 2022) ........................................................................... 14

*In re GSE Bonds Antitrust Litig.*,
    396 F. Supp. 3d 354 (S.D.N.Y. 2019) ........................................................................... 10

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
    933 F.3d 1136 (9th Cir. 2019) ...................................................................................... 25

*In re Pool Prods. Distrib. Market Antitrust Litig.*,
    940 F. Supp. 2d 367 (E.D. La. 2013) ........................................................................... 25

*In re Propranolol Antitrust Litig.*,
    249 F. Supp. 3d 712 (S.D.N.Y. 2017) ........................................................................... 10

*In re Webkinz Antitrust Litig*,
   2010 WL 4168845 (N.D. Cal. Oct. 20, 2010) .......................................................................... 16

*Inform Inc. v. Google LLC*
   (In re Google Digital Adver. Antitrust Litig.), 2024 WL 988966 (S.D.N.Y. Mar. 7, 2024)
   ............................................................................................................................... 19, 22, 24

*Innovative Health LLC v. Biosense Webster, Inc.*,
   2020 WL 6122369 (C.D. Cal. Oct. 7, 2020) ............................................................................ 16

*Irving v. Lennar Corp.*,
   2013 WL 1308712 (E.D. Cal. Apr. 1, 2013) ............................................................................ 16

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
   466 U.S. 2 (1984) ..................................................................................................................... 22

*Jones v. Varsity Brands, LLC*,
   2022 WL 3043895 (W.D. Tenn. Aug. 1, 2022) .............................................................. 7, 23-24

*Kickflip, Inc. v. Facebook, Inc.*,
   999 F. Supp. 2d 677 (D. Del. 2013) ............................................................................ 14, 15, 19

*Klein v. Facebook, Inc.*
   2022 WL 141561 (N.D. Cal. Jan. 14, 2022) ..................................................................... 17, 18

*Lambrix v. Tesla, Inc.*,
   2023 WL 8265916 (N.D. Cal. Nov. 17, 2023) ........................................................................... 7

*Lee v. City of Los Angeles*,
   250 F.3d 668 (9th Cir. 2001) ................................................................................................... 15

*Lee v. Life Ins. Co. of N. Am.*,
   23 F.3d 14 (1st Cir. 1994) ........................................................................................................ 20

*Little Rock Cardiology Clinic, P.A. v. Baptist Health*,
   573 F. Supp. 2d 1125 (E.D. Ark. 2008) ............................................................................ 8, 9, 10

*Med Vets Inc. v. VIP Petcare Holdings, Inc.*,
   2019 WL 1767335 (N.D. Cal. 2019) ....................................................................................... 16

*Meredith Corp. v. SESAC LLC*,
   1 F. Supp. 3d 180 (S.D.N.Y. 2014) ..................................................................................... 7, 14

*MLW Media LLC v. World Wrestling Entm't, Inc.*,
   2023 WL 4053802 (N.D. Cal. June 15, 2023) ......................................................................... 18

*Momento, Inc. v. Seccion Amarilla USA*,
   2009 WL 10696217 (N.D. Cal. Sept. 17, 2009) ...................................................................... 25

*Moore v. James H. Matthews & Co.*,
   550 F.2d 1207 (9th Cir. 2003) ................................................................................................. 22

*Moore v. Regents of the Univ. of Cal.*,
   2016 WL 4917103 (N.D. Cal. Sept. 15, 2016) ........................................................................ 21

*N. Pac. Ry. Co. v. U.S.*,
  356 U.S. 1 (1958) ........................................................................................... 13, 20

*Newcal Indus., Inc. v. Ikon Office Solutions, Inc.*,
  2011 WL 1899404 (N.D. Cal. May 19, 2011) ........................................................ 13

*Ninth Circuit. Red Lion Med. Safety, Inc. v. Ohmeda, Inc.*,
  63 F. Supp. 2d 1218 (E.D. Cal. 1999) ................................................................... 20

*Omega Envtl., Inc. v. Gilbarco, Inc.*,
  127 F.3d 1157 (9th Cir. 1997) .............................................................................. 24

*Oracle Am., Inc. v. CedarStone, Inc.*,
  938 F. Supp. 2d 895 (N.D. Cal. 2013) .................................................................. 20

*PAE Gov't Servs., Inc. v. MPRI, Inc.*,
  514 F.3d 856 (9th Cir. 2007) ............................................................................... 21

*Paladin Assocs., Inc. v. Montana Power Co.*,
  328 F.3d 1145 (9th Cir. 2003) .............................................................................. 22

*Photovest Corporation v. Fotomat Corporation*,
  606 F.2d 704 (7th Cir. 1979) ............................................................................... 22

*Pecover v. Elecs. Arts Inc.*,
  633 F. Supp. 2d 976 (N.D. Cal. 2009) .................................................................. 23

*Plaintiffs. Glen Holly Entm't Inc. v. Tektronix Inc.*,
  352 F.3d 367 (9th Cir. 2003) ............................................................................... 24

*Ploss v. Kraft Foods Grp., Inc.*,
  197 F. Supp. 3d 1037 (N.D. Ill. 2016) ................................................................. 19

*PLS.com, LLC v. Nat'l Ass'n of Realtors*,
  32 F.4th 824 (9th Cir. 2022) ........................................................................... 18, 20

*Queen Villas Homeowners Ass'n v. TCB Prop. Mgmt.*,
  149 Cal. App. 4th 1 (Cal. Ct. App. 2007) ............................................................. 14

*RealPage, Inc. v. Yardi Sys., Inc.*,
  852 F. Supp. 2d 1215 (C.D. Cal. 2012) ...................................................... 14, 19, 25

*Rebel Oil Co., Inc. v. Atl. Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995) ............................................................................... 19

*Reilly v. Apple Inc.*,
  578 F. Supp. 3d 1098 (N.D. Cal. 2022) ................................................................... 7

*Rick-Mik Enter. Inc. v. Equilon Enter., LLC*,
  532 F.3d 963 (9th Cir. 2008) ............................................................................... 16

*Rumble, Inc. v. Google LLC*,
  2022 WL 3018062 (N.D. Cal. July 29, 2022) ....................................................... 24

*S. Cal. Elec. Firm v. S. Cal. Edison Co.*,
   668 F. Supp. 3d 1000 (C.D. Cal. 2023) ........................................................................ 8

*SC Innovations, Inc. v. Uber Tech., Inc.*,
   434 F. Supp. 3d 782 (N.D. Cal. 2020) ....................................................................... 19

*Simon and Simon, PC v. Align Tech., Inc.*,
   533 F. Supp. 3d 904 (N.D. Cal. 2021) ....................................................................... 25

*Slattery v. Apple Computer, Inc.*,
   2005 WL 2204981 (N.D. Cal. Sept. 9, 2005) ........................................................... 22

*Spindler v. Johnson & Johnson Corp.*,
   2011 WL 13278876 (N.D. Cal. Jan. 21, 2011) ............................................................ 7

*Standard Oil Co. v. U.S.*,
   337 U.S. 293 (1949) ..................................................................................................... 5

*Starr v. Sony BMG Music Entm't*,
   592 F.3d 314 (2d Cir. 2010) ..................................................................................... 10

*Surgical Instrument Serv. Co., Inc. v. Intuitive Surgical, Inc.*,
   571 F. Supp. 3d 1133 (N.D. Cal. 2021) ................................................................... 20

*Swenson v. Nat'l R.R. Passenger Corp.*,
   2016 WL 1573323 (E.D. Cal. Apr. 19, 2016) ........................................................... 21

*Team Schierl Cos. v. Aspirus, Inc.*,
   2023 WL 6847433 (W.D. Wisc. Oct. 17, 2023) ................................................. 14, 23

*Todd v. Exxon Corp.*,
   275 F.3d 191 (2d Cir. 2001) ....................................................................................... 7

*Top Rank, Inc. v. Haymon*
   2015 WL 9948936 (C.D. Cal. Oct. 16, 2015) ........................................................... 21

*Tucker v. Apple Computer, Inc.*,
   493 F. Supp. 2d 1090 (N.D. Cal. 2006) ................................................................... 22

*U.S. Steel Corp. v. Fortner Enters., Inc.*,
   429 U.S. 610 (1977) ................................................................................................... 20

*U.S. v. Mercedes-Benz of N. Am., Inc.*,
   517 F. Supp. 1369 (N.D. Cal. 1981) .................................................................... 13-14

*United Energy Trading, LLC v. Pac. Gas & Elec. Co.*,
   200 F. Supp. 3d 1012 (N.D. Cal. 2016) ................................................................... 25

*Water, Inc. v. Everpure, Inc.*,
   2009 WL 10670419 (C.D. Cal. Oct. 28, 2009) ......................................................... 16

*William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*,
   668 F.2d 1014 (9th Cir. 1981) ................................................................................... 25

## **STATUTES**

Clayton Act, 15 U.S.C. § 14  ................................................................................................ 5, 1

Sherman Act 15 U.S.C. §§ 1, 2, 3, 14 ................................................................... 1, 5, 6, 7, 23, 24

Cal. Bus. & Prof. Code § 17200  ............................................................................. 2, 4, 1, 3, 4, 5

## **RULES**

Federal Rule of Civil Procedure 12 .................................................................................. 8

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.     INTRODUCTION

Plaintiffs Dream Big Media, Inc. ("Dream"), Getify Solutions, Inc. ("Getify"), Sprinter Supplier LLC ("Sprinter"), and the Class (together, "Plaintiffs") submit this opposition to the Motion to Dismiss (ECF 71-72) the Second Amended Complaint ("SAC," ECF 70) by Defendants Alphabet Inc. and Google LLC (together, "Google").[1] The Motion should respectfully be denied.

Google has engaged in negative tying and exclusive dealing against Sections 1 & 3 of the Sherman Antitrust Act ("Sherman Act," 15 U.S.C. §§ 1, 3) and Section 3 of the Clayton Antitrust Act ("Clayton Act," 15 U.S.C. § 14), and with self-preferencing in totality, monopolization maintenance (or attempted monopolization) against Sherman Act Section 2 (15 U.S.C. § 2). This all violates the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 ("UCL").

Google's argument that Plaintiffs merely track Google Maps' ***admitted*** categorizations of Maps APIs, Places APIs, and Routes APIs ignore Plaintiffs' allegations. They do not merely track Google's names of its products but entire markets; Plaintiffs allege factual qualities about the Digital Maps API Market, Digital Places API Market, and Digital Routes API Market. Hypocritically, Google argues that, on the one hand, Plaintiffs cannot merely reference its admitted products categories as relevant markets (they do not), but on the other hand, each of Google's own APIs within each relevant market that they allege should be its own relevant market. This ignores Plaintiffs' allegations that within each of the Digital Maps API Market, Digital Places API Market, and Digital Routes APIs Market, the APIs include substitutes: they are related products with sub-features that support the same, overarching purpose and core functionality of each product market.[2]

Responding to the Court's Order dated November 30, 2023 ("Order," ECF 67), Plaintiffs allege that Google's Maps APIs are the tying product, and Google's Places APIs or Routes APIs are the negatively tied products.[3] Google Maps' Terms of Service ("TOS") expressly forbid the use or linking that Plaintiffs seek here: for example, "Customer will not … (iii) link a Google Map to

---

[1] Unless stated otherwise herein, all ¶ references herein are to the SAC, terms not defined herein have the meanings defined in the SAC, all internal citations and quotations are omitted and all emphasis is added herein, and all ECF references herein are to this action's docket, *Dream Big Media, Inc., et al. v. Alphabet Inc., et al.*, No. 22-cv-02314-RS (N.D. Cal.) ("Action").

