David C. Kiernan, Bar No. 215335
dkiernan@jonesday.com
Craig E. Stewart, Bar No. 129530
cestewart@jonesday.com
Lin W. Kahn, Bar No. 261387
lkahn@jonesday.com
JONES DAY
555 California Street, 26th Floor
San Francisco, California 94104
Telephone:    +1.415.626.3939
Facsimile:    +1.415.875.5700

Catherine T. Zeng, Bar No. 251231
czeng@jonesday.com
JONES DAY
1755 Embarcadero Road
Palo Alto, California 94303
Telephone:    +1.650.739.3939
Facsimile:    +1.650.739.3900

Attorneys for Defendants
Alphabet Inc. and Google LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **DREAM BIG MEDIA, INC., GETIFY SOLUTIONS, INC., and SPRINTER SUPPLIER LLC, Individually and on Behalf of All Others Similarly Situated,**<br><br>**Plaintiffs,**<br><br>v.<br><br>**ALPHABET INC. and GOOGLE LLC,**<br><br>**Defendants.** | **Case No. 22-CV-2314-RS**<br><br>**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT**<br><br>Date:     May 9, 2024<br>Time:     1:30 p.m.<br>Judge:    Hon. Richard Seeborg<br><br>Date Action Filed: April 13, 2022 |

1
2

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 2

I.  PLAINTIFFS DO NOT VALIDLY ALLEGE THAT GOOGLE'S TERMS
    IMPOSE A TIE ......................................................................................................... 2

II.  PLAINTIFFS CANNOT PLAUSIBLY ALLEGE COERCION ........................................ 5

III.  PLAINTIFFS FAIL TO ALLEGE COGNIZABLE MARKETS OR MARKET
     POWER ................................................................................................................... 9

     A.  Plaintiffs' Product Markets Are Legally Insufficient ................................. 9

     B.  Plaintiffs Fail to Plausibly Allege Market Power ................................... 11

IV.  PLAINTIFFS' OTHER ANTITRUST THEORIES LIKEWISE FAIL ........................... 14

     A.  Plaintiffs' Exclusive Dealing Claim Fails for the Same Reasons as its
         Tying Claim ........................................................................................... 14

     B.  Plaintiffs Fail to State a Sherman Act Section 2 Claim .......................... 14

     C.  Plaintiffs Fail to State a UCL Claim for the Same Reasons .................... 15

CONCLUSION .................................................................................................................. 15

Reply ISO Motion To Dismiss SAC
No. 22-CV-2314-RS

1

2
## <u>TABLE OF AUTHORITIES</u>

3
**Page**

4
**CASES**

5

6
*AliveCor, Inc. v. Apple Inc.*,
592 F. Supp. 3d 904 (N.D. Cal. 2022) ...................................................................... 13

7

8
*Allen-Myland, Inc. v. Int'l Bus. Machines Corp.*,
33 F.3d 194 (3d Cir. 1994) .................................................................................... 13

9

10
*Am. President Lines, LLC v. Matson, Inc.*,
633 F. Supp. 3d 209 (D.D.C. 2022) ....................................................................... 12

11

12
*Arnold v. Petland, Inc.*,
2009 WL 816327 (S.D. Ohio Mar. 26, 2009) ......................................................... 6

13
*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................................... 1

14

15
*Brandriff v. Dataw Island Owners' Ass'n, Inc.*,
2010 WL 11534504 (D.S.C. Sept. 30, 2010) .......................................................... 6

16

17
*Brown v. Amazon.com, Inc.*,
2023 WL 5793303 (W.D. Wash. Sept. 7, 2023) .................................................... 10

18

19
*Casper v. SMG*,
2006 WL 3111132 (D.N.J. Oct. 31, 2006) ............................................................. 6

20

21
*Christou v. Beatport, LLC*,
849 F. Supp. 2d 1055 (D. Colo. 2012) ................................................................. 13

22

23
*Cost Mgmt. Servs., Inc. v. Washington Nat. Gas Co.*,
99 F.3d 937 (9th Cir. 1996) .................................................................................. 13

24
*Crowder v. LinkedIn*,
2024 WL 1221956 (N.D. Cal. Mar. 21, 2024) ....................................................... 5

25

26
*Datagate, Inc. v. Hewlett-Packard Co.*,
60 F.3d 1421 (9th Cir. 1995) ................................................................................. 8

27

28
*Datel Holdings Ltd. v. Microsoft Corp.*,
712 F. Supp. 2d 974 (N.D. Cal. 2010) ............................................................. 4, 12

*Digidyne Corp. v. Data Gen. Corp.*,
   734 F.2d 1336 (9th Cir. 1984) ........................................................................... 8

*Doe One v. CVS Pharmacy, Inc.*,
   2022 WL 3139516 (N.D. Cal. Aug. 5, 2022) ................................................... 10

*Frame-Wilson v. Amazon.com, Inc.*,
   664 F. Supp. 3d 1198 (W.D. Wash. 2023) ......................................................... 4

*Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*,
   386 F.3d 485 (2d Cir. 2004) ............................................................................. 12

*Hannah's Boutique, Inc. v. Surdej*,
   2013 WL 4553313 (N.D. Ill. Aug. 28, 2013) ................................................... 13

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
   125 F.3d 1195 (9th Cir. 1997) ......................................................................... 10

*In re Amazon.com, Inc. eBook Antitrust Litig.*,
   2024 WL 918030 (S.D.N.Y. Mar. 2, 2024) ....................................................... 4

*In re Google Digital Advert. Antitrust Litig.*,
   2024 WL 988966 (S.D.N.Y. Mar. 7, 2024) ................................................. 9, 13

*In re Google Digital Advert. Antitrust Litig.*,
   627 F. Supp. 3d 346 (S.D.N.Y. 2022) ......................................................... 5, 12

*In re Webkinz Antitrust Litig.*,
   2010 WL 4168845 (N.D. Cal. Oct. 20, 2010) ................................................. 11

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*,
   466 U.S. 2 (1984) ............................................................................................... 7

*Jones v. Varsity Brands, LLC*,
   618 F. Supp. 3d 725 (W.D. Tenn. 2022) ......................................................... 10

