UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DREAM BIG MEDIA INC., et al.,

Plaintiffs,

v.

ALPHABET INC., et al.,

Defendants.

Case No. 22-cv-02314-RS

**ORDER GRANTING MOTION TO DISMISS SECOND AMENDED COMPLAINT**

I. INTRODUCTION

Plaintiffs Dream Big Media, Getify Solutions, Inc., and Sprinter Supplier, LLC, allege they use mapping products provided by defendants Google, LLC and Alphabet, Inc. (collectively, "Google"), including application programming interfaces ("APIs"), to display or use maps or maps-related information on their websites or mobile applications. Plaintiffs contend the Terms of Service ("TOS") Google imposes on customers seeking to use those APIs give rise to claims for unlawful tying, bundling, exclusive dealing, and monopoly leveraging in violation of the Sherman Act, the Clayton Act, and California's Unfair Competition Law.

Plaintiffs' original and First Amended complaints presented a novel tying theory: because Google's TOS purportedly prohibit customers who buy any one of its "Maps," "Routes," or "Places" APIs from using either of the other two categories of APIs provided by any other supplier, each of those three APIs could be either the "tying" product or the (negatively) "tied"

product.[1] The order dismissing the First Amended Complaint with leave to amend did not preclude plaintiffs from continuing to pursue that theory, but cautioned that they would have to show how it was viable legally and factually.

In the Second Amended Complaint, plaintiffs instead elected to pursue a conventional (negative) tying theory. Plaintiffs Dream Big and Getify allege "after purchasing Google's Maps APIs" they were forced through the negative tying effects of Google's TOS to purchase Google's Places APIs and Routes APIs, despite their preferences for competitors' APIs that provide places and routes data and functions. Plaintiff Sprinter, which does not allege to have purchased Google Maps APIs, does not advance claims for an unlawful tying arrangement, but nonetheless contends it may pursue relief under exclusive dealing or other theories.

Although the Second Amended Complaint eliminates the prior basis for dismissal that plaintiffs had not shown a product could be *either* tying or tied, their election to declare now that "Maps APIs" is the tying product is seriously undermined by their prior—and continuing—assertions that Google competitors offer superior maps APIs. Plaintiffs also have not shown at the outset that the Google TOS prohibits its customers who purchase Maps APIs from using APIs provided by Google competitors to provide "places" or "routes" data and functions. For these and other reasons discussed below, the Second Amended Complaint must be dismissed. No further leave to amend is warranted.

## II. BACKGROUND

The Second Amended Complaint describes APIs as software code, sold as products, that enable one computer application to retrieve and utilize data from another computer application. As relevant here, Google offers (for cash or certain kinds of "credits") access to various APIs that allow its customers to use Google maps and related information on their own websites or in other

---

[1] References to Google's products will be capitalized "Maps," "Routes," and "Places," in contrast to maps, routes, and places APIs offered by Google's competitors.

applications. Plaintiffs allege three separate markets, which they claim align with categories Google itself uses:

> (i) APIs that retrieve and display a digital map ("maps APIs");
>
> (ii) APIs that retrieve and display information on a digital map about establishments, locations, and other points-of-interest ("places APIs"); and,
>
> (iii) APIs that retrieve and display navigational information, such as directions, navigation, and travel time, on a digital map "routes APIs").

Google markets its own Maps APIs, Places APIs, and Routes APIs under what it calls the Google Maps Platform. The TOS on which plaintiffs' claims are based governs use of the Maps Platform as a whole. The provision of the TOS in dispute appears under section 3.2.3, entitled "Restrictions Against Misusing the Services." Paragraph (e), labeled "No Use With Non-Google Maps" states,

> To avoid quality issues and/or brand confusion, Customer will not use the Google Maps Core Services with or near a non-Google Map in a Customer Application. For example, Customer will not (i) display or use Places content on a non-Google map, (ii) display Street View imagery and non-Google maps on the same screen, or (iii) link a Google Map to non-Google Maps content or a non-Google map.