[2] For reference herein, Google's products are capitalized (Maps APIs, Places APIs, or Routes APIs), while competitors' products are not capitalized (maps APIs, Places APIs, or routes APIs).

[3] Contrary to repeated, uncalled for attacks by Google against Plaintiffs' amendments in the SAC, the amendments were made in large part to shift the alternative-tying theory to one-way tying.

non-Google Maps content[.]" This is not just a reasonable interpretation; it is the express wording. This point is supported by the by the U.S. House of Representatives Subcommittee on Antitrust, Commercial and Administrative Law ("House Antitrust Subcommittee"), in a report called Investigation of Competition in Digital Markets, released October 6, 2020 ("House Antitrust Report").[4] According to the House Antitrust Report, "[TOS] prohibit developers from using ***any*** component of the Google Maps Core Service with mapping services provided by non-Google firms." "Google [] prohibits developers from using ***any*** part of its mapping tools alongside ***any*** non-Google mapping features[.]" Google's tortured interpretation of the TOS attempts to discredit Plaintiffs' appropriate use of the verbs "use" and "link" in the SAC, despite inconsistent usage that Google itself used for such verbs in the TOS throughout the Class Period—and even inconsistent usage that Google used in briefing in this Action. Contrary to Google's assertion that Google merely made a mistake in including examples in the TOS that expressly encompass the negative tying here, the language in the TOS read in totality further supports that Google made no mistake, that several TOS clauses support the negative tying alleged here,  and the example states what it states: Plaintiffs cannot link Google's Maps APIs, which surely are part of a "Google Map," to competitors' places APIs or routes APIs, which surely are "non-Google Maps content[.]" The TOS is Google's document: any imprecise drafting, broad or vague terms, purported mistakes, and otherwise inconsistent usage of language and how it has evolved falls on Google. But splitting hairs over Google's interpretation gymnastics cannot overcome the substance of Plaintiffs' claims, especially not before discovery is taken about the intent, interpretation, enforcement, or revisions to language.

Google Maps has monopoly power[5] in the Digital Maps API Market, with above 90% market share, which Plaintiffs substantiate with defined terms and express language from the House Antitrust Report: "Google Maps API captures over 90% of the business-to-business market[.]" Plaintiffs buttress this point with allegations of circumstantial market power, direct demonstrations

---

[4] The House Antitrust Report was a bipartisan endeavor, spanned several hearings, thousands of hours of interviews and testimony from companies, industry participants, enforcers, and experts, more than a million documents (even from Google alone), and submissions from about 60 antitrust experts. ¶¶23, 161-63. Google "declined to produce [to the House Antitrust Subcommittee] crucial documents … that were produced to antitrust authorities in ongoing investigations[,]" so crucial evidence about the allegations made herein would be produced in discovery. *Id.*
[5] All references to monopoly power allegations herein also include in the alternative and at the least, sufficient economic or market power.

of monopoly power, and barriers to entry and expansion. This monopoly power in the tying market and the imposition of the negative tie being in the TOS satisfies a *per se* tying claim.

Alleging anything extra in terms of Plaintiffs having been coerced into purchasing the ***tying*** product is not required. Still (in addition to the monopoly power allegations), Plaintiffs allege that they cannot feasibly avoid Google's Maps APIs in totality because of the barriers to entry and expansion and the sheer data advantage that Google Maps has. Pursuant to the TOS and the way in which digital-mapping works on Plaintiffs' apps, once they purchase Google's Maps APIs, they cannot purchase, use, or link competitors' places APIs or routes APIs, despite preferences to use competitors' products. This separately satisfies any coercion element in terms of being forced to purchase ***tied*** products or avoid preferable competitors' products. Google is using the negative tying with Maps APIs being the tying product, with the intent and effect of restraining competition and acquiring or enhancing its power in the negatively tied products, its Places APIs and Routes APIs. The negative tying forecloses Plaintiffs from exercising competitive choices in selecting the negatively tied products of places APIs or routes APIs from competitors based on merit.

Google makes an incredible argument that to show coercion, Plaintiffs should have rolled the dice by violating the TOS or asking Google if they could violate the TOS (as if Plaintiffs could easily have a conversation with Google's lawyers), wait to experience Google's wrath, risk their entire digital presence, suffer the consequences, and only then sue. This is not the law. Imposing such a requirement would render infeasible almost any antitrust class action for tying. Instead, Plaintiffs knew that they could not violate the TOS. By the express terms in the TOS, violations of the TOS were under Google's watchful reporting. Plaintiffs should not be punished for good behavior through abiding by the TOS. Although not required, Plaintiffs offer examples of coercion.

## II.     STATEMENT OF ISSUES

1.  Have Plaintiffs alleged valid claims under the federal antitrust laws or the California UCL?

## III.     BRIEF SUMMARY OF FACTS IN RESPONSE TO ORDER[6]

Digital-mapping application ("app.") programming interfaces ("APIs") are a critical and ubiquitous utility enabling a supplying business (Google Maps) to provide data to direct purchasers (Plaintiffs) (the "business-to-business" segment), who can use, display, and link digital maps data,

---

[6] More-fulsome factual allegations are addressed in the Argument section.

3

1   places data, and routes data on their apps for use by indirect consumers who patronize them.[7]

2          Per the Court's Order (ECF 67, at 5-7), Plaintiffs focus the negative tying on Google's Maps

3   APIs being the tying product, and either Google's Places APIs or Routes APIs as the negatively

4   tied products.[8] The TOS expressly forbid the use or linking that Plaintiffs seek here: Google's Maps

5   APIs are forbidden from being used or linked with competitors' places APIs or routes APIs. *Id.*

6          The monopolistic provider in the Digital Maps API Market is Google Maps, with above

7   90% market share, from the House Antitrust Report.[9] There is circumstantial market power, direct

8   demonstrations of monopoly power, and barriers to entry and expansion.[10] In addition to monopoly

9   power in the tying product and negative tying being expressed in the TOS, Plaintiffs cannot avoid

10  Google's Maps APIs due to barriers to entry and expansion and Google's data advantage.[11]

11         Pursuant to the TOS and the way in which digital-mapping works on Plaintiffs' apps, once

12  they purchase Google's Maps APIs, they cannot purchase, use, or link competitors' APIs, despite

13  preferences to use competitors' places APIs or routes APIs that are alleged to offer comparable

14  quality (if not better) and be cheaper (if not free).[12] This separately satisfies any coercion element

15  in terms of being forced to purchase the ***tied*** products or avoid preferable competitors' offerings.

16  *Id.* Plaintiffs knew that they could not violate the TOS because they were dealing with Google. *Id.*

17         Dream and Getify are victims of the negative tying: after purchasing Google's Maps APIs,

18  they were forced through the negative tying and the TOS to purchase Google's Places APIs and

19  Routes APIs, which they named and provided expenses for, despite preferences to purchase

20  competitors' places APIs and routes APIs, which they named.[13] Dream, Getify, and Sprinter are

21  victims of the exclusive dealing: they were all forced to use only Google's Maps APIs, Places APIs,

22  or Routes APIs.[14] Once they purchased any of Google's Maps APIs, Places APIs, or Routes APIs,

23  they have been locked into Google Maps' ecosphere and could not unwind digital mapping without

[7] ¶¶1, 57-61, 148, 196.
[8] ¶¶8-12, 18-19, 22, 273-78, 207. The initial digital-mapping APIs forming the base of digital maps are often maps APIs, and monopoly power and data and technical advantages result in Google's Maps APIs often forming the base of digital maps. *Id.*
[9] ¶¶3, 9, 32-35, 37-39, 135-38, 150, 207, 229-51, 38-52, 400, 451-73, 527-68.
[10] ¶¶8-12, 18-19, 22-27, 31, 273-78, 381, 398.
[11] ¶¶9, 30, 178, 207, 275, 439, 453, 528, 548.
[12] ¶¶10, 17, 141, 145-46, 220, 274, 276, 284, 286, 300-08, 331, 411, 523-25, 538, 558, 549, 581.
[13] ¶¶3, 348-52, 462-73, 527-68.
[14] ¶¶3, 142-43, 277-81, 288, 348-56, 462-73, 527-89, 597, 606.

4

substantial cost financially, in time, and in effort that renders the process infeasible. *Id.* Dream, Getify, and Sprinter have all experienced the anticompetitive harm from Google's monopolization in totality (or in the alternative, attempted monopolization), including the self-preferencing, through having paid supracompetitive prices for any of Google's Maps APIs, Places APIs, and Routes APIs, among other injuries.[15] Google's anticompetitive conduct has foreclosed Plaintiffs from selecting Google Maps' competitors based on merit. *Id.* Plaintiffs seek damages and equitable, injunctive, and declarative relief on behalf of themselves and the Class. *Id.*

# IV.      ARGUMENT

Negative tying and exclusive dealing are alleged under Sherman Act Section 1 and the lower threshold of Clayton Act Section 3 (¶¶622-62), where the anticompetitive actions "substantially lessen competition[,]" "tend to create a monopoly[,]" or are "found [to have a] probable effect of foreclosing competition[.]"[16] Plaintiffs' allegations of "products" in the SAC (¶¶ 1, 5-6, 57-132, 148, 151, 196) must be credited: APIs are treated more like products than code; Google has recognized Maps APIs, Places APIs, and Routes APIs as "Products" on its webpages during the Class Period. *Id.* Google cannot on reply challenge the products allegations. *Dytch v. Yoon*, 2011 WL 839421, at *3 (9th Cir. Mar. 7, 2011) (issues cannot be raised first on reply).

**1. Negative Tying Is Alleged Under Sherman Act Sections 1 & 3 and Clayton Act Section 3.**
    **A. The Digital Maps API Market, Digital Places API Market, and Digital Routes API Market are Relevant Antitrsut Product Markets.**

Google's argument that Plaintiffs merely track Google Maps' ***admitted*** categorizations of Maps APIs, Places APIs, and Routes APIs ignore Plaintiffs' allegations: Plaintiffs allege detailed factual qualities about the distinct Digital Maps API Market, Digital Places API Market, and Digital Routes API Market. ¶¶4-7, 61-132, 151. In support, Google cites a webpage without requesting judicial notice nor incorporation by reference. ECF 71, at 15 (webpage); ECF 72 (not referring to webpage). Google argues that, on one hand, Plaintiffs cannot reference admitted products categories as relevant markets (Plaintiffs do not), but on the other hand, Google argues that each of

---

[15] ¶¶3, 20-21, 27, 41-42, 147, 277-81, 288, 348-56, 361, 462-73, 527-89, 597, 606.
[16] 15 U.S.C. § 14; *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 n.1 (9th Cir. 2010); *see also Standard Oil Co. v. U.S.*, 337 U.S. 293, 312-14 (1949).

its APIs within each relevant market should be its own market (ECF No. 71, at 2, 15-17).[17]

But this ignores Plaintiffs' allegations that within each of the Digital Maps API Market, Digital Places API Market, and Digital Routes APIs Market, the APIs included are substitutes in that they are related products with sub-features that support the same, overarching purpose and core functionality of each market. APIs of digital data about maps, images, and terrain are the U.S. "Digital Maps API Market." ¶¶4-7, 63-88, 151. Plaintiffs allege distinct features of maps APIs as examples of particular characteristics that demonstrate the distinct core functionality of maps APIs. *Id*. Although competitors and Google Maps use different names for APIs part of the Digital Maps API Market, and those APIs may have sub-features, they are all used for the same, overarching ultimate purpose and core functionality of using maps, images, and terrain data on apps or websites, and Plaintiffs thus allege them as the Digital Maps API Market. *Id*. No substitutes are reasonably interchangeable for the distinct core functionality of maps APIs, and there is no cross-elasticity of demand with any purported substitutes. *Id*.