*Kickflip, Inc. v. Facebook, Inc.*,
   999 F. Supp. 2d 677 (D. Del. 2013) ................................................................... 4

*Kickflip, Inc. v. Facebook, Inc.*,
   999 F. Supp. 2d at 688–89 ............................................................................... 13

*Klein v. Facebook, Inc.*,
   580 F. Supp. 3d 743 (N.D. Cal. 2022) ............................................................. 14

*Mason v. Telefunken Semiconductors Am., LLC,*
797 F.3d 33 (1st Cir. 2015) ................................................................................. 3

*Meredith Corp. v. SESAC LLC,*
1 F. Supp. 3d 180 (S.D.N.Y. 2014) ............................................................. 4, 10

*MLW Media LLC v. World Wrestling Entm't, Inc.,*
2023 WL 4053802 (N.D. Cal. June 15, 2023) ................................................. 13

*Moore v. James H. Matthews & Co.,*
550 F.2d 1207 (9th Cir. 1977) ............................................................................ 9

*Morales v. City & Cnty. of San Francisco,*
603 F. Supp. 3d 841 (N.D. Cal. 2022) ............................................................... 5

*N. Pac. Ry. Co. v. United States,*
356 U.S. 1 (1958) ........................................................................................... 4, 7

*Newcal Indus., Inc. v. IKON Off. Sols., Inc.,*
2011 WL 1899404 (N.D. Cal. May 19, 2011) .................................................... 4

*Ploss v. Kraft Foods Grp., Inc.,*
197 F. Supp. 3d 1037 (N.D. Ill. 2016) .............................................................. 12

*PLS.Com, LLC v. Nat'l Ass'n of Realtors,*
32 F.4th 824 (9th Cir. 2022) ......................................................................... 8, 12

*Queen Villas Homeowners Assn. v. TCB Prop. Mgmt.,*
149 Cal. App. 4th 1 (2007) ................................................................................. 2

*RealPage, Inc. v. Yardi Sys., Inc.,*
852 F. Supp. 2d 1215 (C.D. Cal. 2012) ....................................................... 4, 12

*Rebel Oil v. Atl. Richfield Co.,*
51 F.3d 1421 (9th Cir. 1995) ............................................................................ 13

*Reilly v. Apple Inc.,*
578 F. Supp. 3d 1098 (N.D. Cal. 2022) ............................................................. 9

*Resendiz v. Cnty. of Monterey,*
2015 WL 3988495 (N.D. Cal. June 30, 2015) ................................................... 6

*Rick-Mik Enterprises, Inc. v. Equilon Enterprises LLC,*
532 F.3d 963 (9th Cir. 2008) .................................................................... 6, 7, 8

*Roberts v. Daymon Worldwide Inc.*,
  2015 WL 2251330 (N.D. Cal. May 13, 2015) ............................................................ 5

*SmileCare Dental Grp. v. Delta Dental Plan of California, Inc.*,
  88 F.3d 780 (9th Cir. 1996) ................................................................... 14, 15

*Smith v. eBay Corp.*,
  No. C 10-03825 JSW, 2012 WL 27718 (N.D. Cal. Jan. 5, 2012) ............................... 4

*Stern v. Rocket Mortg., LLC*,
  666 F. Supp. 3d 234 (E.D.N.Y. 2023) .................................................................. 5

*Surgical Instrument Serv. Co., Inc. v. Intuitive Surgical, Inc.*,
  571 F. Supp. 3d 1133 (N.D. Cal. 2021) ................................................................ 8

*Team Schierl Companies v. Aspirus, Inc.*,
  No. 22-CV-580-JDP, 2023 WL 6847433 (W.D. Wis. Oct. 17, 2023) ......................... 5

*Tucker v. Apple Computer, Inc.*,
  493 F. Supp. 2d 1090 (N.D. Cal. 2006) ............................................................... 9

*United States v. Mercedes-Benz of N. Am., Inc.*,
  517 F. Supp. 1369 (N.D. Cal. 1981) ................................................................... 4

**OTHER AUTHORITIES**

P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 1700d3 (updated Aug. 2023) ................................ 6

P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 1734 (updated Aug. 2023) .................................... 7

P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 565 (updated Aug. 2023) ..................................... 10

1

**INTRODUCTION**

2      Plaintiffs' opposition takes the same flawed approach as their SAC:  it floods the Court

3 with overbroad, conclusory, irrelevant, and in some instances, outright false assertions—all in an

4 effort to obscure the fatal defects in their complaint in the hopes that discovery might reveal a

5 claim.  But that is exactly what Rule 12's "specificity in pleading" requirement is designed to

6 prevent.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007) (quotation marks omitted).

7 Because plaintiffs' opposition confirms that they have not met this standard, their complaint

8 should be dismissed with prejudice.

9      First, the opposition leaves no doubt that plaintiffs' new one-way tying theory is irrecon-

10 cilable with the plain language of the Google Maps Platform Terms of Service ("Terms").  To try

11 to show otherwise, plaintiffs are reduced to arguing that different words in the Terms ("use,"

12 "display," and "link") in fact all mean the same thing and that, where Google said "non-Google

13 *map*," it actually meant a much broader prohibition covering "non-Google *APIs.*"  None of this is

14 a valid way to interpret a contract, much less a permissible basis for finding an antitrust violation.

15      Second, plaintiffs have not plausibly alleged coercion because they have alleged—and

16 continue to maintain—that competitors offer maps APIs (the alleged tying product) that are

17 equivalent to or better than Google Maps API services.  This allegation defeats any claim that

18 Google could coerce buyers, who, under plaintiffs' own theory, could avoid Google's Terms (and

19 any purported tying arrangement) by simply selecting one of these competing maps API providers

20 in the first place.  No case has found a valid tying claim in a circumstance like this.

21      Third, plaintiffs fail to allege cognizable antitrust markets, instead lumping together

22 disparate API services that can be licensed separately and are not substitutes for each other.

23 Neither the SAC nor plaintiffs' opposition offers any coherent explanation for defining the

24 relevant markets this way.