The TOS defines "Google Maps Core Services" as including various APIs falling within the category of Maps APIs, Places APIs, and Routes APIs. The TOS also defines "Street View" as a Core Service. Paragraph (e) and its examples therefore unambiguously purport to prohibit a customer from buying Google's Places or Routes APIs and using them on maps generated from competitors' APIs. A customer is also precluded from using Google's Street View (a specific API within the "maps APIs" category as defined by plaintiffs) "on the same screen" as a non-Google map.

The Second Amended Complaint, however, is premised on the theory that Google's Maps APIs is the tying product, and places and/or routes APIs are the (negatively) tied product(s). The fact that the TOS purports to prohibit Google's products in the allegedly tied markets from being

used with competitor's products in the alleged tying market does not give rise to an unlawful tying claim, and plaintiffs do not argue otherwise. Similarly, Google's insistence that one of its products in the purported tying market (Street View) may only be used with other Google products in the same alleged market does not support an unlawful tying claim.

Accordingly, the parties' dispute centers on paragraph (e) (iii), purporting to restrict a purchaser of Google Maps APIs from "link[ing] a Google Map to non-Google Maps content or a non-Google map."[2] Plaintiffs contend this must be interpreted as prohibiting a person who has purchased Google Maps APIs from using a competitor's routes and/or places APIs in conjunction with a Google Map. Google insists its Maps customers are free to use a competitors' routes or places APIs with their Google maps, as long as they do not link those the Maps to non-Google content or non-Google maps, such that an end user would be redirected from the Google Map to non-Google content.

### III. LEGAL STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2). While "detailed factual allegations" are not required, a complaint must have sufficient factual allegations to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. v. Twombly*, 550 U.S. 544, 555, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). This standard asks for "more than a sheer possibility that a defendant has acted unlawfully." *Id.* The determination is a context-specific task

---

[2] Google has preserved its argument that the complaint is still subject to dismissal under the reasoning of *Sambreel Holdings LLC v. Facebook, Inc.*, 906 F. Supp. 2d 1070 (S.D. Cal. 2012). For the reasons set out in the order dismissing the First Amended Complaint, any rights Google may otherwise have to "dictate the terms on which it will permit its customers to use and display its mapping services," do not insulate it from potential antitrust liability for improper tying practices. To the extent *Sambreel* suggests otherwise, it is not persuasive.

requiring the court "to draw on its judicial experience and common sense." *Id.* at 679.

A motion to dismiss a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the claims alleged in the complaint. *See Conservation Force v. Salazar*, 646 F.3d 1240, 1241-42 (9th Cir. 2011). Dismissal under Rule 12(b)(6) may be based on either the "lack of a cognizable legal theory" or on "the absence of sufficient facts alleged under a cognizable legal theory." *Id.* at 1242 (internal quotation marks and citation omitted). When evaluating such a motion, the court must accept all material allegations in the complaint as true and construe them in the light most favorable to the non-moving party. *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1140 (9th Cir. 2017).

## IV. DISCUSSION

### A. *Terms of Service*

Google insists that even though the TOS restrict using Google mapping content "with or near a non-Google Map," the plain language permits developers to use or display non-Google places or routes APIs with or near a Google Map. Thus, Google contends, there is no negative tie because its customers are perfectly free to use competitors' versions of the allegedly tied products (routes and places APIs) with the alleged tying product (Google Maps APIs). As noted above, the dispute turns on section 3.2.3(e)(iii), which prohibits "linking" a Google Map to non-Google content. Google argues plaintiffs are improperly asking the court to read the word "link" to mean "use" or "display," thereby expanding the scope of clause (iii) to prohibit developers from using Google Maps and competitors' routes or places APIs "even near each other [or] even in the same app."