APIs of digital data about establishments, geographic locations, and points of interest are the U.S. "Digital Places API Market." ¶¶4-7, 63-65, 89-112, 151. Plaintiffs allege distinct features of places APIs as examples of particular characteristics that demonstrate the distinct core functionality of places APIs. *Id*. Although competitors and Google Maps use different names for APIs part of the Digital Places API Market, and those APIs may have sub-features, they are all used for the same purpose and core functionality of using and linking data about places on a digital map, and Plaintiffs thus allege them as the Digital Places API Market. *Id*. No substitutes are interchangeable for the distinct core functionality of places APIs, and there is no cross-elasticity of demand with any purported substitutes. *Id*.

APIs of digital routing data about directions, navigation, and travel time are the U.S. "Digital Routes API Market." ¶¶4-7, 63-65, 113-32, 151. Plaintiffs allege distinct features of routes APIs as examples of particular characteristics that demonstrate the distinct core functionality of

---

[17] Google does not otherwise challenge Plaintiffs' allegations that the Digital Maps API Market, Digital Places API Market, and Digital Routes API Market are not substitutes for each other and that no other products are substitutes for them. They cannot because Plaintiffs provide detailed allegations in support. ¶¶4-7, 41, 64-132, 151. There is competitor (including Google) and industry recognition of the Digital Maps API Market, Digital Places API Market, and Digital Routes API Market. *Id*. Plaintiffs even present purported substitutes and dispel them. ¶¶4-7, 41, 64-132, 151.

1  routes APIs. *Id*. Although competitors and Google Maps use different names for APIs part of the

2  Digital Routes API Market, and those APIs may have sub-features, they are all used for the same,

3  overarching purpose and core functionality of using and linking data about directions, navigation,

4  travel distances, and times on a digital map, and Plaintiffs thus allege them as the Digital Routes

5  API Market. *Id*. No substitutes are reasonably interchangeable for the distinct core functionality of

6  routes APIs, and there is no cross-elasticity of demand with any purported substitutes. *Id.*

7       Google's attempt to inject sub-markets in the Digital Maps API Market, Digital Places API

8  Market, and Digital Routes API Market—in contradiction of Plaintiffs' allegations—are

9  unpersuasive and impermissible at this stage. *Image Tech. Servs. v. Eastman Kodak Co.*, 125 F.3d

10  1195, 1203-04 (9th Cir. 1997) (rejecting argument that each part was relevant market); *Todd v.*

11  *Exxon Corp.*, 275 F.3d 191, 201-02, 203-06 (2d Cir. 2001) (market not over-inclusive by including

12  all industry employees); *Brown v. Amazon.com, Inc.*, 2023 WL 5793303, at \*6-7 (W.D. Wash.

13  Sept. 7, 2023) (no defects in markets, despite claims of over- and under-inclusiveness); *Am.*

14  *President Lines, LLC v. Matson, Inc.*, 2022 WL 4598538, at \*6 (D.D.C. Sept. 30, 2022) (it is a

15  question of fact as to whether markets include submarkets); *Jones v. Varsity Brands, LLC*, 2022

16  WL 3043895, \*11-14 (W.D. Tenn. Aug. 1, 2022) (similar); *Meredith Corp. v. SESAC LLC*, 1 F.

17  Supp. 3d 180, 196, 219-20 (S.D.N.Y. 2014) (at summary judgment, defendant's argument for

18  narrower markets limited to each work are insufficient to dismiss action); *Giordano v. Saks Inc.*,

19  2023 WL 1451534, at \*17-21 (E.D.N.Y. Feb. 1, 2023) (relevant market not overinclusive).[18]

20  [18] Google cites authority decided at summary judgement that actually supports Plaintiffs'
    allegations based on lack of cross-elasticity of demand. *Geneva Pharm. Tech. Corp. v. Barr Labs.*
21  *Inc.*, 386 F.3d 485, 494, 496-500 (2d Cir. 2004) (at summary judgment, generic drug was a separate
    market, as inelastic demand made customers loyal despite price differences). Google demands—
22  without citing any applicable case—that Plaintiffs must each purchase all of Google's Maps APIs
    or Places APIs or Routes APIs at once, as opposed to purchasing individual APIs within those
23  markets, for each to be a relevant market. ECF 71, at 16. But this would make it infeasible for any
    relevant market to ever include more than one single product. Indeed, Google shoots itself in the
24  foot by citing cases where plaintiffs attempted to make relevant markets too specific, something
    that Google attempts to do. *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1121-23 (9th Cir. 2018) (within
25  the general advertising market, submarkets could not be limited to advertising to golf fans or during
    live tournaments); *Lambrix v. Tesla, Inc.*, 2023 WL 8265916, at \*5-8 (N.D. Cal. Nov. 17, 2023)
26  (tentatively finding that plaintiffs alleged fore-market of battery-electric vehicles separate from
    internal-combustion vehicles, but finding that plaintiffs failed to allege a single-brand aftermarket);
27  *Reilly v. Apple Inc.*, 578 F. Supp. 3d 1098, 1107-09 (N.D. Cal. 2022) (market could not plausibly
    be limited to Apple's iOS App Distribution Market, especially where plaintiff in complaint
28  conceded that overwhelming majority of mobile devices used Google's Android OS system);
    *Spindler v. Johnson & Johnson Corp.*, 2011 WL 13278876, at \*3 (N.D. Cal. Jan. 21, 2011) (finding
    unpersuasive plaintiff simply alleging the market of "pharmaceutical services").

Google cites nothing in the record nor the SAC to state that APIs within each of the Digital Maps API Market, Digital Places API Market, and Digital Routes APIs Market are complements, as opposed to substitutes. ECF 71, at 16-17. First, Google could have made this argument in its prior motion to dismiss but did not. ECF 51, at 8-9. The relevant market allegations were not substantially changed between the First Amended Complaint ("FAC") and SAC. ECF 71-1, Exhibit ("Ex.") B, at 17-31. Under Federal Rule of Civil Procedure ("Rule") 12(g)(2), Google's ability to argue this is waived. *Gardner v. StarKist Co.*, 2020 WL 1531346, at *3 (N.D. Cal. Mar. 31, 2020) ("[A]llegations are not substantively different in the SAC, StarKist's argument could have been raised in its first [motion] and its motion violates Rule 12(g)(2)'s ban on successive Rule 12(b) motions."); *Hamman v. Cava Grp., Inc.*, 2023 WL 8374747, at *3 (S.D. Cal. Dec. 4, 2023) (similar).

Second, this fails because Google's off-the-record assertion that APIs within each alleged relevant market are complements and not substitutes is wrong and contradicts Plaintiffs' allegations. The only decision that Google cites within the Northern District of California, *Intel Corporation v. Seven Networks, LLC*, **supports** Plaintiffs' argument because there, while the defendant argued that plaintiff's alleged substitute patents were in fact compliments, the court rejected accepting defendant's assertion over plaintiff's allegations on a motion to dismiss. 562 F. Supp. 3d 454, 463 (N.D. Cal. 2021). But plaintiff's allegations itself that some of the patents were complements—not substitutes—resulted in those complementary patents not being included in the otherwise-valid relevant markets that revolved around substitute patents combining to form part of each relevant market. *Id.* at 461-63. Here, the APIs within each relevant market are substitutes, and Google's claim that they are complements—without basis in the record—is at most a question of fact. *High Tech. Careers v. San Jose Mercury News*, 996 F.2d 987, 990 (9th Cir. 1993) (substitutes factual inquiry for jury); *Allen-Myland, Inc. v. Int'l Bus. Mach. Corp.*, 33 F.3d 194, 206-07 (3d Cir. 1994) (substitutes versus complements was a question of fact for trial).[19]

---

[19] Other decisions that Google relies upon are distinguishable, where plaintiffs conceded that the services were complements and not substitutes, and those distinct products could not have been used for similar, overarching purposes. *S. Cal. Elec. Firm v. S. Cal. Edison Co.*, 668 F. Supp. 3d 1000, 1014-15 (C.D. Cal. 2023) (plaintiffs conceded services were not substitutes); *Little Rock Cardiology Clinic, P.A. v. Baptist Health*, 573 F. Supp. 2d 1125, 1140-47 (E.D. Ark. 2008) (market could not include both services offered by hospitals and cardiologists in one market merely because hospitalized patients needed both a hospital and a cardiologist; the services were complementary and not substitutes; defendant hospital did not compete in cardiologists' services and thus had no market power; and there were no anticompetitive effects).

**B. Plaintiffs Allege Negative Tying.**

Google Maps uses the TOS to commit negative tying, prohibiting Plaintiffs from using or linking competitors' places APIs or routes APIs with Google's Maps APIs. ¶¶11-13, 18-19, 196-211, 277-81. The House Antitrust Report states that "[d]evelopers choose to mix and match, using map data from one firm but places data from another." ¶¶24, 199. But the House Antitrust Report notes "Google [] prohibits developers from using ***any*** part of its mapping tools alongside ***any*** non-Google mapping features," revising the TOS as even more exclusionary (¶¶24-25, 196-211, 427):

> Google Maps Content means any content provided through the Services (whether created by Google …), including map and terrain data, imagery, trace data, and places data (including business listings). … (e) No Use With Non-Google Maps. To avoid quality issues and/or brand confusion, Customer will not use the Google Maps Core Services with or near a non-Google Map in a Customer Application. For example, Customer will not (i) display or use Places content on a non-Google map, (ii) display Street View imagery and non-Google maps on the same screen, or (iii) link a Google Map to non-Google Maps content or a non-Google map. [¶203.]

***First***, the TOS state: "Customer will not … (ii) display Street View imagery [a Google Maps API] and non-Google maps on the same screen, or (iii) link a Google Map to non-Google Maps content or a non-Google map." ¶203. This is the one-way negative tying. *See* ¶301. Plaintiffs purchase maps APIs, places APIs, and routes APIs to be used and linked together on one app or website, for their customers to view on one app or website.[20] There is demand to use and link Google's Maps APIs with competitors' places APIs or routes APIs: it makes no sense for Plaintiffs to use the Google's Maps APIs  and competitors' places APIs or routes APIs in unlinked ways. *Id.*

***Second***, the House Antitrust Report supports that the TOS include the alleged one-way negative tying. ¶¶19, 204, 427. According the House Antitrust Report (including the statements above), "[b]oth versions of this provision [including prior version] prohibit developers from using any component of the Google Maps Core Service with mapping services provided by non-Google firms. The April 2020 change to the [TOS] is even more restrictive: it prohibits developers from even displaying any component of Google Maps near any other map." ¶¶19, 204, 427. This includes that once Plaintiffs purchase Google's Maps APIs, Google forbids them from using or linking competitors' places APIs or routes APIs, not even near each other nor even in the same app. ¶¶17, 23, 141, 196-211, 275-78, 282, 300-08, 331, 411, 529, 549. Those preferring competitors' places

---

[20] ¶¶13-16, 141-44, 220, 284, 300-08, 462-89.