25      Fourth, plaintiffs fail to plausibly allege market power.  Their sole basis for their alleged

26 high market share is an anonymous source referring to an undefined market that does not

27 correlate to the markets plaintiffs allege.  But even ignoring that defect, plaintiffs offer no

28 plausible explanation for how Google could exercise market power when there are at least 12

1  other maps API competitors, some of which, according to plaintiffs' allegations, provide superior

2  map API services.  Plaintiffs allege no *facts* (as opposed to conclusions) that these competitors

3  face any barriers to expansion or would be disabled from disciplining any exercise of Google's

4  purported market power.

5       Plaintiffs have had more than ample opportunity to try to state a valid claim.  Their

6  repeated failures to do so require that this case be dismissed with prejudice.

7  **ARGUMENT**

8  **I.      PLAINTIFFS DO NOT VALIDLY ALLEGE THAT GOOGLE'S TERMS IMPOSE**

9  **A TIE.**

10  As Google's motion explained, plaintiffs' new one-way tying theory rests on a reading of

11  Google's Terms that contradicts the Terms' plain language.  While the Terms restrict using

12  Google mapping content "with or near a *non-Google Map*," they do not impose that restriction on

13  using competing places or routes APIs with or near a *Google map*.  Mot. 7–9.  In other words, the

14  plain language permits developers to use or display non-Google places or routes APIs with or

15  near a Google map.  The Terms thus defeat plaintiffs' claim.

16  Effectively conceding as much, plaintiffs ask the Court to rewrite the Terms.  Plaintiffs

17  rely on section 3.2.3(e)(iii), which prohibits "linking" a Google Map to non-Google content, and

18  ask the Court to read the word "link" as meaning "use" or "display."  *See* Opp. 11 (asserting that

19  all three terms "cover the same behavior (using the elements together)").  Plaintiffs theorize that,

20  because "link" supposedly means "use" or "display," clause (iii) prohibits developers from using

21  Google Maps and competitors' routes or places APIs "even near each other [or] even in the same

22  app."  Opp. 9.  But clause (iii) prohibits only "link[ing] a Google Map to non-Google Maps

23  content or a non-Google map."  It does not refer to "use" or "display," which are expressly used

24  in other parts of section 3.2.3(e).  Under blackletter contract interpretation principles, different

25  words must be given "different meanings," particularly when they appear in the same section.

26  *Queen Villas Homeowners Assn. v. TCB Prop. Mgmt.*, 149 Cal. App. 4th 1, 9 (2007).  And this

27  principle applies with particular force here, where (1) plaintiffs' proposed rewrite would

28  transform section 3.2.3(e) from a narrow, one-directional prohibition into a far broader two-

1   directional prohibition, Mot. 7–9, and (2) where plaintiffs have not pointed to a single instance of

2   Google telling them or anyone else that non-Google mapping API services (*e.g.*, maps APIs,

3   routes APIs, or places APIs) cannot be used with or near a Google Map.

4       Plaintiffs' convoluted arguments to the contrary highlight how strained their interpretation

5   is.  Despite their argument that the terms all cover the "same behavior," plaintiffs admit that "use"

6   is broader than "display" and "link."  Opp. 11.  That admission proves the point:  section

7   3.2.3(e)(iii) is a narrower prohibition on "link[ing]" and not a broader prohibition on any type of

8   "use . . . with or near."  This defeats plaintiffs' claim because plaintiffs have not alleged facts

9   showing that they wanted to "link" APIs in a way that the Terms prohibit.  Mot. 8–9 (discussing

10  plaintiffs' unexplained sprinkling of the word "link" across the SAC).  To the contrary,

11  throughout their brief, plaintiffs consistently refer to "using *or* linking" competitors' places or

12  routes APIs with Google Maps—a disjunctive description that implicitly admits both that the

13  terms are different and that plaintiffs have not alleged facts showing the latter.  Opp. 9, 10, 13, 21.

14      Plaintiffs argue that the Terms' reference to "non-Google map" in section 3.2.3(e) is

15  actually shorthand for "non-Google APIs."  Opp. 12.  But that just shows that plaintiffs' claim

16  requires the Terms to be written differently.  If Google had wanted to impose a broad two-way

17  restriction of the kind plaintiffs allege, the Terms would have stated that customers "may not use

18  any non-Google Maps content with or near any Google Maps Core Services."  But that is not

19  what the Terms say.  Basic principles of contract interpretation teach that the different phrases—

20  "Google Maps Core Services" (a defined term) compared to a "non-Google map" (an undefined

21  term that must be given its ordinary meaning)—reflects an intentional difference in meaning.  *See*

22  *Mason v. Telefunken Semiconductors Am., LLC*, 797 F.3d 33, 42 & n.6 (1st Cir. 2015) (applying

23  California law) (recognizing "distinct terms [as] having different meanings").  Plaintiffs cannot

24  manufacture a tying claim by rewriting the Terms to create a restriction Google never imposed.

25      Plaintiffs' non-textual arguments are even less persuasive.  First, plaintiffs misleadingly

26  state that "Google has admitted to the negative tying."  Opp. 10.  But they cite only Google's

27  recognition that the Terms restrict the use of Google's mapping API services with a *non-Google*

28  *map*—which says nothing about the inverse scenario alleged in the complaint of using non-

Google APIs with a *Google map*.  *Compare* Opp. 10 & SAC ¶ 218, *with* Mot. 7–8.  Second, plaintiffs falsely claim that Google itself has used the terms "use," "display," and "link" interchangeably in prior briefing.  Opp. 13.  But none of the cited documents use the term "link" at all (except in inapposite contexts)—let alone use the term interchangeably with "use" or "display."  Third, plaintiffs refer to unknown "revelations" from "antitrust investigations" and the "[m]edia" (Opp. 10), while string-citing only allegations of unrelated alleged wrongdoing (SAC ¶¶ 258–62, 265, 268), generic references to investigations into "Google Maps" or its map API policy generally (SAC ¶¶ 252–56, 263–64, 266–67), and an allegation regarding developers who purportedly received a violation notice with no explanation whether these developers used Google's mapping API services with a *non-Google map* (which the Terms restrict) or instead mixed non-Google mapping APIs with a *Google map* (which is permissible).  SAC ¶ 257.  Plaintiffs' reliance on overbroad statements in the House Report (Opp. 9) fails for similar reasons, as the report offered no basis for its interpretation nor examples of developers being prevented from using non-Google APIs with a Google Map.