Google contends clause (iii) prohibits only "link[ing] a Google Map to non-Google Maps content or a non-Google map" and that it does not refer to "use" or "display," which are expressly used in other parts of section 3.2.3(e). Google relies on the "blackletter contract interpretation principles" that different words must be given different meanings, particularly when they appear in the same section. *See Queen Villas Homeowners Assn. v. TCB Prop. Mgmt.*, 149 Cal. App. 4th 1,

9 (2007).

Google argues the principle applies with particular force here, because plaintiffs' proposed reading would "transform section 3.2.3(e) from a narrow, one-directional prohibition into a far broader two-directional prohibition" and because plaintiffs have pointed to no instance of Google claiming the TOS means non-Google mapping API services (e.g., maps APIs, routes APIs, or places APIs) cannot be used with or near a Google Map.

Plaintiffs have not shown how a prohibition on "linking" a Google Map to non-Google Maps content or a non-Google map reasonably can be understood to prohibit the use of competitors' routes and/or places APIs in conjunction with a Google Map. While there might be circumstances where a negative tying claim could be supported by mere uncertainty as to the possible scope of terms of service, plaintiffs have not presented plausible factual allegations that Google has precluded its Maps APIs customers from turning to its competitors for their routes and places API needs, either by the express terms of the TOS, or through some chilling effect arising from ambiguity or possible implication, or through any other means.

Google has acknowledged its TOS expressly prohibit using its Places APIs with non-Google Maps. Were plaintiffs alleging Google was using market power in a validly defined places API market to coerce purchases of its products in a validly defined tied market for maps APIs, a negative tying claim likely would be viable. Because Google does not preclude its Maps APIs customers from using competitors' places or routes, however, the negative tying claim plaintiffs are attempting to advance fails.

B.  *Coercion*

Plaintiffs do not disavow their previous allegations that competitors offer "better" and "cheaper" maps APIs than Google. To the contrary, their opposition repeats that assertion. Opp. at p. 20 ("competitors offer[] maps APIs . . . that are better or cheaper than Google's Maps APIs"); Opp. at p. 21 ("competitors offered better or cheaper maps APIs"). Plaintiffs insist they appropriately "no longer focus on" those allegations now that they have revised their theory in

1  light of the prior dismissal order.

2        Plaintiffs have explained *why* they have omitted, or de-emphasized, those prior allegations,
3  but they have not provided a basis for disregarding them. *See Morales v. City & Cnty. of San*
4  *Francisco*, 603 F. Supp. 3d 841, 846–47 (N.D. Cal. 2022) (dismissing complaint as implausible
5  where plaintiff omitted prior bad facts rather than explaining them in light of new theory). Even
6  putting aside the prior complaints, plaintiffs' opposition brief continues to maintain that there are
7  equivalent or superior maps API suppliers. *See Resendiz v. Cnty. of Monterey*, 2015 WL 3988495,
8  at *6 (N.D. Cal. June 30, 2015) (plaintiffs' statements in opposition brief to motion to dismiss
9  were "a binding judicial admission" warranting dismissal of complaint).

10       Plaintiffs cannot advance a plausible tying claim while simultaneously alleging that there
11 are equal or better competitors in the alleged tying market. This same principle defeated the prior
12 complaint's theory that the same product could be either tied or tying. A tying arrangement gives
13 rise to potential antitrust liability only when the seller has coerced the purchase of a tied product.
14 *See Rick-Mik Enterprises, Inc. v. Equilon Enterprises LLC*, 532 F.3d 963, 971 (9th Cir. 2008). The
15 requisite coercion cannot exist where, as plaintiffs allege here, "the buyer can obtain the tying
16 product on equally advantageous terms from other sources." P. Areeda & H. Hovenkamp,
17 Antitrust Law ¶ 1700d3 (updated Aug. 2023).