APIs or routes APIs, which are alleged to have comparable quality (if not better) and be cheaper (if not free), cannot use them and must purchase unwanted Google's Places APIs or Routes APIs. *Id.*

Google has admitted to the negative tying. ¶218. According to the House Antitrust Report, "Google was asked to identify and justify any limits it places on the ability of app developers who use the Google Maps Platform to use non-Google mapping services." *Id.* "***Google responded that it does 'restrict developers from incorporating Google Maps Core Services into an application that uses a non-Google map'*** in order to prevent brand confusion and other negative user experiences." *Id.*; *see* ¶¶218, 391-97. But the House Antitrust Report and testimony by Eric Gunderson ("Gunderson"), who is Mapbox's co-founder and chief executive officer, both support that these lame excuses lack merit: there would be no confusion about sources of digital-mapping data because developers can seamlessly display the sources on digital maps.[21] The House Antitrust Report notes that Google Maps' lack of competition allowed it to skimp on quality control, resulting in millions of fake business listings and inaccurate locations, causing anticompetitive harm to businesses and indirect users (even including physical danger), but profit to Google from advertising. ¶¶31, 219, 202-03, 429-35. The House Antitrust Report cited sources alleging that Google Maps knows about these fake listings but lets them occur. *Id.*

***Third***, the TOS forbidding any use and linking of any of Google's Maps APIs, Places APIs, and Routes APIs with competitors' maps APIs, places APIs, and routes APIs—and thus using or linking Google's Maps APIs with competitors' places APIs or routes APIs—is further supported by revelations of the antitrust investigations into related issues by the U.S. Department of Justice, Antitrust Division ("DOJ-Antitrust") and German Federal Cartel Office ("GFCO"). ¶¶ 27, 252-68, 299. Media about the investigations specifically reference the TOS as forbidding developers from combining Google Maps' digital-mapping APIs with any of competitors' APIs. ¶¶27, 252-62, 263-68.[22] And Gunderson noted to the House Judiciary Committee that Google Maps' negative tying is brazen through the TOS and causes anticompetitive harm. ¶¶365-73, 375-80, 395.

---

[21] ¶¶31, 219, 391-97, 365-73, 375-80, 395.
[22] The investigations are supportive. *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 325 (2d Cir. 2010) ("[C]omplaint alleges … Department of Justice has … launched two new investigations[.]"); *In re GSE Bonds Antitrust Litig.*, 396 F. Supp. 3d 354, 363 (S.D.N.Y. 2019) (similar); *In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712, 723 (S.D.N.Y. 2017) (similar). Google did not challenge the investigations' relevance and cannot on reply. *Dytch*, 2011 WL 839421, at *3.

*Fourth*, Google's tortured language interpretation should not be credited to contradict Plaintiffs' allegations—indeed, to contradict the express language of the TOS. Google has broadly defined the term "Google Maps Platform," "Google Maps Core Services," and "Services" to include all "Google Maps Content"—Google's Maps APIs, Places APIs, Routes APIs, and other tools. ¶¶205, 233, 233 n.112. Should the language have been permissive (it was not) of enabling Plaintiffs to use and link Google's Maps APIs with competitors' places APIs and routes APIs, then Google would have (1) provided precisely defined terms for its Maps APIs, as separate from its Places APIs and Routes APIs, (2) provided precisely defined terms for its competitors' maps APIs, places APIs, and routes APIs, and (3) removed the forbidden examples of "(ii) display Street View imagery [a Google Maps API] and non-Google maps on the same screen, or (iii) link a Google Map to non-Google Maps content or a non-Google map." ¶¶203, 205. Google did none of these. *Id.*

The sentence introducing the three forbidden examples in Term 3.2.3(e) states that "Customer will not use the Google Maps Core Services with or near a non-Google Map in a Customer Application." ¶203. The verb "use" introduces these examples, which reflects that the verbs in those examples—"display" and "link"—are included in the broader verb "use." ECF 71-1, Ex. A, at 6-7. These broad verbs are bi-directional: to "use," "display," or "link" elements of an app cover the same behavior (using the elements together), which includes the one-way tie alleged here. Google's use of broad, imprecise language is intentional to make negative tying prohibitions as broad as possible. *HotChalk, Inc. v. Scottsdale Ins. Co.*, 736 Fed. Appx. 646, 648 (9th Cir. 2018) ("California courts ascribe words their plain meaning and give broad meaning to broad terms"); *Bay Cities Paving & Grading v. Lawyers' Mut. Ins. Co.*, 855 P.2d 1263, 1271 (Cal. 1993) (similar).

Term 3.2.3(e)(iii) forbids Plaintiffs from "link[ing] a Google Map[,]" which certainly includes Google's Maps APIs, "to non-Google Maps content[,]" which certainly includes competitors' places APIs and routes APIs. This expressly includes the one-way negative tie alleged here. *Brobeck, Phleger & Harrison v. Telex Corp.*, 602 F.2d 866, 872 (9th Cir. 1979) ("[I]t is beyond question that every provision of a contract should be examined to determine the meaning and intention of the parties"). Throughout the SAC, Plaintiffs have appropriately, clearly, and specifically used the verbs "use" or "link" to refer to what they wanted to do, but for the negative

tying in the TOS, as expressly forbidden in the Term 3.2.3(e).[23]

Google in the Motion introduces only one example of forbidden activity under 3.2.3(e)(iii): "such as via a hyperlink that opens a non-Google map when a user clicks on the Google Map[.]" ECF 71, at 8. Even in this example, the word "use" can be interchangeable with term "via[,]" and this example is listed nowhere in the TOS. The inclusion of example 3.2.3(e)(iii) was not a mistake by Google, and it does not contradict the introductory sentence for the three examples. Rather, the reasonable interpretation is that the terms "non-Google Map[,]" "non-Google map[,]" and "non-Google maps" in the TOS (Google Maps in the TOS throughout the Class Period has used these terms with inconsistent capitals and singular versus plural usage without stating the reasoning for the inconsistent usage nor providing specific definitions) were merely shorthand for reflecting any of competitors' maps APIs, places APIs, or routes APIs (not just competitors' maps APIs). Instead of stating that "Customer will not use the Google Maps Core Services with or near a [non-Google Maps Core Service] in a Customer Application[,]" Google simply uses the shorthand of "non-Google Map" to make the sentence less verbose: "Customer will not use the Google Maps Core Services with or near a non-Google Map [including non-Google maps APIs, places APIs, and routes APIs] in a Customer Application." This is especially so where the more-formal term was used immediately before in the same sentence. This supports that "non-Google Map" and similar terms mean non-Google maps APIs, places APIs, and routes APIs (not just non-Google maps APIs).

Indeed, this interpretation is consistent with Google's own use throughout the TOS of the term "Google Maps" as referring broadly to all of its Maps APIs, Places APIs, and Routes APIs— not just Google's Maps APIs. The logical interpretation of "non-Google Map" being short-form for competitors' maps APIs, places APIs, and routes APIs (not just maps APIs) is consistent with several other references to "Google Maps" throughout the TOS as being references to all of Google's Maps APIs, Places APIs, and Routes APIs (among other of Google's digital-mapping

---

[23] ¶¶2-3, 11-15, 18-19, 61, 68, 91, 115, 138, 140-44, 148, 196-211, 220, 256, 274, 277-81, 284, 302-04, 306-08, 348-52, 385-86, 462-73, 527-68. That in prior inoperative pleading, Plaintiffs may not have used such verbiage with surgical precision reflects that in the FAC, Plaintiffs were alleging alternative-tying and accounting for Sprinter's preference to use Routes APIs as the tying product (Sprinter now alleges only to be harmed under exclusive dealing and monopoly maintenance). Dream and Getify allege harm from negative tying, and the verbiage was justifiably modified to account for this and the one-way tying. Google's cherry-picking of different verbs used in the SAC in isolation (ECF 71, at 8), while ignoring other verbs used in totality, cannot crater the Action.

APIs and software). This is shown, among other places, in TOS 3.2.2(a)(i) (where Google uses "Google Maps features" to logically refer to a broad scope of Google APIs), Term 3.2.2(a)(iii) (where Google refers to "Google Maps features and content" in connection with potential suspending and terminating), and Term 14 (where "GOOGLE MAPS" is used in proximity to "GOOGLE MAPS CORE SERVICES" in a way that reflects it is a shortened term for all of Google's Maps APIs, Places APIs, and Routes APIs). ECF 71-1, Ex. A, at Terms 3.2.2(a) & Term 14. Even Google in its briefing in the Action has used words to the effect of "Google's mapping API services" as not just referring to Google's Maps APIs, but to all of its Maps APIs, Places APIs, and Routes APIs. ECF 29, at 1-4, 7; ECF 41, at 1, 2, 5-6; ECF 51, at 1-3, 5, 12; ECF 71, at 1, 3, 4.

Furthermore, this interpretation is reasonable because otherwise, the TOS would only be forbidding customers from using or linking Google's Maps APIs with competitors' maps APIs, but it would allow using or linking Google's Maps APIs with competitors' places APIs or routes APIs. There is no reason presented within the record nor the SAC for this distinction. For example, Term 3.2.3(e)(ii) forbids Plaintiffs from "display[ing] Street View imagery[,]" which is a Google Maps API (¶¶66-88, 350, 539), "and non-Google maps on the same screen[.]" If Google is forbidding Google's Maps APIs from being used or linked with competitors' maps APIs, it would also forbid using or linking with competitors' places APIs or routes APIs.

*Fifth,* law does not support Google's nit-picking over verbiage before discovery. Google cannot demand more-surgical precision from Plaintiffs (ECF 71, at 7-9) than Google itself has used: the TOS has used verbs to effect of contain, display, link, and use interchangeably without precise definitions (¶336); and Google in briefing has used "use," "display," and "link" interchangeably when arguing about what the TOS prohibit (ECF 29, at 3, 6; ECF 51, at 6; ECF 65-2, at 1, 4, 6).