The plain language of the Terms defeats plaintiffs' claim.  But even if plaintiffs were correct that the Terms could be read in the manner plaintiffs assert, plaintiffs cite no case holding that they can state a plausible tying claim by construing language to impose a restriction that Google neither endorses nor seeks to enforce.  Plaintiffs instead cite irrelevant cases where the defendant did not dispute the existence of a tying arrangement,[1] or in which the court found a tying arrangement based on plausible allegations (or evidence) of a course of dealing that is absent here.[2]  Plaintiffs' other cases involved fact scenarios or arguments not at issue here—such as a dispute over what contracts consumers actually signed in the first place, *Newcal Indus., Inc.*

---

[1] *See Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974, 998 (N.D. Cal. 2010); *RealPage, Inc. v. Yardi Sys., Inc.*, 852 F. Supp. 2d 1215, 1220, 1223–24 (C.D. Cal. 2012); *Kickflip, Inc. v. Facebook, Inc.*, 999 F. Supp. 2d 677, 689 (D. Del. 2013); *see also id.* Opening Brief ISO Def.'s Motion to Dismiss 15-17, No. 12-1369-LPS (Filed Jan. 4, 2013), ECF No. 12; *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 11 (1958); *Frame-Wilson v. Amazon.com, Inc.*, 664 F. Supp. 3d 1198, 1209 (W.D. Wash. 2023); *In re Amazon.com, Inc. eBook Antitrust Litig.*, 2024 WL 918030, at *6 (S.D.N.Y. Mar. 2, 2024).

[2] *United States v. Mercedes-Benz of N. Am., Inc.*, 517 F. Supp. 1369, 1381 (N.D. Cal. 1981); *Smith v. eBay Corp.*, No. C 10-03825 JSW, 2012 WL 27718, at *6 (N.D. Cal. Jan. 5, 2012); *Meredith Corp. v. SESAC LLC*, 1 F. Supp. 3d 180, 208 (S.D.N.Y. 2014).

*v. IKON Off. Sols., Inc.*, 2011 WL 1899404, at *5 (N.D. Cal. May 19, 2011), an alleged non-compete that plaintiffs plausibly alleged to exist despite select contracts submitted by the defendant not including the alleged non-compete, *Crowder v. LinkedIn*, 2024 WL 1221956, at *3–4 & n.1 (N.D. Cal. Mar. 21, 2024), an alleged contractual arrangement requiring publishers to use both the tying and tied products, *In re Google Digital Advert. Antitrust Litig.*, 627 F. Supp. 3d 346, 369 (S.D.N.Y. 2022), and an alleged tying arrangement that did not depend on interpreting any specific contractual language, *Team Schierl Companies v. Aspirus, Inc.*, No. 22-CV-580-JDP, 2023 WL 6847433, at *7 (W.D. Wis. Oct. 17, 2023).

Finally on this point, plaintiffs argue that their interpretation must be accepted because, in their view, there is "no reason" for the restriction in clause (iii) to be narrower than section 3.2.3's general restriction.  Opp. 13.  But plaintiffs cannot rewrite the Terms simply because they profess not to understand the reason behind them or believe a different formulation would make more sense—and they certainly cannot rewrite them to make them more restrictive than how Google wrote them.  The Terms do not impose the restriction plaintiffs allege, which requires that their claim be dismissed.  *Stern v. Rocket Mortg., LLC*, 666 F. Supp. 3d 234, 247 (E.D.N.Y. 2023) (dismissing breach of contract claim where the alleged breach did "not exist and is actually based on [plaintiff's] misunderstanding of the terms of his mortgage loan agreement"); *Roberts v. Daymon Worldwide Inc.*, 2015 WL 2251330, at *6 (N.D. Cal. May 13, 2015) (dismissing claim based on erroneous interpretation of contract that would require court to insert words not present).

## II.     PLAINTIFFS CANNOT PLAUSIBLY ALLEGE COERCION.

Plaintiffs do not disavow their previous allegations that competitors offer "better" and "cheaper" maps APIs than Google.  To the contrary, their opposition repeats that assertion.  Opp. 20 ("competitors offer[] maps APIs … that are better or cheaper than Google's Maps APIs"); *id.* at 21 ("competitors offered better or cheaper maps APIs").  Rather than disavow the allegation, plaintiffs argue that they are "no longer focus[ing] on" it now that they have changed their tying claim.  Opp. 20.  But this is precisely the gamesmanship the caselaw on judicial admissions is designed to avoid.  A plaintiff cannot avoid dismissal by "simply deleting" prior factual allegations without any explanation.  *Morales v. City & Cnty. of San Francisco*, 603 F. Supp. 3d

1   841, 846–47 (N.D. Cal. 2022) (dismissing complaint as implausible where plaintiff omitted prior

2   bad facts rather than explaining them in light of new theory).  Plaintiffs all but admit that this is

3   what they did here.  Opp. 20–21.  Regardless, the Court need not wade into the effect of

4   plaintiffs' prior complaints because plaintiffs continue to maintain—even in their opposition

5   brief—that there are equivalent or superior maps API suppliers.  *Resendiz v. Cnty. of Monterey*,

6   2015 WL 3988495, at *6 (N.D. Cal. June 30, 2015) (plaintiffs' statements in opposition brief to

7   motion to dismiss were "a binding judicial admission" warranting dismissal of complaint).

8          Plaintiffs' allegation defeats their tying claim.  Google is aware of no case—and plaintiffs

9   cite none—permitting a plaintiff to pursue a tying claim while simultaneously alleging that there

10   are equal or better competitors in the alleged tying market.  That claim is at odds with

11   rudimentary tying law.  A tying arrangement presents an antitrust problem only when the seller

12   has *coerced* the purchase of a tied product.  *See Rick-Mik Enterprises, Inc. v. Equilon Enterprises*

13   *LLC*, 532 F.3d 963, 971 (9th Cir. 2008); Mot. 12–13.  The requisite coercion cannot exist where,

14   as plaintiffs allege here, "the buyer can obtain the tying product on equally advantageous terms

15   from other sources."  P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 1700d3 (updated Aug. 2023).