18       Plaintiffs attempt an end run around this fundamental defect by arguing that Dream Big
19 and Getify could not purchase alternative routes or places APIs "*after* purchasing Google's Maps
20 APIs." Coercion, however, must be evaluated as of the time before the plaintiff makes its
21 purchase— not after. Otherwise, the plaintiff is merely complaining of being bound to a condition
22 that it knowingly and voluntarily accepted.

23

24     C. *Market definitions and power*

25      Google correctly observes that, a plausible market definition requires explaining "why the
26 products included in the market are substitutes for one another." *Reilly v. Apple Inc.*, 578 F. Supp.
27 3d 1098, 1109 (N.D. Cal. 2022) (emphasis added). Plaintiffs contend each of the individual APIs

28

1  in each of the three alleged markets (maps, places, and routes APIs) are designed to support the
2  "same, overarching purpose." As Google observes, however, such allegations do not bear on
3  substitutability.
4    Google also correctly notes it is plaintiffs' burden to allege with supporting facts a valid
5  market, including showing the propriety of grouping together disparate products or services into a
6  market. It is unclear that they have done so here, because they have not shown purchasers need to
7  buy all the products or services in the group. *Cf. Image Tech. Servs., Inc. v. Eastman Kodak Co.,*
8  125 F.3d 1195, 1203 (9th Cir. 1997). While plaintiffs argue Google has failed to show that the
9  individual API services in each alleged market "are complements as opposed to substitutes," the
10 complementary nature of the APIs follows from plaintiffs' own allegations that they are used
11 together to support the same overarching purpose. See P. Areeda & H. Hovenkamp, Antitrust Law
12 ¶ 565 (updated Aug. 2023) ("complements are goods that are most efficiently made or used
13 together").
14    Google contends the SAC's allegations of market power fail because: (1) plaintiffs fail to
15 allege plausibly a high share of the relevant market, because their market-share allegation is based
16 on an anonymous source referring to an unknown market that does not equate to the maps API
17 market plaintiffs define here; and (2) plaintiffs do not plausibly allege any barriers preventing the
18 twelve alleged competitors from taking market share from Google if it behaved anti-competitively.
19    Standing alone, Google's arguments about the sufficiency of the allegations regarding
20 market definitions and power might not warrant dismissal at the pleading stage, even if plaintiffs
21 have not fully rebutted all of the points. The failure to support maps APIs as a relevant market in
22 which Google exercises power, however, is intertwined with the issues discussed above, and
23 further supports dismissal.

   D.  *Remaining claims*

26   Plaintiffs' exclusive dealing claim rests on the same predicate as their tying claim. See
27 Opp. at p. 23 ("[t]he negative tying effectuates exclusive dealing: Plaintiffs must only use

Google's Maps APIs, Places APIs, or Routes APIs—or none of them.") Because the allegations of a negative tie fail, so does the exclusive dealing claim.

Plaintiffs' Section 2 claim similarly fails because they have not plausibly alleged exclusionary or anticompetitive conduct. *See SmileCare Dental Grp. v. Delta Dental Plan of California, Inc.*, 88 F.3d 780, 783 (9th Cir. 1996) ("predatory or anticompetitive conduct" required for attempted monopolization). Plaintiffs' contention that "[n]egative tying, exclusive dealing, and self-preferencing in totality" cause anticompetitive harm in the relevant markets fails with the tying claim. To the extent plaintiffs contend Google has engaged in other anticompetitive conduct in the relevant markets, they have not offered sufficient non-conclusory factual allegations to support a Section 2 claim.

Finally, the sole basis plaintiffs offer for their UCL claim is that they have alleged an antitrust claim. See Opp. at p. 25. The failure of their antitrust claim thus defeats their UCL claim as well.

## V. CONCLUSION

The Second Amended Complaint is dismissed without leave to amend. A separate judgment will be entered.

**IT IS SO ORDERED**.

Dated: July 15, 2024

_____
RICHARD SEEBORG
Chief United States District Judge