Verb usage cannot overcome the substance of Plaintiffs' antitrust claims, especially not at this stage. *N. Pac. Ry. Co. v. U.S.*, 356 U.S. 1, 7-12 (1958) ("[T]hese agreements are binding obligations held over the heads of vendees which deny defendant's competitors access to the fenced-off market[.]"); *Newcal Indus., Inc. v. Ikon Office Solutions, Inc.*, 2011 WL 1899404, at \*5 (N.D. Cal. May 19, 2011) (allegations raise factual issues despite arguments regarding language); *U.S. v. Mercedes-Benz of N. Am., Inc.*, 517 F. Supp. 1369, 1379-84, 1388-90 (N.D. Cal. 1981)

1    ("ambiguity does not defeat the existence of tying language" as "otherwise would result in

2    defendant benefitting from its own imprecise drafting."); *Frame-Wilson v. Amazon.com, Inc.*, 2023

3    WL 2632513, at *5-6 (W.D. Wash. Mar. 24, 2023) (disputes over interpretation insufficient); *Team*

4    *Schierl Cos. v. Aspirus, Inc.*, 2023 WL 6847433, at *7 (W.D. Wisc. Oct. 17, 2023) ("Plaintiffs

5    aren't required to attach contracts or cite specific contractual language in their complaint."); *In re*

6    *Amazon.com, Inc. eBook Antitrust Litig.*, 2024 WL 918030, at *5 (S.D.N.Y. 2024) (accepting as

7    true plaintiff's contractual analysis); *In re Google Digital Adver. Antitrust Litig.*, 627 F. Supp. 3d

8    346, 360-62, 367-70, 402 (S.D.N.Y. 2022) (tying alleged, in part, through contractual terms, despite

9    arguments about contrary interpretation); *Meredith*, 1 F. Supp. 3d at 207-09 (even at summary

10   judgment, defendants' arguments about interpretation insufficient).[24]

11       The negative tying forecloses competition on the merits in the Digital Places API Market

12   and Digital Routes API Market. ¶¶209, 463; *Smith v. eBay Corp.*, 2012 WL 27718, at *1-2, 5-6

13   (N.D. Cal. Jan. 5, 2012) (tying in connection with online-auction platform, even though options

14   existed); *Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974, 995-99 (N.D. Cal. 2010)

15   (use of consoles conditioned on purchasing accessories ); *RealPage, Inc. v. Yardi Sys., Inc.*, 852 F.

16   Supp. 2d 1215, 1223-24, 1227 (C.D. Cal. 2012) (license agreements conditioned use of software

17   on agreement not to use competitors' software); *Kickflip, Inc. v. Facebook, Inc.*, 999 F. Supp. 2d

18   677, 685-89 (D. Del. 2013) (tied virtual-currency services to social-game networks).

19   **C. Plaintiff alleges Google's Monopoly Power in the Digital Maps API Tying Market.**

20

---

21   [24] Google does not cite decisions where an antitrust action was dismissed on a motion to dismiss, based on disputed language interpretation. *Chickasaw Nation v. U.S.*, 534 U.S. 84, 86-95 (2001) (interpreting language of federal tax statute, a canon for which warns against providing tax exemptions without express reference, finding that the only reasonable interpretation was that a cross-referencing example was clearly a mistake, relying on legislative history); *Georgia-Pacific LLC v. OfficeMax Inc.*, 2013 WL 5273007, at *6-10 (N.D. Cal. Sept. 18, 2013) (denying summary judgment motion to dismiss plaintiff's claim, where language in the agreement "[did] not clearly show that [defendant] is not liable," substantive text of section did not appear to be ambiguous and heading of section simply confirmed scope of substantive text, and stating that "the heading of a section cannot limit the plain meaning of the text"); *Alexander v. Citigroup Global Mkts., Inc.*, 2013 WL 12077818, at *1-2, 4-6 (C.D. Cal. Apr, 10, 2013) (dismissing claims subject to heightened pleading of both FRCP 9(b) and the Private Securities Litigation Reform Act, where agreement language clearly allowed defendant's conduct, plaintiff did not dispute portions-at-issue of the agreement, and plaintiff did not present plausible counter-interpretation of language); *Queen Villas Homeowners Ass'n v. TCB Prop. Mgmt.*, 149 Cal. App. 4th 1, 3-9 (Cal. Ct. App. 2007) (reversing summary judgment in favor of defendant, based, in part, on lack of explicit language to exculpate defendant from liability, as clauses are construed against the defendants, who usually draft the contracts, and commercial realities and intent of the parties to the contract should be considered).

Google Maps has over 90% market share in the Digital Maps API Market. ¶¶37-39, 135-38, 150, 229-51, 400, 451-61. According to the House Antitrust Report, in the "business-to-business" segment, which Plaintiffs allege and define as that concerning Google Maps and competitors supplying digital-mapping APIs to Plaintiffs, "Google Maps API" has above 90% share in the Digital Maps API Market, as expressly stated in the House Antitrust Report: "***Google Maps API captures over 90% of the business-to-business market[.]***" ¶¶37, 136-37, 150, 229-51, 231, 233-34, 451-61. This is not only a reasonable interpretation of the language: it is the express language. *Id.* Portions of the House Antitrust Report addressed in the SAC supports Plaintiffs' allegations and definition of the above-90% figure applying to Google Maps' market share in the Digital Maps API Market, samples of which follow (¶¶37, 136, 136 n. 5, 233):

> Google Maps is the ***dominant provider*** of mapping data and turn-by-turn navigation services. The company declined to provide the Committee with information about the market share captured by Google Maps. … According to a third-party estimate, however, Google Maps combined with Waze captures 81% of the market for turn-by-turn navigation services. … ***One market participant, meanwhile, estimated that Google Maps API captures over 90% of the business-to-business market***.

For Plaintiffs to ***plausibly allege*** sufficient market power, the House Antitrust Report need not have made a formal "finding," "conclusion," nor used similar verbiage.[25] Google attempts to discredit Google Maps' alleged monopoly share, while the House Antitrust Report noted that Google incredibly claimed that it did not maintain market share information. ¶¶23, 137, 161-63, 233, 240, 242. The House Antitrust Report's reliance on a confidential market participant bolsters the allegations: the House Antitrust Subcommittee conducted a thorough investigation and would not have included such a point on a whim; the point that this source is a market participant—indeed, retained experts are often market participants—adds sufficient support. ¶¶23, 137, 161-63, 240. Indeed, the House Antitrsut Subcommittee cites this Source 564 several times for portions about Google: Google's presence and market power; actions that Google takes to stifle competition and reduce innovation, not just from competitors but also reduce innovation from Google itself of the

---

[25] Google requested neither judicial notice nor incorporation by reference of the entire House Antitrust Report, relying on extraneous portions to argue about use of verbiage in market power determinations for companies other than Google. ECF 71, at 18. Although a court may take judicial notice of public records, a court could not use extraneous portions of them to contradict plaintiffs' allegations. *Lee v. City of Los Angeles*, 250 F.3d 668, 689-90 (9th Cir. 2001); *AliveCor, Inc. v. Apple Inc.*, 592 F. Supp. 3d 904, 913 (N.D. Cal. 2022) ("Court will not interpret the incorporated documents to contradict well-pled factual allegations in the complaint."). Google's nitpicking over terminology used screams that factual issues remain to be litigated in discovery (that has not begun).

quality of its own tools because Google need not compete on the merits with rivals; and Google Maps having been able to institute price hikes after "**gaining dominance.**" Pls.' Ex. 1 (House Antitrust Report), at 83 n. 425-26, 84 n. 427, 180 n. 1,082, 188 n. 1,129, 193 n. 1,164-165, 240 n. 1,459. Google's above-80% market share in the "turn-by-turn navigation" segment, ¶¶37-39, 134, 150, 229-42, along with Google Maps' default placement on Android-operated mobile devices, adds ammo for Google Maps to block competitors in the Digital Maps API Market, disabling them from access to location data to help build scale for their competing offerings. ¶¶150, 190, 236-39.[26]

As further detailed in the SAC, Plaintiffs also allege Google Maps' direct demonstrations of monopoly power through several years, all without losing market share to existing competitors and while foreclosing new meaningful competitors since 2013: (i) imposing supracompetitive and shocking price escalations of 1,400%, over 200 times, and over 20 times that endured for several years and were more expensive than competitors, with developers stating that Google Maps

_____

[26] These allegations well exceed pleading thresholds. *Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 502-03 (1969) ("economic power over the tying product [is] sufficient "); *Digidyne Corp. v. Data Gen. Corp.*, 734 F.2d 1336, 1338-39, 1340-42 (9th Cir. 1984) ("restraint results *whenever the seller can exert [] power over some of the buyers*") (emphasis in original.); *AliveCor*, 592 F. Supp. 3d at 917-18 (recognizing courts approve rough share estimates and switching costs; collecting cases); *In re Webkinz Antitrust Litig*, 2010 WL 4168845, at *3 (N.D. Cal. Oct. 20, 2010) (crediting web traffic estimates ); *Datel*, 712 F. Supp. 2d at 982 (accepting 66% market share allegation based on "information and belief") (No. C-09-05535 EDL, ECF No. 1, at ¶¶37-44.). Google relies on distinguishable authority where plaintiffs' market-power pleadings paled in comparison. *Rick-Mik Enter. Inc. v. Equilon Enter., LLC*, 532 F.3d 963, 972 (9th Cir. 2008) ("[O]ther than stating that '[Equilon] rank[s] number one in the industry . . . there are no specific allegations at all as to the franchise market."); *Med Vets Inc. v. VIP Petcare Holdings, Inc.*, 2019 WL 1767335, at *3-7 (N.D. Cal. 2019) (in challenging merger, plaintiff failed to allege relevant market, and even assuming that it did, the alleged market share figures related to an unrelated market), *aff'd*, 811 F. App'x 422 (9th Cir. 2020); *Irving v. Lennar Corp.*, 2013 WL 1308712, *17 (E.D. Cal. Apr. 1, 2013) (market power allegations were insufficient because plaintiffs merely stated that defendants constituted one of the largest U.S. home building operations, and it was unclear whether relevant market was throughout the U.S.); *Innovative Health LLC v. Biosense Webster, Inc.*, 2020 WL 6122369, at *3 (C.D. Cal. Oct. 7, 2020) (plaintiff alleged neither relevant market nor market power); *Hip Hop Beverage Corp. v. Monster Energy Co.*, 2016 WL 7324091, *4-5 (C.D. Cal. Oct. 26, 2016) (merely alleging Monster controlled "major percent" of energy-drink market without alleging that it was the top competitor nor addressing the other "entrenched competitor[s]" of Red Bull and Rockstar, which were plaintiff's own allegations); *Dominick v. Collectors Universe, Inc.*, 2012 WL 4513548, *7 (C.D. Cal. Oct. 1, 2012) (no allegations about how prices compared to competitors'); *Water, Inc. v. Everpure, Inc.*, 2009 WL 10670419, *6-7 (C.D. Cal. Oct. 28, 2009) (granting judgment on pleadings where market-power allegations boiled down to defendants "occupy a dominant market position"); *F.T.C. v. Facebook, Inc.*, 560 F. Supp. 3d 1, 4, 18 (D.D.C. 2021) ("FTC alleges only that Facebook has maintained a dominant share … (in excess of 60%) [without estimating an actual share nor providing indication of the support for this] … and that no other social network of comparable scale exists."); *Arnold v. Petland, Inc.*, 2009 WL 816327, at *5-8 (S.D. Ohio Mar. 26, 2009) (mere assertion that defendant was the only full-service pet store franchise listed among Entrepreneur's Franchise 500 top retail pet franchises).