16   Courts therefore refuse to entertain tying claims when purchasers can avoid purchasing the *tied*

17   product by simply purchasing the *tying* product somewhere else.  Mot. 13 (citing cases).[3]

18          Plaintiffs offer no meaningful response to these cases.  They assert that *Arnold v. Petland,*

19   *Inc.*, 2009 WL 816327 (S.D. Ohio Mar. 26, 2009), found only that the plaintiff failed to

20   adequately plead market power, Opp. 16 n.26, while failing to address the central fact that—as in

21   *Arnold*—plaintiffs are alleging coercion while simultaneously claiming that the defendant is "one

22   of several or many competing" suppliers of the tying product.  2009 WL 816327, at *8.  Plaintiffs

23   dismiss *Casper v. SMG*, 2006 WL 3111132 (D.N.J. Oct. 31, 2006) and *Brandriff v. Dataw Island*

24   *Owners' Ass'n, Inc.*, 2010 WL 11534504 (D.S.C. Sept. 30, 2010), as summary judgment cases,

---

26   [3] Plaintiffs' argument that they need only allege that they were coerced into purchasing the *tied*

27   product and not the *tying* product is misguided.  Opp. 20.  The issue here is that plaintiffs cannot plausibly have been coerced into purchasing the *tied* products (Google Routes and Places API services) when they allegedly could have gone elsewhere to obtain an equivalent or superior

28   version of the *tying* product (maps APIs) in the first place.

1  Opp. 22–23 n.40, but the procedural posture is irrelevant.  Just as factual defects defeat a claim at

2  summary judgment, defects in *factual allegations* defeat claims at the pleading stage.

3      Plaintiffs argue that so long as they have adequately alleged market power in the tying

4  market, they need not allege "anything further for coercion."  Opp. 20.  But "market power"

5  cannot be alleged in a vacuum without regard to the defendant's ability to coerce.  The funda-

6  mental purpose of evaluating a defendant's "market power" is to determine whether the defendant

7  can plausibly coerce purchasers into buying the tied product.  This is why the Supreme Court has

8  held that the "essential characteristic" of an unlawful tie is the seller's power to "force the buyer

9  into the purchase of a tied product" through its power (or "control") over the tying product.

10  *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984).  A plaintiff who cannot plausibly

11  show the ability to coerce—*e.g.*, because equal or superior competitors are available for

12  purchasers of the tying product—cannot show the requisite market power for a tying claim

13  because the defendant necessarily lacks the "power to force, exploit, or coerce a [buyer] to

14  purchase a tied product."  *Rick-Mik*, 532 F.3d at 972; *see also* Mot. 12 (collecting authority);

15  P. Areeda & H. Hovenkamp, *Antitrust Law* ¶¶ 1734, 1734c (updated Aug. 2023) (recognizing that

16  a "tie" cannot force consumers to purchase an unwanted second product when "choices [in the

17  tying market] are ample").

18      Plaintiffs' cases illustrate the point.  Each involved a defendant with a unique position in

19  the tying product that allowed it to coerce buyers into purchasing the tied product—a far cry from

20  the situation alleged here where plaintiffs repeatedly claim that equivalent or better maps APIs

21  are allegedly available from several Google competitors.  For example, in *N. Pac. Ry. Co. v.*

22  *United States*, 356 U.S. 1, 7–9 (1958), the defendant had "extensive landholdings" in

23  "strategically located" areas that were "prized" by purchasers and "essential to their business

24  activities."  This must-have land was then "used as leverage" to coerce buyers into purchasing the

25  tied product (railroad services).  The Supreme Court recognized that "[o]f course where the seller

26  has no control or dominance over the tying product"—as would necessarily be the case if

27  competitors offer equivalent or superior versions of that product—no tying claim can exist.  *Id.* at

28  6.  Plaintiffs' other cases similarly involve scenarios where the defendant was the *sole* supplier of

the alleged tying product.  *See Datagate, Inc. v. Hewlett-Packard Co.*, 60 F.3d 1421, 1423, 1426–27 (9th Cir. 1995); *Surgical Instrument Serv. Co., Inc. v. Intuitive Surgical, Inc.*, 571 F. Supp. 3d 1133, 1137, 1140 (N.D. Cal. 2021); *cf. PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 830, 836 (9th Cir. 2022) (Multiple Listing Services were uniquely valuable because they "reach the widest possible range of buyers").  Simply put, unlike the tying cases plaintiffs cite—where the defendant's tying product was a "must-have" for buyers—here plaintiffs allege that they could have licensed equally good or better maps APIs elsewhere.  That allegation makes it impossible to infer that Google could have coerced anyone into anything.

Rather than grapple with this fundamental defect, plaintiffs focus on the choices available to developers *after* they have purchased Google Maps API services.  *See* Opp. 21; *id.* at 4 (alleging that Dream Big and Getify could not purchase alternative routes or places APIs "*after* purchasing Google's Maps APIs*") (emphasis added).  But plaintiffs fail to respond to Google's argument that coercion must be evaluated as of the time *before* the plaintiff makes its purchase—not *after*.  *See* Mot. 14.  Otherwise, the plaintiff is merely complaining of being bound to a condition that it knowingly and voluntarily accepted.  *See Rick–Mik*, 532 F.3d at 973 ("While the allegation of a contractual relationship does not necessarily doom a tying claim at the pleading stage, it also does not remedy a complaint's failure to properly plead market power.").[4]

Plaintiffs' remaining arguments are entirely non-responsive.  In a footnote, plaintiffs caricature Google as arguing that the defendant must be the sole supplier of the tying product before a plaintiff can show coercion.  Opp. 21 n.39.  That is not Google's argument.  Rather, the point is that when other suppliers of the tying product allegedly offer an equivalent or superior product, a plaintiff cannot plausibly allege coercion.  Plaintiffs similarly argue that they need not

---

[4] The only potential exception to this principle is for "lock-in" cases, which do not apply for the reasons Google explained.  *See* Mot. 13–14.  Plaintiffs have waived any lock-in theory by not defending it in their opposition brief (and indeed, arguing that Google's discussion of lock-in cases are irrelevant and related to "a type of tying that Plaintiffs do not allege here").  Opp. 20 n.36.  For these reasons, plaintiffs' reliance on *Digidyne Corp. v. Data Gen. Corp.*, 734 F.2d 1336, 1346 (9th Cir. 1984), is misplaced because that court's ruling turned on the fact that the purported existence of comparable or functionally equivalent tying products from other sellers would not "have freed 'locked-in' [buyers]" from the defendant's power.  *See also id.* at 1341 (finding "abundant evidence that defendant's [tying product] . . . could not be readily produced by other sellers," which is almost the exact opposite of plaintiffs' allegations here).