1    institute prices hikes after "gaining dominance," which underscored its power to set the terms of

2    commerce; (ii) offering digital-mapping APIs that were incomplete, riddled with errors, and

3    crashed; (iii) imposing byzantine terms, which were not just related to negative tying; and (iv)

4    committing alleged data-privacy violations—especially within Google Maps—without losing

5    customers and having outweighed any purported benefits to users (there were no benefits to users

6    from data misappropriation), for the benefit of Google (for example, through acquiring data to fuel

7    advertising), for which Google has already settled lawsuits for hundreds of millions of dollars.[27]

8    Google allegedly used Google Street View in a manner that committed data-privacy violations, in

9    order to amass its digital-mapping empire, which is a method that competitors cannot use because

10   of the alleged illegality of the data-privacy violations. *Id.* The House Antitrust Report cites antitrust

11   enforcers across the globe (such as former DOJ-Antitrust and Federal Trade Commission

12   enforcers), law professors, antitrust experts, and economic and technology experts supporting that

13   monopoly power can be shown through data-privacy violations, even pointing to Google. *Id.* The

14   Northern District of California in *Klein v. Facebook, Inc.* found persuasive allegations that data-

15   privacy violations and misleading disclosures were part of the scheme that helped maintain

16   monopoly power and cause anticompetitive harm. 2022 WL 141561, *16-20, 23-41 (N.D. Cal. Jan.

17   14, 2022). The court noted that the Ninth Circuit has deemed sufficient rough market share

18   estimates, and the court found entry barriers through network effects and switching costs. *Id.* at

19   *23-41 (citing cases against Google and P. Areeda & H. Hovenkamp, Antitrust Law ¶782b).[28]

20           Google's arguments that Plaintiffs' allegations about competitors contradict Google Maps'

21   monopoly power and that Plaintiffs did not allege anticompetitive effects ignore Plaintiffs'

22   allegations.[29] Although questions of fact, Plaintiffs allege that competitors' market shares combined

23   _____

[27] ¶¶17, 30, 34-35, 41, 82-83, 107, 128, 133, 151-60, 164-74, 194, 229-51, 403-50, 549.

24   [28] ¶¶17, 25, 34-35, 41, 82-83, 107, 128, 164-73, 202-03, 218-19, 300-08, 338-47, 357-61, 365-73, 375-80, 381-97, 411-21, 429-35, 478, 549. *Intel Corp. v. Fortress Inv. Grp. LLC* is distinguishable:

25   "Intel points to no instance in which it has actually paid higher royalties post-aggregation[.] … Intel has failed plausibly to plead that any price increases were the result of Fortress's patent aggregation.

26   … [F]rom the face of the [complaint] there are obvious alternative explanations for the alleged price increase." 2022 WL 16756365, at *2 (9th Cir. 2022). And the decision in *In re eBay Seller*

27   *Antitrust Litig.* was at summary judgment, based on experts and other discovery. 2010 WL 760433, at *4-5, 12-14 (N.D. Cal. Mar. 4, 2010), *aff'd sub nom.*, 433 F. App'x 504 (9th Cir. 2011).

28   [29] ¶¶17, 30, 34-35, 36-39, 83, 107, 128, 133, 151-60, 164-95, 229-51, 277-81, 322-61, 403-50, 491, 495-97, 491-97, 519-25, 594-96. Google misrepresents Plaintiffs' allegations as stating that there

are meager and dwindling.[30] Contrary to Google's bald, false assertions (ECF 71, at 2, 17-22), Plaintiffs indeed allege barriers to expansion and the anticompetitive conduct stifling existing competitors' ability to counteract Google's alleged monopoly power (Google ignores that these are digital products, so the usual concept of increasing supply does not translate).[31] The House Antitrust Report noted durable barriers to entry and expansion, even ones that Google erected.[32] There are high switching costs[33] and numerous other barriers that give Google Maps domination. *Id.* Existing competitors are barricaded from enticing Google Maps' customers because of the anticompetitive activity and barriers. ¶¶228, 356, 403-50.[34] But for the anticompetitive practices, there would have been competition from existing competitors, which now have immaterial and dwindling market share compared to Google Maps' above-90% market share in the Digital Maps API Market, and there would have been entry of new competitors. ¶¶228, 356, 403-50. Throughout the Class Period, Google Maps has been able to flex monopoly power, while its base of over one billion users per month has been durable and expanded, and it continuing to grow its revenue and financial strength, a material component of which having been due to the anticompetitive conduct. *Id.*

Plaintiffs allegations well exceed pleading standards for monopoly power. *Cost Mgmt. Servs., Inc. v. Washington Natural Gas Co.*, 99 F.3d 937, 950-51 (9th Cir. 1996) (monopoly power

---

are at least 12 competitors in the Digital Maps API Market alone (ECF 71, at 5, 11-14, 19); instead, Plaintiffs allege that those are potential competitors across the Digital Maps API Market, Digital Places API Market, and Digital Routes API Market—not that those 12 compete in each. ¶¶148-60.
[30] *See PLS.com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 839-40 (9th Cir. 2022) ("[Policy] prevented innovative competitors from entering the market and growing large enough to meaningfully compete"); *Allen-Myland*, 33 F.3d at 210 ("[T]here may be a sizable number of steelmakers of various sizes and specialties, [but] that does not necessarily make it easy to build a steel mill and enter the business today."); *Geneva*, 386 F.3d at 502-04 (monopoly power sufficiently disputed at summary judgment, despite ten competitors); *MLW Media LLC v. World Wrestling Entm't, Inc.*, 2023 WL 4053802, at *1-2, 5-6 (N.D. Cal. June 15, 2023) (share estimate, despite several competitors and argument against appropriateness of metric); *Klein*, 2022 WL 141561, *6-20, 23–41 (market power, despite defendant's argument of "countless" competing services).
[31] ¶¶17, 41, 82-83, 107, 128, 166-73, 300-08, 340-47, 390, 411, 413-21, 478, 549.
[32] ¶¶17, 30-39, 83, 107, 128, 133, 151-95, 229-51, 277-81, 322-61, 403-61, 491-525, 594-96.
[33] Switching costs are high financially, effort-wise, and timing-wise to disassemble a digital map, including the opportunity cost of apps in digital construction and away from the public. ¶¶455-58.
[34] According to the House Antitrust Report, Google Maps' data advantage is key (as of 2019, its users contribute 20 million pieces of information daily): "Google [has] a trove of user data, reinforcing its dominance across markets and driving greater monetization through online ads. … Google functions as an ecosystem of interlocking monopolies." ¶¶178, 439. Google Maps has an enormous advantage over competitors owing to the sheer volume of competitively valuable and sensitive data, through location data acquired through its panoply of tools, and through Google Maps being a default on Android mobile phones. ¶¶456-58, 503. Media reported that DOJ-Antitrust is investigating Google Maps' use of data to exclude competitors, even citing two developers, and Gunderson noted ways in which Google Maps uses data to harm competition. ¶¶258, 261, 378.

based on market share and ability to exclude competitors); *RealPage*, 852 F. Supp. 2d at 1227 (license agreements lock in customers); *Inform Inc. v. Google LLC (In re Google Digital Adver. Antitrust Litig.*), 2024 WL 988966, at *4-5 (S.D.N.Y. Mar. 7, 2024) (market power based on market share); *Google Digital Adver.*, 627 F. Supp. 3d at 363-64 (over 60% share, supracompetitive prices compared to competitors, and lack of market entry); *Kickflip*, 999 F. Supp. 2d at 688 (90% share and conduct); *Am. President*, 2022 WL 4598538, at *5, 8 ("[S]hipping customers face reduced output (i.e., fewer shipping choices), increased prices, and diminished quality"); *Ploss v. Kraft Foods Grp., Inc.*, 197 F. Supp. 3d 1037, 1071-73 (N.D. Ill. 2016) (monopoly power based on raised prices and excluding competitors); *Hannah's Boutique, Inc. v. Surdej*, 2013 WL 4553313, at *3-5 (N.D. Ill. Aug. 28, 2013) ("Defendants, however, do not cite any case requiring a plaintiff to allege a specific market size or percentage market share"); *Christou v. Beatport, LLC*, 849 F. Supp. 2d 1055, 1066-68 (D. Col. 2012) (market power without need to specify market shares).[35]

**D. Plaintiffs Allege Coercion to Purchase the *Tied* Products Through Google's Monopoly Power in the Tying Products and the TOS, Coercion to Have Purchased the *Tying* Products Is Not Required, and Even Then, Plaintiffs Provide Examples of Coercion.**

According to even Google in its briefing, Plaintiffs' additional allegations (compared to the original complaint) satisfy pleading standards for coercion. Taking Google's words:

> Plaintiffs assert that the main tying product is Google Maps API[s], and that the tied products are Routes and Places API[s]. … To validly allege a tie under this theory, plaintiffs were required to plead facts showing at a minimum that they (1) purchased a Maps API … from Google *[Dream and Getify did and identified the APIs and costs, ¶¶3, 348-52, 462-73, 527-68]*, (2) wanted to purchase a Routes or Places API … from a competitor *[Dream and Getify wanted to and even named competitors, id.]* to use along with the Google Maps API … *[note that Google itself used the verb "use" rather than "link", further supporting Plaintiffs' contractual interpretations argued above]* but (3) were forced to buy the Routes or Places API … from Google instead (or to refrain from buying it from a competitor) *[Dream and Getify did and identified the APIs and costs, id.]*.

---

[35] Google relies on cases at summary judgment, trial, or otherwise distinguishable concerning oligopolistic markets and predatory pricing, where entrenched competitors with comparatively referenced market power to defendants were able to temper defendants' actions. *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 212-13, 217-19, 228-29, 233-40 (1993) (motion for judgment notwithstanding trial verdict for predatory-pricing; defendant was third-largest firm in highly concentrated industry with only 12% share; oligopolist competitors tempered each other's decisions); *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1429-33, 1437-38, 1440-43, 1447-48 (9th Cir. 1995) (summary-judgment on predatory pricing; market power based on theory of oligopolistic competitors—rather than monopoly power—to control prices; ***but sustaining 44% share for plaintiffs' Clayton Act Section 3 claim that had lower standard than Sherman Act Section 2***); *SC Innovations, Inc. v. Uber Tech., Inc.*, 434 F. Supp. 3d 782, 787, 793-95 (N.D. Cal. 2020) (no monopoly power in predatory-pricing claim; oligopoly of defendant Uber and non-defendant Lyft—itself a significant competitor—tempered each other's decisions).

1    *See* ECF 41, at 5 (citing cases that coercion to purchase tied—not tying—product is what matters).