1    have violated the Terms to show coercion (Opp. 22), but again Google has not suggested

2    otherwise.  Google highlighted plaintiffs' undisputed failure to show a single example of the

3    Terms being enforced in the manner they allege because the lack of such examples undermines

4    the plausibility of plaintiffs' contorted contract interpretation—not because it informs the

5    coercion analysis.  Cases suggesting that coercion may be shown when an "appreciable number of

6    buyers" have agreed to "burdensome terms," *Moore v. James H. Matthews & Co*., 550 F.2d 1207,

7    1217 (9th Cir. 1977), similarly do not help plaintiffs.  Those cases merely stand for the idea that

8    coercion must be evaluated "at the market level" rather than "individual" level.  *Tucker v. Apple*

9    *Computer, Inc.*, 493 F. Supp. 2d 1090, 1097 (N.D. Cal. 2006).  The problem here is that plaintiffs

10   have not plausibly alleged coercion of *any* buyer at *any* level, and cannot do so, because they

11   allege that buyers can obtain equivalent or superior maps APIs elsewhere.

12   　　　Plaintiffs' reliance on *In re Google Digital Advert. Antitrust Litig*., 2024 WL 988966

13   (S.D.N.Y. Mar. 7, 2024), is also misplaced.  There, the plaintiff alleged specific reasons,

14   sufficient to withstand a motion to dismiss, explaining why purchasing the alleged tying product

15   from the defendant was "desirable and necessary" despite its alleged inferiority to other suppliers.

16   That is precisely what is missing here:  Plaintiffs assert that Google's Maps API services are

17   equivalent or inferior to other maps API providers, but offer no facts to explain why they (or any

18   other developer) nevertheless were coerced into licensing Google Maps API services in the first

19   place.  Instead, plaintiffs provide only conclusory statements about Google's purported "data

20   advantage," which are insufficient to allege coercion for the reasons Google's motion explained.

21   *Compare* Mot. 13, *with* Opp. 21 n.37.  Plaintiffs have no answer to that point, relegating their

22   discussion of the issue to a footnote that merely repeats the SAC's conclusory allegations.

23   **III.    PLAINTIFFS FAIL TO ALLEGE COGNIZABLE MARKETS OR MARKET**

24   **　　　　POWER.**

25   　　　**A.    Plaintiffs' Product Markets Are Legally Insufficient.**

26   　　　As Google explained, a plausible market definition requires explaining "why the products

27   included in the market are substitutes *for one another*."  *Reilly v. Apple Inc.*, 578 F. Supp. 3d

28   1098, 1109  (N.D. Cal. 2022) (emphasis added).  Plaintiffs fail to provide this explanation.  They

1   instead repeat their allegations that the individual APIs in each of the three alleged markets

2   (maps, places, and routes APIs) are designed to support the "same, overarching purpose," Opp. 6–

3   7, while ignoring Google's argument that such allegations are irrelevant to evaluating

4   substitutability, Mot. 15–17.  Rather than respond to Google's arguments, plaintiffs address a

5   series of strawmen (*e.g.*, that each API within the three categories "should be its own market,"

6   Opp. 6, that plaintiffs should have defined submarkets, *id.* at 7, or that a market can never consist

7   of more than one product, *id.* at 7 n.18).  Google has not asserted any of these arguments.

8   *Plaintiffs* have the burden—not Google—to properly allege with supporting facts a valid market,

9   including showing the propriety of grouping together disparate products or services into a market.

10  They have not done so.

11        Plaintiffs' cases again do not provide otherwise.  Only four considered the issue presented

12  here.  And all four found this grouping proper because purchasers needed to buy *all* the products

13  or services in the group.  *Image Tech. Servs., Inc. v. Eastman Kodak Co*., 125 F.3d 1195, 1203

14  (9th Cir. 1997); *Jones v. Varsity Brands, LLC*, 618 F. Supp. 3d 725, 750–51 (W.D. Tenn. 2022);

15  *Meredith Corp. v. SESAC LLC*, 1 F. Supp. 3d 180, 219 (S.D.N.Y. 2014); *Brown v. Amazon.com,*

16  *Inc*., 2023 WL 5793303, at *7 (W.D. Wash. Sept. 7, 2023); *id.* Amazon.Com, Inc.'s Motion to

17  Dismiss 22-23, No. 2:22-cv-00965-JHC (Filed Sept. 30, 2022), ECF No. 18.  This is precisely

18  what plaintiffs fail to allege here and what renders their market legally deficient.  *See* Mot. 15–16

19  (explaining that plaintiffs allege developers can select individual API services a la carte).

20        Plaintiffs further argue that Google fails to show that the individual API services in each

21  alleged market "are complements as opposed to substitutes."  Opp. 8.  But the complementary

22  nature of the APIs is evident from plaintiffs' own allegations that they are used together to

23  support the same overarching purpose—which is the very definition of complementary goods.

24  *See* P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 565 (updated Aug. 2023) ("complements are

25  goods that are most efficiently made or used together").  Plaintiffs' waiver argument (Opp. 8) is

26  likewise untenable, as Google raised this argument in its prior motion.  *See* ECF 51, p. 14.

27  Google need not raise an argument in identical terms to avoid waiver.  *See, e.g., Doe One v. CVS*

28  *Pharmacy, Inc*., 2022 WL 3139516, at *5-6 (N.D. Cal. Aug. 5, 2022).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

     **B.**        **Plaintiffs Fail to Plausibly Allege Market Power.**

     Google's motion explained why plaintiffs' allegations of market power fail:  (1) plaintiffs fail to plausibly allege a high share of the relevant market because their market-share allegation is based on an anonymous source referring to an unknown market that does not equate to the maps API market plaintiffs define here; and (2) plaintiffs do not plausibly allege any barriers preventing the 12 alleged competitors from taking share from Google if it behaved anticompetitively.  Mot.  17–20.  Plaintiffs offer no valid response.