2    Google attempts to fog the point that coercion to purchase the tying product is not required.

3         Plaintiffs satisfy coercion through alleging Google's monopoly power in the tying Digital

4    Maps API Market and the TOS, so Plaintiffs need not allege anything further for coercion. *N. Pac.*,

5    356 U.S. at 7-9 (contracts were coercive); *PLS.com*, 32 F.4th at 836 (coercion through dominant

6    platform stating that users give up its services, if they use some of competitors' platforms);

7    *Datagate, Inc. v. Hewlett-Packard Co.*, 60 F.3d 1421, 1426-27 (9th Cir. 1995) ("harm from tying

8    … is … forced sale of … tied product, not … withholding of … tying product."); *Surgical*

9    *Instrument Serv. Co., Inc. v. Intuitive Surgical, Inc.*, 571 F. Supp. 3d 1133, 1140 (N.D. Cal. 2021)

10   ("[Defendant's] ability to forbid [providers] from purchasing refurbishment services from

11   [competitors] flows not from [providers'] voluntary choice … but from … monopoly power.").[36]

12        Google's argument that Plaintiffs must demonstrate that something other than Google's

13   monopoly power draws them to the tying product has no basis in law. There is nothing inconsistent

14   in the SAC that Plaintiffs no longer focus on competitors offering maps APIs—no longer the

15   negatively tied products—that are better or cheaper than Google's Maps APIs. ¶¶3, 348-52, 462-

---

16   [36] Google relies on authority addressing summary judgment or is nevertheless distinguishable
     because plaintiffs failed to show coercion, in part by failing to show market power. *U.S. Steel Corp.*
17   *v. Fortner Enters., Inc.*, 429 U.S. 610, 611-12, 614-16, 619, 621-22 (1977) (at summary judgment,
     evidence did not demonstrate defendant's power in tying product of providing credit for real estate,
18   expressly referencing defendant not having large share); *Lee v. Life Ins. Co. of N. Am.*, 23 F.3d 14,
     16-20 (1st Cir. 1994) ("Appellants can assert no colorable claim that [one college] holds
19   [appreciable economic power in] tying market for a university education[.]"). The after-market
     finding in *Lee* is called into question in the Ninth Circuit. *Red Lion Med. Safety, Inc. v. Ohmeda,*
20   *Inc.*, 63 F. Supp. 2d 1218, 1230 (E.D. Cal. 1999) ("The *Honeywell* court's interpretation of [*Kodak*],
     however, is not supported[.] [*Kodak*] does not hold that an aftermarket claim is contingent on a
21   change in a manufacturer's [policy.]"). Google's selective cite to P. Areeda & H. Hovenkamp,
     Antitrust Law ¶ 1700d3 reflects Google's attempt to fog market power: "[T]he unwanted second
22   product from the tying seller must reflect either unusually attractive terms for the tying product *or*
     ***the seller's market power over that product***. When power produces the tie, we might therefore be
23   concerned with narrowing buyers' freedom of choice, facilitating their exploitation, or
     overcharging … for the tied product." Google relies on irrelevant decisions, where tying was
24   alleged on a single-brand, after-market tying claim, as articulated under *Eastman Kodak Co. v.*
     *Image Technical Servs., Inc.*, 504 U.S. 451 (1992), a type of tying that Plaintiffs do not allege here.
25   *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 510-19 (3d Cir. 1998) (reversing
     jury trial verdict, where plaintiff failed to prove a single-brand tying market, a geographical market
26   focused only on plaintiff's business, lock-in costs that did not focus on the victims of the tying, and
     even accepting plaintiffs' flawed relevant market definition, defendant's market share at best was
27   only approximately 25%); *Oracle Am., Inc. v. CedarStone, Inc.*, 938 F. Supp. 2d 895, 896-97, 901-
     08 (N.D. Cal. 2013) (plaintiff failed to plead a single-brand, after-market tying claim, noting that
28   the primary market faced competition; "while a substantial part of the parties' briefing is devoted
     to the issue of whether or not an aftermarket claim must allege a change of policy, the parties appear
     to agree that such an allegation is not always required").

73, 527-68. Following the Court's Order (ECF 67, at 5-7), Plaintiffs allege one-way tying with Google's Maps APIs being the tying product, and its Places APIs or Routes APIs being the negatively tied products, thus focusing on competitors' places APIs and routes APIs that Dream and Getify preferred, while removing the multi-directional tying with Sprinter alleging that one of the negatively tied products was Google's Maps APIs, because as to Sprinter, competitors offered better or cheaper maps APIs. ¶¶3, 210-11, 348-52, 355-61, 462-73, 569-89, 585-89. There is nothing inconsistent about this. Plaintiffs' allegations in the SAC must be accepted as true.[37]

Once Plaintiffs purchase the tying product of Google's Maps APIs, they are bound by the TOS, under which Plaintiffs are forbidden from using or linking competitors' places APIs or routes APIs. ¶¶220, 274, 284, 286, 523-25, 527-89. Plaintiffs preferring competitors' places or routes APIs (Dream and Getify even named such competitors) cannot use or link them.[38] They are forced to purchase unwanted Google's Places APIs and Routes APIs. *Id.* Google uses Maps APIs as the tying product, with the intent and effect of restraining competition and acquiring or enhancing its power in the negatively tied products, its Places APIs and Routes APIs. ¶¶208-09, 463. This forecloses Plaintiffs from competitive choices on merits for places or routes APIs and satisfies coercion. *Id.*[39]

[37] *PAE Gov't Servs., Inc. v. MPRI, Inc.*, 514 F.3d 856, 859-60 (9th Cir. 2007) ("[N]othing in the [FRCP] prevent [party] from filing successive pleadings [with]…even contradictory allegations."). There are no unexplained inconsistencies between the SAC and FAC, rendering Google's authority distinguishable. *Airs Aromatics, LLC v. Victoria's Secret Stores Brand Mgmt., Inc.*, 744 F.3d 595, 599-600 (9th Cir. 2014) (amendment futile where plaintiff did not allege continuous usage of trademark in commerce and other issues); *Moore v. Regents of the Univ. of Cal.*, 2016 WL 4917103, at *4 (N.D. Cal. Sept. 15, 2016) (unexplained material discrepancy concerning facts); *Swenson v. Nat'l R.R. Passenger Corp.*, 2016 WL 1573323, at *5-6 (E.D. Cal. Apr. 19, 2016) (same). In addition to the barriers to entry and expansion and Google Maps' monopoly power, it was infeasible to avoid purchasing Google's Maps APIs in totality because of Google Maps' data advantage over competitors. ¶¶17, 30, 34-35, 36, 173-94, 228, 322-61, 403-50, 491, 495-97. According to the House Antitrust Report, these data advantages include superior distribution in adjacent business lines, ¶191, such as Android giving Google Maps unparalleled access to data. ¶178-79. Indeed, location data is some of the most sensitive and valuable data that Google collects. ¶449.
[38] ¶¶13, 16-17, 27, 42, 133, 138-42, 151-60, 173, 220, 252-62, 274, 284, 300-08, 281-308, 322-61, 411, 462-589, 523-25, 527-89.
[39] Google ignores the alleged appreciable economic power in the tying products, by arguing that there can be no tying because according to Google, Plaintiffs are technically able to purchase full sets of competitors' tying and tied products (which is incorrect). ECF 71, at 10-13. Google's argument dictates that there would never be a tying claim, unless defendant has 100% share and is the only competitor in the tying product market. ¶145. If this is a defense, there would rarely ever be a cognizable tying claim because most independent sets of tying and tied products would normally be permitted to be bought or used separately from separate competitors. ¶146. Google relies on distinguishable authority where plaintiffs could not even point to a contract that effectuated the tie nor to any examples of victims of the tie. *Apple iPod iTunes Antitrust Litig.*,

1    Google makes an incredible argument (ECF 71, at 9-10) that to show coercion, Plaintiffs

2    should have risked their online presence by violating the TOS or asking Google if it could violate

3    the contract (as if Plaintiffs could easily have a conversation with Google's lawyers). This is not

4    the law. Such a requirement would render infeasible almost any antitrust class action that alleges

5    tying. Plaintiffs could not violate the TOS, as the TOS mandated reporting by Plaintiffs and gave

6    Google discovery and enforcement powers (Terms 1.4, 3.2.2(c), and 5.1). *Id.* Being forced through

7    the TOS to purchase Google's tied products of Places APIs or Routes APIs satisfies coercion.

8    *Moore v. James H. Matthews & Co.*, 550 F.2d 1207, 1216-17 (9th Cir. 2003) ("coercion may be

9    implied from a showing that an appreciable number of buyers have accepted burdensome terms");

10   *Tucker v. Apple Computer, Inc.*, 493 F. Supp. 2d 1090, 1097 (N.D. Cal. 2006) ("no requirement

11   that individual purchaser plaintiffs must allege coercion at the individual level"); *Slattery v. Apple*

12   *Computer, Inc.*, 2005 WL 2204981, at *3-4 (N.D. Cal. Sept. 9, 2005) ("fact that Plaintiff can

13   purchase the items separately does not dismiss a tying claim"); *Inform*, 2024 WL 988966, at *7-8

14   ("Inform [alleged] that it was coerced into using [Google's] DFP ad server in order to access

15   [Google's] AdX. That Inform preferred to sell ad sales directly and sought to transact on exchanges

16   other than AdX does not suggest a lack of coercion in being forced to use DFP in order to access

17   the market's dominant ad exchange product. Inform … has identified reasons why AdX was

18   purportedly less advantageous to publishers than other ad exchanges, but, given AdX's purported

19   monopoly power, accessing ad inventory on the exchange was desirable and necessary.").[40]

20   _____

21   2009 WL 10678940, at *1-2, 5-6 (N.D. Cal. Oct. 30, 2009) (granting motion for judgment on the pleadings where no agreement nor express nor implied conditioning dictated a tie); *Edge Sys. LLC*

22   *v. Ageless Serums LLC*, 2021 WL 3812875, at *4-6 (C.D. Cal. May 11, 2021) (tying claims dismissed because claimant only pointed to trademark-license agreement that did not impose a tie); *CCBN.com, Inc. v. Thomson Fin., Inc.*, 270 F. Supp. 2d 146, 154 (D. Mass. 2003) (complaint

23   asserted tying on information and belief without referencing a contract that implicated tying).

24   [40] Although Plaintiffs are not required to provide them, the House Antitrust Report, media reports about the DOJ-Antitrust investigation, and Gunderson's testimony further show examples of

25   coercion on developers. ¶¶23-27, 30, 187-88, 196-220, 212-17, 252-62, 277-81, 285-308, 427. Google cites *Photovest Corporation v. Fotomat Corporation*, which actually supports Plaintiffs'

26   arguments, where the Seventh Circuit affirmed (in part) a trial victory for plaintiff based (in part) on tying claims. 606 F.2d 704, 707, 716-17, 720-22, 725 (7th Cir. 1979). The tying findings hinged

27   on language not permitting plaintiff to purchase from competitors. *Id.* at 721-22, 725. *Top Rank, Inc. v. Haymon* is distinguishable because the alleged anticompetitive agreement did not impose

28   tying, as it left open the ability for boxers to use the tied promoter services from competitors other than defendant. 2015 WL 9948936, at *5, 7-11, 19 (C.D. Cal. Oct. 16, 2015). Indeed, according to boxing laws, defendant boxing manager was not even permitted to compete in the alleged tied

**2. Exclusive Dealing Is Alleged Under Sherman Act Section 1 and Clayton Act Section 3.**

The House Antitrust Report's findings, Plaintiffs' own allegations, and practicalities of the markets support that the negative tying effectuates exclusive dealing: Plaintiffs must only use Google's Maps APIs, Places APIs, or Routes APIs—or none of them. ¶¶252-62, 282-308. The House Antitrust Report showed numerous examples of Google's "aggressive" enforcement of tying effectuating exclusive dealing to wall developers into Google Maps' ecosystem, including even behemoth companies (having even provided details about the exclusive dealing on Ford). ¶¶26-28, 212-20, 252-62, 263-68, 282-308, 337, 365-73, 375-80, 395. Plaintiffs subject to the TOS, including over 90% of the Digital Maps API Market, are subject to the exclusive dealing through negative tying. ¶¶282-308. This results in preventing the over-90% of the market of buyers of Google's Maps APIs from purchasing places APIs or routes APIs from competitors, thus walling them into the Google Maps ecosphere and forcing them to purchase only Google's Places APIs or Routes APIs. *Id.* This is foreclosure of well more than a substantial share of the market. *Id.*