     **Market Share:**  On their deficient market share allegation, plaintiffs do not answer the point that the SAC is devoid of any facts showing that the purported "business-to-business" market mentioned in the House Report is the same as the maps API market that plaintiffs have defined.  Nor do plaintiffs offer any valid basis for distinguishing the cases Google cited in its motion, which straightforwardly concluded that market share must be alleged based on the market in question—not a different market.  Mot. 18; *see, e.g.*, Opp. 16 n.26.

     Further, even if the "business-to-business market" were the same market as an alleged maps APIs market, the House Report makes no finding that Google possesses 90% of that market.  Plaintiffs argue that no such formal finding is necessary.  Opp. 15.  But plaintiffs cite no authority suggesting that a bare reference to an anonymous source in a third-party report without any explanation or supporting facts is sufficient to support an allegation of market power.  Plaintiffs cite this Court's decision in *In re Webkinz Antitrust Litig.*, 2010 WL 4168845 (N.D. Cal. Oct. 20, 2010), which found market power adequately alleged based on actual "comparative sales estimates" and estimates of "website traffic," which plausibly had "significant correlation" with actual product sales.  *Id.* at *3 & n.5.  The Court's recognition that a plausible proxy for market power (along with other allegations) can be sufficient to state a claim says nothing about plaintiffs' reliance on an anonymous quote referring to an unknown and undefined market as the basis for alleging market power.

     Finally, plaintiffs fail to explain how a 90% market share is plausible given their allegations that there are at least 12 other competitors in the maps API market.  Mot. 19.  Plaintiffs claim for the first time that they are only alleging 12 competitors in all three API

1   markets, not that there are 12 competitors in each.  Opp. 17–18 n. 29.  But that claim is belied by

2   plaintiffs' own allegations in the SAC.  *See* SAC ¶¶ 152–57 (treating 12 competitors as such in

3   the maps API market).

4       **Barriers to Expansion:**  Even if the Court finds plaintiffs' market-share allegation

5   sufficient, a high market share alone does not show market power because a defendant can only

6   have "market power"—an antitrust term of art—when new or existing competitors are not able to

7   take share from the defendant in the event it behaves anticompetitively.  Mot. 19–20.  Plaintiffs

8   fail to meaningfully address this argument.  They opt instead only to re-state their conclusory

9   allegation that competitors' shares are "meager and dwindling" and that there are "high switching

10  costs" (with no factual support identified).  Opp. 17–18 & n.33.  Plaintiffs' argument that the

11  "usual concept of increasing supply does not translate" to digital products, Opp. 18, only proves

12  the point:  nothing prevents any one of the 12 alleged competitors in the maps API market from

13  taking share from Google.  Finally, plaintiffs fail to elaborate on their conclusory allegations

14  about Google's "data advantage."  Opp. 18 n.34.  They instead respond to Google's argument on

15  this point solely in a footnote, and by citing a mishmash of unhelpful paragraphs from the SAC,

16  such as those dealing with Google's alleged advantage in the *advertising* market not at issue here,

17  SAC ¶¶ 178, 439, 503, or paragraphs that are as generic and conclusory as plaintiffs' opposition

18  brief or that refer to "[m]edia" reports that are nowhere to be found, SAC ¶¶ 228, 261, 356, 456–

19  58.  Plaintiffs also cite a 47-paragraph stretch of their SAC that purports to allege direct

20  demonstrations of market power, none of which relates to existing competitors' ability to take

21  market share from Google.  Opp. 18 (citing SAC ¶¶ 403–50).

22      Plaintiffs' cited cases, Opp. 16 n.26, 18–19, are inapposite.  In several of them, the

23  defendant did not meaningfully dispute market power.[5]  In others, the plaintiff pled specific

24  examples of barriers to competitors.[6]  Other cases summarily found market power with no

25  _____

26  [5] *PLS.Com*, 32 F.4th at 835 n.5; *In re Google Digital Advert. Antitrust Litig.*, 627 F. Supp. 3d at 359, 361; *Datel Holdings*, 712 F. Supp. 2d at 995; *see also Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*, 386 F.3d 485, 501 (2d Cir. 2004) (defendant did not dispute it was "sole

27  manufacturer" which "alone creates a strong inference of monopoly power").

28  [6] *RealPage*, 852 F. Supp. 2d at 1227; *Am. President Lines, LLC v. Matson, Inc.*, 633 F. Supp. 3d 209, 224 (D.D.C. 2022); *Ploss v. Kraft Foods Grp., Inc.*, 197 F. Supp. 3d 1037, 1071 (N.D. Ill.

meaningful analysis.[7]  And the remaining cases found market power where the plaintiff had

plausibly shown the defendant's challenged conduct was preventing others from competing in the

market.[8]  But as Google's motion explained, plaintiffs have not coherently explained how

Google's challenged conduct has increased barriers in the alleged *maps API* market (as opposed

to allegedly increasing barriers to competition in the tied markets, which is irrelevant).  Mot. 19–

20.  Plaintiffs fail to respond to Google's argument on this point, instead copying and pasting

their conclusory allegations that "[b]ut for the anticompetitive practices, there would have been

competition from existing competitors."  Opp. 18.  Plaintiffs' inability to respond beyond re-

stating their factually devoid conclusions confirms they have not adequately alleged the required

barriers to entry or expansion.

     **Direct Market Power:**  Plaintiffs do not dispute that they have not alleged facts showing

that Google has reduced output in the alleged maps API market.  Nor do plaintiffs contest that

such a reduction must be pled for a complaint to allege direct market power.  *Compare* Mot. 20–

21, *with* Opp. 15–19.  This alone requires rejecting plaintiffs' purported allegations of direct

market power.  Nor do plaintiffs meaningfully address Google's arguments that plaintiffs have

not shown supracompetitive prices.  Mot. 21.  Instead, plaintiffs yet again re-state their

conclusory and irrelevant allegations without explanation.  Opp. 16–17.  Plaintiffs also now

claim, for the first time, that Google increased its prices "over 200 times"—a claim that is untrue

and nowhere to be found in the SAC, which instead only refers to a single one-time price increase

in mid-2018.  Opp. 17 n.27 (citing, e.g., SAC ¶¶ 41, 82–83, 107, 128, 164–74, 412–19

---

2016); *Hannah's Boutique, Inc. v. Surdej*, 2013 WL 4553313, at *4 (N.D. Ill. Aug. 28, 2013); *AliveCor, Inc. v. Apple Inc.*, 592 F. Supp. 3d 904, 917 (N.D. Cal. 2022); *see also Allen-Myland, Inc. v. Int'l Bus. Machines Corp.*, 33 F.3d 194, 210 (3d Cir. 1994) (discussing district court's findings on barriers to new entry, which is a separate issue from barriers to expansion of existing competitors, and discussing other errors not relevant here).