Plaintiffs' allegations satisfy pleadings requirements. *Pecover v. Elecs. Arts Inc.*, 633 F. Supp. 2d 976, 982-83 (N.D. Cal. 2009) (accepting allegations concerning exclusive deals); *Blue Sky Color of Imagination, LLC v. Mead Westvaco Corp.*, 2010 WL 4366849, at *4 (C.D. Cal. Sept. 23, 2010) (exclusive dealing excluded developers); *Team Schierl*, 2023 WL 6847433, at *10-11 (exclusive contract prohibited business with competitor); *Jones*, 2022 WL 3043895, at *3-7, 16

---

service market of boxing promoting, so any alleged tie would not have been perpetrated to have increased defendant's market power (it had none) in the tied service market because defendant could not compete in that tied market legitimately. *Id.* Google relies on distinguishable authority at summary judgment or trial, where plaintiffs failed to prove coercion, market power, or anticompetitive harm. *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 24-32 (1984) (at trial, hospital was shown to have had approximately 30% market share, and no adverse effects to competition); *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1178-80 (9th Cir. 2016) (at summary judgment, no express nor implied conditions linking the sale of a tying product to a tied product, nor a condition to forego competitors); *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1156-63, (9th Cir. 2003) (at summary judgment, no market power nor coercion, where defendant made statements to plaintiff about conditions that it would impose on one other customer—but evidence indicated that statements were never conveyed to that customer—and several customers testified that there was no coercion); *Brandriff v. DATAW Island Owners' Assoc., Inc.*, 2010 WL 11534504, at *4-5 (D.S.C. Sept. 30, 2010) (at summary judgment, no market power where evidence failed to demonstrate that certain real estate was unique with no adequate substitutes; even plaintiffs' own expert admitted that tying real estate at most represented approximately 17% of comparable property); *Casper v. SMG*, 2006 WL 3111132, at *4-6 (D.N.J. Oct. 31, 2006) (at summary judgment, no market power in erroneous definition of a trade show venue as a market of its own, which was undermined by plaintiff's testimony that it could go to venues across the country), *aff'd sub nom.*, 262 F. App'x 449 (3d Cir. 2008).

(plausible inference of at least 30-40% foreclosure); *Hytera Commc'ns Corp. Ltd. v. Motorola Solutions, Inc.*, 2022 WL 3645908, at \*13-16 (N.D. Ill. Aug. 24, 2022) (inference that exclusive dealing could foreclose substantial competition); *Am. President*, 2022 WL 4598538, at \*9-10 ("[A]bsence of [total exclusivity] does not shield [liability.]").[41]

### 3. Section 2 Violations Are Alleged in Totality.

Google's argument that self-preferencing only adversely affects competition outside the relevant markets (ECF 71, at 23-24) ignores the allegations: contrary to Google's insinuation otherwise (ECF 71, at 24 n.9), Plaintiffs focused allegations on actions harming competition in the relevant markets.[42] Google relies on authority supporting Plaintiffs. *Glen Holly Entm't Inc. v. Tektronix Inc.*, 352 F.3d 367, 378 (9th Cir. 2003) ("[customers] are presumptively those injured by its unlawful elimination"). Google is no stranger to facing sustained self-preferencing allegations. *Rumble, Inc. v. Google LLC*, 2022 WL 3018062, at \*1-4 (N.D. Cal. July 29, 2022) (self-preferencing video platform); *Inform*, 2024 WL 988966, at \*6 (self-preferencing YouTube video advertisements); *Google Digital Adver.*, 627 F. Supp. 3d 384-91, 396-97 (exclusionary practices favoring own products). Negative tying, exclusive dealing, and self-preferencing in totality cause anticompetitive harm in all of the Digital Maps API Market, Digital Places API Market, and Digital

---

[41] Google relies on distinguishable cases not decided on motions to dismiss, where plaintiffs failed to present evidence of foreclosed competition of substantial shares. *Allied*, 592 F.3d at 996-97 (dismissing claims at summary judgment, where agreements only provided for volume discounts to customers—as opposed to any contractual obligation); *Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1161-64 (9th Cir. 1997) (granting motion for judgment after trial because even 38% market share considerably overstated economic foreclosure, where plaintiff did not account for the full relevant market). *Feitelson v. Google Inc.* is distinguishable because plaintiffs did not demonstrate that foreclosure of 51.7% share was a translatable foreclosure to the salient relevant market; but the decision, in part, supports Plaintiffs' allegations because the alleged agreements were effectively exclusive because of the practicalities of the market, despite their short duration and not foreclosing alternative avenues. *See* 80 F. Supp. 3d 1019, 1030-32 (N.D. Cal. 2015).

[42] The House Antitrust Report found that Google Maps engages in anticompetitive self-preferencing for map caching. ¶¶3, 29, 309-21. Market participants stated that Google added map-caching restrictions to detriment Google Maps' competitors in the relevant markets that use as inputs Google's Maps APIs, Places APIs, and Routes APIs: "Commenting on the asymmetry, [a] market participant stated that Google's decision to deny third parties caching denigrates the service that our maps can provide compared to Google's. … [T]hat's why we can't create an app that provides directions as well as Google or we can't update a user's location as quickly as Google." ¶¶314-15. This self-preferencing forecloses competitors that compete directly with Google Maps in the Digital Maps API Market, Digital Places API Market, and Digital Routes API Market, who use Google's Maps APIs, Places APIs, or Routes APIs as inputs in their own products that compete with Google Maps. ¶¶29, 309-21, 357-60, 396-97, 434-35, 563-68. This unreasonably insulates Google Maps from competition in the relevant markets, causing anticompetitive harm to Plaintiffs, jacking up costs and degrading quality. *Id.* Restrictions disable Plaintiffs from having back-up data, experimenting competitors, and hedging against Google Maps outages (that recently occurred). *Id.*

1  Routes API Market. ¶¶210-11, 355-61, 466-68, 585-89. As the SAC details, even if Plaintiffs

2  purchased any of Google's Maps APIs, Places APIs, and Routes APIs (not necessarily being a tying

3  victim), they suffered anticompetitive harm. *Id.*; *In re Nat'l Football League's Sunday Ticket*

4  *Antitrust Litig.*, 933 F.3d 1136, 1152 (9th Cir. 2019) (practices in tandem restrain competition);

5  *Simon and Simon, PC v. Align Tech., Inc.*, 533 F. Supp. 3d 904, 913 (N.D. Cal. 2021) (similar).

6       In the alternative, Plaintiffs allege attempted monopolization. Google's conduct intended to

7  exclude rivals and has been willful and executed over years. ¶¶318, 322-61, 677-90. Specific intent

8  is established through unlawful design or drawn from anticompetitive conduct. *William Inglis &*

9  *Sons Baking Co. v. ITT Cont'l Baking Co.*, 668 F.2d 1014, 1027-28 (9th Cir. 1981); *United Energy*

10  *Trading, LLC v. Pac. Gas & Elec. Co.*, 200 F. Supp. 3d 1012, 1020-24 (N.D. Cal. 2016). Plaintiffs

11  exceed the required lower quantum of share. ¶¶37-39, 135-38, 150, 229-51, 400-01, 451-61;

12  *Momento, Inc. v. Seccion Amarilla USA*, 2009 WL 10696217, at *4 (N.D. Cal. Sept. 17, 2009)

13  ("[A]ntitrust cases are fact-intensive[.] … [C]ourts strongly disfavor dismissals[.]"); *RealPage*, 852

14  F. Supp. 2d at 1228-29 (attempted monopolization despite "flimsy contentions regarding market

15  share"); *In re Pool Prods. Distrib. Market Antitrust Litig.*, 940 F. Supp. 2d 367, 387 (E.D. La. 2013)

16  (probability from defendant's 33% share and restrictive agreements).

17  **4.  Plaintiffs Allege a UCL Claim.**

18       By sufficiently alleging their antitrust claims, Plaintiffs sufficiently allege a UCL claim.

19                        **V.    CONCLUSION**

20       For the reasons above, the Court should respectfully deny the Motion. In a reversal of a

21  central argument, Google ***admits*** the TOS impose a negative tie: if Plaintiffs use Google's Places

22  APIs or Routes APIs, they cannot use competitors' maps APIs. ECF No. 71, at 1, 4, 7-10.[43] Before,

23  Google denied the TOS imposing any negative tying.[44] Thus in the alternative, if more allegations

24  are needed (they are not), Plaintiffs respectfully request leave to amend. *Smith*, 2012 WL 27718, at

25  *7-10.

─────────────

26  [43] For example: "[t]he [TOS] only restrict using *Google's mapping API services* with a *non-Google Map*," ECF 71, at 1; and "[t]his language imposes only a one-way restriction on developers using

27  Google's API services (*e.g.*, Routes or Places) with or near a non-Google Map[,]" ECF 71, at 7.
[44] For example: "[restricts] only how a customer uses Google's content. It is therefore not a negative

28  tie[,]" ECF 29, at 7; "[no] negative tie because they are directed to the use of Google's own content and how that content is displayed to consumers[,]" ECF 62, at 7; and "[No] negative tie because they do not … prohibit … licensing any API service from a competitor[,]" ECF 65-2, at 1.

1

2
Dated: March 20, 2024

3
                                                     /s/ Mario Simonyan

4
                                                     Mario Simonyan (State Bar No. 320226)

5
                                                     **ESQGo, PC**
                                                     303 North Glenoaks Boulevard, Suite 200

6
                                                     Burbank, CA 91502
                                                     Telephone:     (424) 363-6233

7
                                                     mario@esqgo.com
                                                     *Attorney for Plaintiffs and the Class*

8

9
                                                     Justin S. Nematzadeh*

10
                                                     **NEMATZADEH PLLC**
                                                     101 Avenue of the Americas, Suite 909

11
                                                     New York, New York 10013
                                                     Telephone:     (646) 799-6729

12
                                                     jsn@nematlawyers.com
                                                     *Attorney for Plaintiffs and the Class*

13
                                                     *\*Admitted Pro Hac Vice*

14
                                                     John G. Balestriere*

15
                                                     **BALESTRIERE FARIELLO**
                                                     225 Broadway, 29th Floor

16
                                                     New York, New York 10007
                                                     Telephone:     (212) 374-5401

17
                                                     Facsimile:     (212) 208-2613
                                                     john.balestriere@balestrierefariello.com

18
                                                     *Attorney for Plaintiffs and the Class*
                                                     *\*Admitted Pro Hac Vice*

19

20
                                                     Matthew W. Schmidt (State Bar No. 302776)
                                                     **Schmidt Law Corporation**

21
                                                     116A Main Street
                                                     Tiburon, California 94920

22
                                                     Telephone:     (415) 390-6075
                                                     matt@schmidtlc.com

23
                                                     *Attorney for Plaintiffs and the Class*

24

25

26

27

28