[7] *Christou v. Beatport, LLC*, 849 F. Supp. 2d 1055, 1067 (D. Colo. 2012).  Plaintiffs also cite *Kickflip, Inc. v. Facebook, Inc.*, 999 F. Supp. 2d at 688–89, which is an outlier case and conflicts with Ninth Circuit precedent requiring more than a mere allegation of high market share before finding market power.  *See* Mot. 19; *Rebel Oil v. Atl. Richfield Co.*, 51 F.3d 1421, 1439 (9th Cir. 1995) ("A mere showing of substantial or even dominant market share alone cannot establish market power[.]").

[8] *See MLW Media LLC v. World Wrestling Entm't, Inc.*, 2023 WL 4053802, at *5 (N.D. Cal. June 15, 2023); *Cost Mgmt. Servs., Inc. v. Washington Nat. Gas Co.*, 99 F.3d 937, 950 (9th Cir. 1996); *In re Google Digital Advert. Antitrust Litig.*, 2024 WL 988966, at *4–5 (S.D.N.Y. Mar. 7, 2024).

1    (allegations of a mid-2018 increase plus conclusory allegations of "drastic price increases over

2    several years" with no support)).

3          Rather than addressing Google's arguments, plaintiffs continue to obfuscate and misdirect

4    attention towards purported "data-privacy violations"—yet still fail to cite any case endorsing this

5    as a method of showing direct market power (and Google is aware of none).  *Compare* Mot. 21–

6    22, *with* Opp. 17.  Plaintiffs cite over 20 pages of *Klein v. Facebook, Inc.,* 580 F. Supp. 3d 743

7    (N.D. Cal. 2022), which involved standalone claims for data-privacy violations that are not

8    alleged here.  Despite the prevalence of alleged data-privacy violations in that case, nowhere in

9    the Court's discussion of antitrust market power did it endorse (or even consider) purported data-

10   privacy violations.  *Id.* at 776–81.

11   **IV.    PLAINTIFFS' OTHER ANTITRUST THEORIES LIKEWISE FAIL.**

12         **A.    Plaintiffs' Exclusive Dealing Claim Fails for the Same Reasons as its Tying**

13              **Claim.**

14         Plaintiffs' opposition confirms that their exclusive dealing claim rests on the same

15   predicate as their tying claim.  *See* Opp. 23 (restating tying claim allegations as support for

16   exclusive dealing claim—*e.g.*, that developers are "subject to the exclusive dealing through

17   negative tying"—and that this alleged tying results in the necessary foreclosure for exclusive

18   dealing claim).  The exclusive dealing claim thus fails for the same reasons as the tying claim.

19         **B.    Plaintiffs Fail to State a Sherman Act Section 2 Claim.**

20         Plaintiffs fail to state a Section 2 claim because they have not plausibly alleged

21   exclusionary or anticompetitive conduct.  *See SmileCare Dental Grp. v. Delta Dental Plan of*

22   *California, Inc*., 88 F.3d 780, 783 (9th Cir. 1996) ("predatory or anticompetitive conduct"

23   required for attempted monopolization).  As explained above, plaintiffs have not shown exclusive

24   dealing or tying.  And as Google's motion explained, plaintiffs' reliance on Google's alleged

25   policy on map caching is irrelevant because—per plaintiffs' own allegations—this policy merely

26   disadvantages competitors to Google's "non-mapping products," and plaintiffs allege no

27   competitive harm or injury to themselves as to these products.  *See* Mot. 23–24; *see also id.* n. 9

28   (highlighting plaintiffs' effort to strike unhelpful language from the SAC to conceal that their

factual allegations on self-preferencing relate to non-mapping products).  Plaintiffs offer no response to Google's argument on this point, instead yet again stating in conclusory fashion that they have "focused allegations on actions harming competition in the relevant markets."  Opp. 24; *see also id.* n.42 (citing allegations that are mere conclusions or related to alleged self-preferencing in non-mapping products or "other lines of business").

Nor can plaintiffs rely on allegations that Google's caching policy "degrade[s]" the quality of the APIs because, as Google explained, developing a less desirable product does not foreclose competition.  Mot. 24.  Plaintiffs suggest that competitors of Google Maps (*i.e.*, end user maps apps and websites, *e.g.*, Apple Maps)) are disadvantaged relative to Google because of the caching policy.  Opp. 24 n.42.  But plaintiffs' antitrust claims are about APIs licensed to developers for the creation of their own apps or websites—not end-user maps apps and websites.  Plaintiffs allege no facts suggesting that the caching policy forecloses other *API suppliers*, which is the relevant inquiry for their Section 2 claim.  Because plaintiffs have not shown anticompetitive conduct in the first place, their argument about "specific intent" (a separate element of attempted monopolization claims) is irrelevant.  *Cf.* Opp. 25.

Finally, plaintiffs' Section 2 claims independently fail because they have not properly defined a market or shown market power.  *Supra* pp. 9–14; Mot. 24.

**C.      Plaintiffs Fail to State a UCL Claim for the Same Reasons.**

The sole basis plaintiffs offer for their UCL claim is that they have alleged an antitrust claim.  Opp. 25.  The failure of their antitrust claim thus defeats their UCL claim as well.

**CONCLUSION**

The Second Amended Complaint should be dismissed with prejudice.

Dated: April 4, 2024                                            JONES DAY

By:  */s/ David C. Kiernan*
          David C. Kiernan

Attorneys for Defendants
Alphabet Inc. and Google LLC